U.S.C.A. No. 13-10444
U.S.D.C. No. 2:11-cr-00731-SRB-2

_____

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ARTEMIO PENA-TORRECILLAS,

Defendant-Appellant.
_____

Appeal from a Judgment of the United States District Court

District of Arizona
_____

**BRIEF OF APPELLANT**
_____

Nancy Hinchcliffe
Attorney-at-Law
State Bar No. 004052
5025 North Central Avenue, # 616
Phoenix, Arizona 85012-1505
(602) 252-3200
Attorney for Defendant-Appellant

# **TABLE OF CONTENTS**

**Title**                                                                    **Page**

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**Table of Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

**Statement of Jurisdiction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    District Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  Timeliness of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV.  Bail Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Statement of Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    Issues One and Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Issues Three and Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  Issue Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Statement of the Case** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.   Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     A. Issues One and Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          1. Probable Cause for the Wiretap Applications . . . . . . . . . . . . . . . 9

          2. TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

a. TT1–June 4, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

b. TT2–July 13, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

c. TT3–August 30, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . 13

d. TT4–September 29, 2010 . . . . . . . . . . . . . . . . . . . . . . . . 16

e. TT5–October 5, 2010 and TT6–October 28, 2010 . . . . . . 17

f. TT7 Tracking Warrant–November 3, 2010 . . . . . . . . . . . 17

g. TT7 Tracking Warrant–January 4, 2011 . . . . . . . . . . . . . 18

h. TT7 Toll Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

3. TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

a. Prior Authorizations . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

b. TT9 Listed Targets . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

c. Castro-Perez and Cruz Investigations . . . . . . . . . . . . . . 20

d. TT7 Interceptions and Surveillance . . . . . . . . . . . . . . . . 22

e. TT9 Tracking Warrant–February 17, 2011 . . . . . . . . . . . 28

f. TT9 Toll Information and Analysis . . . . . . . . . . . . . . . . . 29

4. Necessity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

a. Investigations to Date Demonstrated the Need for
Further Interceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

b. Normal Investigative Techniques Previously Employed . 31

i.  Confidential Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ii.  Undercover Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

iii.  Consensual Recordings . . . . . . . . . . . . . . . . . . . . . . . . 32

iv.  Physical Surveillance  . . . . . . . . . . . . . . . . . . . . . . . . . 33

v.  Pen Registers, Trap and Trace Devices, Toll
    Analysis and Telephone Subscriber Information  . . . . 34

vi.  Tracking Devices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

vii.  Mobile Number Recorders (MNR) . . . . . . . . . . . . . . 35

viii. Search Warrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        (a)  TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 36

        (b) TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 37

        (c) Both Affidavits . . . . . . . . . . . . . . . . . . . . . . 37

ix.  Interviews, Grand Jury Subpoenas and Immunity  . . . 38

        (a) TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 38

        (b) TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 38

        (c) Both Affidavits . . . . . . . . . . . . . . . . . . . . . . 39

x.  Trash Searches  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        (a) Both Affidavits . . . . . . . . . . . . . . . . . . . . . . 39

        (b) TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 40

-iii-

(c) TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . 40

xi. Pole Cameras . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

(a) TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . 41

(b) TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . 41

xii. Financial Investigation . . . . . . . . . . . . . . . . . . . . . . . . 42

(a) TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . 42

(b) TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . 42

5. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**Summary of Arguments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

I.   Issues One and Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A.  Summary of Argument One . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B.  Summary of Argument Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

II.  Issues Three and Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

A.  Summary of Arguments Three and Four . . . . . . . . . . . . . . . . . . . 48

III. Issue Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

A.  Summary of Argument Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**Arguments One and Two** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

I.   Issues One and Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

-iv-

II.    Standard of Review for Issues One and Two . . . . . . . . . . . . . . . . . . . . . . . 51

III.   Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

       A.  Standing to Challenge the Wiretap Authorizations  . . . . . . . . . . . . . . 52

       B.  Probable Cause for Wiretap Authorization . . . . . . . . . . . . . . . . . . . . . 53

       C.  Facts Used to Establish Probable Cause in the TT7 Application . . . . . 54

              1.  Castro-Perez DTO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

              2.  The McDowell Apartment Complex Connection . . . . . . . . . . . . 56

              3.  Surveillance and Phone Conversations . . . . . . . . . . . . . . . . . . . 58

              4.  Tracking Warrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

              5.  Toll Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

       D.  Lack of Probable Cause to Support the TT7 Wiretap Authorization . . 60

       E.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

       F.  Facts Relied upon to Establish Probable Cause in TT9 Application  . . 65

              1.  Surveillance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

              2.  Surveillance and Intercepted Conversations . . . . . . . . . . . . . . . 66

              3.  Telephone Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

                     a.  Giving Directions for Meeting  . . . . . . . . . . . . . . . . . . . . 67

                     b.  Put Papers Where the Stove Is  . . . . . . . . . . . . . . . . . . . . 68

                     c.  Chiquillo Took the Groceries to Tommy  . . . . . . . . . . . . 68

    d. Lend Him the Black One–But I Only Need Four . . . . . . . 68

    e. Call El Senor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

   4. Money Seizure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

   5. Toll Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

  G. Lack of Probable Cause to Support the TT9 Wiretap Authorization . . 70

  H. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

**Arguments Three and Four** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

I. Issues Three and Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

II. Standard of Review for Issues Three and Four . . . . . . . . . . . . . . . . . . . . 75

III. Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

  A. Background and Objective of the Investigation . . . . . . . . . . . . . . . . . 76

  B. Necessity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

   1. Statutory Requirements to Prove Necessity . . . . . . . . . . . . . . . 77

   2. Necessity for Each Target Telephone and Targeted
   Conspirator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

   3. Investigative Procedures Must Be Tried for a Reasonable
   Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    a. Cruz Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

    b. Artemio Investigation . . . . . . . . . . . . . . . . . . . . . . . . . 83

   4. Effective Traditional Investigative Techniques not Employed . . 85

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

**Argument Five** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

I.  Issue Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

II.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

III.  Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

**Certificate of Compliance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

**Statement of Related Cases** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

**Certificate of Service** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

# TABLE OF AUTHORITIES

**Authority**                                                   **Page(s)**

**Constitution**

Amendment 4  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 44, 48, 51, 75

**Cases**

Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873 (1967) . . . . . . . . . . . . . 54
Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317 (1983) . . . . . . . . . . . . 52, 54
Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429 (1966) . . . . . . . . . . 54
United States v. Abascal, 564 F.2d 821 (9th Cir.1977) . . . . . . . . . . . . . . 53
United States v. Aldana-Ortiz, 6 F.3d 601 (9th Cir.1993) . . . . . . . . . . . . 96
United States v. Angulo-Lopez, 791 F.2d 1394 (9th Cir.1986) . . . . . . . . . 63
United States v. Bennett, 219 F.3d 1117 (9th Cir.2000) . . . . . . . . . . . 80, 82
United States v. Blackmon, 271 F.3d 1204 (9th Cir.2001) . . . . . . 77, 85, 91
United States v. Brown, 761 F.2d 1272 (9th Cir.1985) . . . . . . . . . . . . . . 52
United States v. Canales Gomez, 358 F.3d 1221(9th Cir.2004) . . 51, 52, 75
United States v. Carneiro, 861 F.2d 1171
        (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 74, 78, 79, 80, 92
United States v. Cervantes, 703 F.3d 1135 (9th Cir.2012) . . . . . . 52, 63, 73
United States v. Collins, 559 F.2d 561(9th Cir.),
        *cert. denied*, 434 U.S. 907, 98 S.Ct. 309 (1977) . . . . . . . . . . . . . . 61
United States v. Commito, 918 F.2d 95 (9th Cir.1990) . . . . . . . . . . . . . . 80
United States v. Connell, 960 F.2d 191(1st Cir.1992) . . . . . . . . . . . . . . . 96
United States v. Fernandez, 388 F.3d 1199 (9th Cir.2004) . . . . . . . . . 53, 62
United States v. Forrester, 616 F.3d 929 (9th Cir.2010) . . . . . . . . . . . . . 76
United States v. Gann, 732 F.2d 714 (9th Cir.), *cert. denied*,
        469 U.S. 1034, 105 S.Ct. 505 (1984) . . . . . . . . . . . . . . . . . . . . . . . 61
United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820 (1974) . . . . . . . . 77
United States v. Gonzalez, Inc., 412 F.3d 1102 (9th Cir.2005) . . . 77, 78, 79
United States v. Ippolito, 774 F.2d 1482 (9th Cir.1985) . . . . . . . . . . . . . 85
United States v. King, 478 F.2d 494 (9th Cir.1973) . . . . . . . . . . . . . 53, 77
United States v. Landis, 726 F.2d 540 (9th Cir.1984) . . . . . . . . . . . . . . . 62
United States v. Lynch, 367 F.3d 1148 (9th Cir.2004) . . . . . . . . . . . . . . 51

United States v. Lynch, 437 F.3d 902 (9th Cir.2006) . . . . . . . . . . . . . . . . 75

United States v. Macklin, 902 F.2d 1320 (8th Cir.1990) . . . . . . . . . . . . . . 53

United States v. Meling, 47 F.3d 1546 (9th Cir.1995) . . . . . . . . . . . . . 51, 53

United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770 (1993) . . . . . . . . . 94

United States v. Pelisamen, 641 F.3d 399 (9th Cir.2011) . . . . . . . . . . . . . 94

United States v. Pitts, 6 F.3d 1366 (9th Cir.1993) . . . . . . . . . . . . . . . . . . 62

United States v. Rivera, 527 F.3d 891 (9th Cir.2008) . . . . . . . . . . . . . . . 75

United States v. Sanders, 67 F.3d 855 (9th Cir.1995) . . . . . . . . . . . . . . . 96

United States v. Shryock, 342 F.3d 948 (9th Cir.2003) . . . . . . . . . . . . 52, 76

United States v. Spagnuolo, 549 F.2d 705 (9th Cir.1977) . . . . 65, 74, 92, 93

United States v. Stanert, 762 F.2d 775, *amended* 769 F.2d
        1410 (9th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

United States v. Tham, 960 F.2d 1391 (9th Cir.1992) . . . . . . . . . . . . . . . 53

United States v. Wales, 977 F.2d 1323 (9th Cir.1992) . . . . . . . . . . . . . 50, 96

Williams v. United States, 651 F.2d 648, 650 (9th Cir.1981) . . . . . . . . . . 94

## United  States Code

18 U.S.C. § 2510(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

18 U.S.C. § 2515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 74, 92

18 U.S.C. § 2518(1)(c) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 48, 49, 75, 78, 92

18 U.S.C. § 2518(3) . . . . . . . . . . . . . . . 3, 8, 44, 48, 51, 53, 54, 64, 73, 75

18 U.S.C. § 2518(3)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 78, 92

18 U.S.C. § 2518(10)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3582(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## United States Sentencing Guidelines

1B1.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

1B1.11(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

2D1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 49, 50, 94

2D1.1(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

2D1.1(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

**Federal Rules of Appellate Procedure**

4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
32(a)(7)(B)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

**Federal Rules of Criminal Procedure**

52(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

**Other**

Federal Bureau of Prisons Homepage, Inmate Locator at
http://www.bop.gov/inmateloc/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## STATEMENT OF JURISDICTION

### I.  District Court

Artemio Pena-Torrecillas appeals his conviction and sentence for one count (Count 1) of conspiracy to possess with intent to distribute methamphetamine, a controlled substance; one count (Count 2) of conspiracy to commit money laundering; two counts (Counts 7 and 9) of possession with intent to distribute methamphetamine, a controlled substance; and one count (Count 8) of possession of a firearm in furtherance of a drug trafficking offense.  [CR466,ER2–3[1]]

The district court had jurisdiction regarding these federal offenses pursuant to 18 U.S.C. §3231.

### II.  Court of Appeals

This appeal is from a final judgment and sentence.  The appellate court has jurisdiction pursuant to 18 U.S.C. §3742(a) and 28 U.S.C. §1291.

### III.  Timeliness of Appeal

A timely notice of appeal was filed and entered of record on August 23, 2013, pursuant to the Federal Rules of Appellate Procedure, Rule 4(b)(1). [CR467,ER2–1]

---

[1] "ER1" refers to Excerpts of Record, Volume One, followed by the page number.  "ER2" refers to Excerpts of Record, Volume Two, followed by the page number.

## IV. __Bail Status__

Pena-Torrecillas was sentenced on August 12, 2013, to 480 months in the Bureau of Prisons and is serving his sentence in a federal prison in Atwater, California.  His actual or projected release date is February 14, 2046.  [See Federal Bureau of Prisons homepage at http://www.bop.gov/iloc2/LocateInmate.jsp.

## STATEMENT OF ISSUES

### I.  Issues One and Two

Did the judge issuing the TT7 or TT9 wiretap authorizations have a substantial basis to find there was probable cause to believe, as required by 18 U.S.C. § 2518(3), that:  (1) Cruz was committing, had committed, or was about to commit drug trafficking offenses; (2) that communications relevant to these offenses would be intercepted through the wiretapping of TT7 or TT9; and (3) that Cruz would use TT7 or TT9 to discuss matters relevant to these offenses?

Did the district court abuse its discretion, in reviewing the issuing court's decision, and in violation of the Fourth Amendment, deny appellant's motion to suppress evidence of the wiretapped conversations that were admitted at trial?

### II.  Issues Three and Four

Did the issuing court err in finding that the TT7 and TT9 wiretap authorizations were supported by a full and complete statement of facts in compliance with 18 U.S.C. § 2518(1)(c) and in finding there was necessity for the wiretap authorizations pursuant to 18 U.S.C. § 2518(3)?

Did the district court, in reviewing the district court's decision, abuse its discretion, and deny appellant's motion to suppress evidence of the wiretapped conversations that were admitted at trial, in violation of the Fourth Amendment?

**III.  Issue Five**

Since Pena-Torrecillas's sentence is not final until completion of direct review and an intervening amendment has made him eligible for a two-level reduction in base offense level pursuant to U.S.S.G § 2D1.1, effective date November 1, 2014, is he entitled to a remand to the district court for consideration of a sentence reduction?

# STATEMENT OF THE CASE

## I. Procedural History

Pena-Torrecillas (Artemio) was arrested in Phoenix, Arizona, on April 12, 2011, and indicted on April 19, 2011, along with Cruz Samuel Ortega-Ruano (Cruz), Gerardo Diarte-Lara (Diarte, aka "Chiquillo"), Francisco Torrecillas-Torres (Torres, aka "Kiko") and Juan Martin Tapia-Bernal (Tapia, aka "Martin"), for drug and money laundering offenses. These offenses occurred on or before January, 2011, continuing through April 14, 2011.

On May 18, 2011, a superceding indictment was filed.

Eventually, all of the defendants entered guilty pleas. Pena-Torrecillas pled guilty to one count of conspiracy to possess with intent to distribute 500 grams or more of methamphetamine, and consented to the forfeiture allegations, on May 4, 2012.

Based upon a motion filed by newly retained counsel, the district court on December 13, 2012, allowed Pena-Torrecillas to withdraw from his plea agreement and set the case for trial.

A Motion to Suppress was filed on January 11, 2013, challenging the validity of the authorizations allowing the interception of Pena-Torrecillas's telephone conversations. The Government response and Pena-Torrecillas's reply

-5-

were filed on February 4 and 9, 2013, respectively.

The Government on March 12, 2013, filed a second superceding indictment.[2]  The first count accused Pena-Torrecillas, between January, 2011, and continuing through April 14, 2011, of conspiring with Ortega-Ruano, Diarte, Torres and Tapia to possess with intent to distribute 500 grams or more of methamphetamine.  The second count charged Pena-Torrecillas, Ortega-Ruano and Diarte, during the same time frame alleged in Count 1, with conspiracy to commit money laundering.  Count 3 charged that on April 12, 2011, Pena-Torrecillas, an alien, possessed firearms[3].  Counts, 7 and 9, charged Pena-Torrecillas with possessing methamphetamine, with the intent to distribute it, beginning on April 9, 2011, continuing through April 11, 2011 (Count 7) and beginning on April 11, 2011, continuing through April 13, 2011 (Count 9). Counts, 8 and 10, accused Pena-Torrecillas of possessing firearms, beginning on April 9, 2011, continuing through April 12, 2011 (Count 8) and beginning on April 11, 2011, continuing through April 13, 2011, in furtherance of a drug trafficking offense.  Finally, forfeiture allegations were included.  [CR396,ER2

---

[2] All four co-defendants had entered plea agreements at this point in time.

[3]The Government dismissed Counts 3, 4, 5 and 6 as they were added "in error" to the indictment. [PSR,p.4,¶4]

156]

On March 25, 2013, the district court denied Pena-Torrecillas's request for a *Franks* hearing along with his suppression motion.

[CR404,ER1–1;CR492,ER1–42]

During trial, the Government introduced numerous phone calls that had been taped during the court-ordered wiretaps that Pena-Torrecillas had unsuccessfully tried to suppress. [CR499,ER1–44-45;CR496,ER1–46-61]

A jury convicted Pena-Torrecillas on all counts on May 30, 2013.

[CR435;CR452;CR466,ER2–3]

Pena-Torrecillas was sentenced on August 12, 2013, to 480 months in the Bureau of Prisons, as follows:

> Count 1:  360 months for Conspiracy to Possess with Intent to Distribute a Controlled Substance;
> Count 2:  240 months for Conspiracy to Commit Money Laundering;
> Count 7:  360 months for Possession with Intent to Distribute Methamphetamine;
> Count 8:  120 months for Possession of a Firearm in Furtherance of a Drug Trafficking Offense; and
> Count 9:  360 months for Possession with Intent to Distribute Methamphetamine.
> Count 10:  The parties agreed that defendant should not be sentenced on this count.

[CR466,ER2–3]

The district court granted the Government's motion to consolidate Counts 8 and 10 for sentencing purposes to avoid a potential double jeopardy issue. Counts 1, 2, 7 and 9 were ordered to run concurrently. However, Count 8, the firearms count, was ordered to run consecutively to these same counts. Once released from prison, Pena-Torrecillas must serve 5 years of supervised release on five counts, 1, 7, 8 and 9; and 3 years of supervised release on Count 2 to run concurrently with the other counts. A total of $500 was imposed as a penalty assessment. No fine or restitution was imposed. Pena-Torrecillas forfeited any interest that he may have had in numerous guns, a Honda vehicle and $23,283.00. [CR466,ER2–3]

A timely Notice of Appeal was filed and entered of record on August 23, 2013. [CR467,ER2–1]

## II. <u>Statement of Facts</u>

### A. <u>Issues One and Two</u>

Did the judge issuing the TT7 or TT9 wiretap authorizations have a substantial basis to find there was probable cause to believe, as required by 18 U.S.C. § 2518(3), that: (1) Cruz was committing, had committed, or was about to commit drug trafficking offenses; (2) that communications relevant to these offenses would be intercepted through the wiretapping of TT7 or TT9; and (3) that Cruz would use TT7 or TT9 to discuss matters relevant to these offenses?

Did the district court abuse its discretion, in reviewing the issuing court's decision, and in violation of the Fourth Amendment, deny appellant's motion to suppress evidence of the wiretapped conversations that were admitted at trial?

Pena-Torrecillas sought to suppress all wiretapped statements seized pursuant to wiretap authorizations issued on January 24, 2011, on Target Telephone 7 (TT7), (480) 226-0867, used by Ortega-Ruano (Cruz), and issued on March 15, 2011, on Target Telephone 9 (TT9), (602) 722-4174, used by Pena-Torrecillas (Artemio).[4]  [ER2–14-15,106-108]  The supporting affidavits failed to set forth sufficient reliable facts to support findings of probable cause or of the necessity for resorting to the interception of private telephone conversations.

## 1.  <u>Probable Cause for the Wiretap Applications</u>

The following facts are derived from the affidavits supporting both wiretap applications.  The affidavits used many of the same facts in support of both the probable cause and necessity requirements.  The following sections delineate the facts that were found in both affidavits and those that were unique to each.

The government's broad goal in seeking wiretap authorizations for TT7 and TT9 was to determine the identity of the participants in the Cruz Drug Trafficking Organization (DTO), along with the methods, locations, and transportation routes the DTO used to conduct its business, in order to dismantle the entire organization and prosecute its members to conviction.  [ER2–16-17,108-109]

---

[4] To avoid confusion, Ortega-Ruano will be referred to as "Cruz" and Pena-Torrecillas will be referred to as "Artemio" since the affidavits repeatedly refer to them only by their first names.

Both affidavits indicated that the investigation into Cruz began as an offshoot of the investigation into Manuel Castro-Perez, one of the persons expected to be heard over TT7. In turn, the investigation of Cruz led to the investigation of Artemio.

Along with providing information about Cruz, his activities and conversations, the affiant devoted many pages providing background information regarding the Castro-Perez DTO investigation. This included surveillance of Castro-Perez, along with his intercepted conversations obtained pursuant to previous wiretap authorizations that included Cruz, a suspected customer of the Castro-Perez DTO.

The following information was relied upon to establish probable cause for the issuance of a wiretap authorization for TT7.

### 2. **TT7 Affidavit**

#### a. **TT1–June 4, 2010**

Castro-Perez was first intercepted on January 24, 2010, pursuant to a wiretap authorized by a Denver District Judge. Authorities believed that Castro-Perez was involved in drug trafficking in the Phoenix area and notified Phoenix DEA agents who began their own investigation. [ER2–19-20,22,111,114]

An investigation established that Castro-Perez lived and had stash houses in

-10-

the Phoenix area. Phoenix police were able to identify Castro-Perez during a traffic stop. [ER2–19-20]

He first became a target on June 4, 2010, when Phoenix District Judge Snow authorized a wire interception for TT1, a phone used by Cholo. [ER2–22] Castro-Perez and Mariano were intercepted over TT1. Mariano was believed to be the brother of Castro-Perez's girlfriend and a possible narcotics distributor for the DTO. [ER2–20-21,22]

Wire intercepts over TT1 revealed that Castro-Perez had several customers and answered to Chapo and Chuy. [ER2–25-26]

On June 28, 2010, agents seized $194,500, from a load vehicle that left from Castro-Perez's "former" stash house. The driver, Victor Ariel-Arreola, denied knowledge of the currency and invoked his right to counsel. Although Ariel-Arreola was part of the Castro-Perez DTO, "he is not associated with or connected to the Cruz DTO." [ER2–26,96]

### b. TT2–July 13, 2010

Castro-Perez and Mariano became targets when Phoenix District Judge Teilborg authorized a wire interception for TT2 on July 13, 2010. [ER2–22-23, 25,112]

Although Mariano was not intercepted over TT2, Genaro was first

-11-

intercepted over TT2 and believed to be a customer of the Castro-Perez DTO.

Based upon wire interceptions and surveillance, authorities believed that Castro-Perez delivered narcotics to Genaro or his associates at a McDowell apartment on July 20, 2010. [ER2–20-21,58-59] Surveillance observed Castro-Perez's vehicle enter a garage at the apartment. As this vehicle backed out of the garage, a male walked close by and appeared to communicate with Castro-Perez. This male closed the garage door and then walked away carrying a backpack. [ER2–58-59]

On July 21, 2010, officers observed Castro-Perez's white Ford Explorer meet with a Ford F250 in Phoenix which was later stopped in another county and found to contain $5,594 and 15 kilograms of cocaine. [ER2–26-27] The occupants, John Gibbons and Lisa Sayamontry, were arrested but neither provided the identity of the source of supply. Both were believed associated with the Castro-Perez DTO, but "they are not associated with or connected to the Cruz DTO." [ER2–96-97]

On July 27, 2010, a vehicle, occupied by Jose Martin-Quijada and Trinidad Encinas, that departed from Castro-Perez's "prior" stash house was stopped and found to contain $305,014. Neither answered questions about the money. Both were believed associated with the Castro-Perez DTO, but "they are not associated with or connected to the Cruz DTO." [ER2–28,97]

-12-

The next day, investigators found $118,156 during a search of this "prior" stash house. Shortly after these seizures, Castro-Perez discontinued the use of TT2. [ER2–28]

### c. TT3–August 30, 2010

Authorities initiated surveillance of the Cruz DTO in late August and continued surveillance in September, 2010. Cruz drove a black Monte Carlo and utilized residences on Orange Blossom, 82nd Lane and Hazelwood streets located within the Phoenix area. [ER2–18-19,28-29,31-32]

On August 30, 2010, Castro-Perez, Cruz, Mariano and Genaro became targets when District Judge Teilborg authorized interception of TT3, used by Castro-Perez. All had their phone conversations intercepted. This wiretap was re-authorized by Judge Teilborg on September 28, 2010. [ER2–23,112]

Cruz was first intercepted per this authorization on August 31, 2010. [ER2–18,23]

Affiant interpreted the following translated intercepted phone conversations. [ER2–13-14]

Castro-Perez called Chapo on August 31, 2010. Chapo directed Castro-Perez to deliver narcotics to Cruz as both Chapo and Castro-Perez discussed the quality of the drugs to be delivered. [ER2–32,34]

-13-

On September 1, 2010, Cruz and Castro-Perez traded phone calls discussing the location and timing of the delivery. That same day, surveillance followed Castro-Perez to the McDowell apartment complex mentioned during the July 20, 2010, surveillance. A minivan pulled up next to Castro-Perez's truck and left shortly thereafter. Although no transfer was observed, authorities believed Castro-Perez obtained narcotics from someone inside. Castro-Perez was next observed at a Fry's store parking lot. Based upon wire interceptions and surveillance, authorities believed Cruz sent a courier driving a white Honda to meet with Castro-Perez and receive the drugs. [ER2–34-36,59-60] Later that day, Castro-Perez called Chapo informing Chapo that Cruz had taken them. Later that afternoon, Cruz called Castro-Perez stating that they did not coagulate and were runny or loose and that he would hand them to Castro-Perez later on. [ER2–36-37]

On September 6, 2010, surveillance observed Castro-Perez and an unknown occupant in Castro-Perez's Sport Track meet with someone in Cruz's Monte Carlo at a Phoenix condominium. An agent observed a hand to hand transaction in the parking lot between the two unknown individuals. [ER2–61]

Based upon wire interceptions and surveillance, authorities believed that Castro-Perez delivered narcotics to Genaro or his associates at the McDowell

-14-

apartment again on September 15, 2010.  Castro-Perez was observed in a garage,

utilized by Genaro's DTO, talking to two individuals who later drove a Ford

Expedition into the same garage after hauling some storage containers back and

forth.  Later the two men went to a Best Buy store.  The Monte Carlo, believed to

be Cruz's, was parked in the same parking lot.  Later the Monte Carlo traveled to

the McDowell apartment complex and parked along side the Expedition where a

man exited and spoke to someone in the Monte Carlo.  The Monte Carlo then left

the lot.  The Expedition was observed later that day leaving the apartment complex

and was followed and stopped and searched by the California Highway Patrol.

Officers found five kilograms of cocaine secreted in a compartment and its driver,

David Barraza, was arrested but invoked his rights.  Barraza was believed

associated with the Castro-Perez DTO, but "he is not associated with or connected

to the Cruz DTO."  [ER2–29-30,61-63,97]

Based on TT3 intercepted calls and surveillance, agents learned that Castro-

Perez would and did meet with Javier Lopez-Felix in Phoenix on September 18,

2010.  Lopez-Felix, who was stopped later in Las Vegas and found to be carrying

approximately two kilograms of cocaine, refused to make any statements.  He is

believed to be associated with the Castro-Perez DTO, but "he is not associated

with or connected to the Cruz DTO."  [ER2–30-31,97-98]

On October 8, 2010, the agents recorded two phone calls, and on October 11, 2010, one additional phone call, placed between Castro-Perez on TT3 and Cruz on what became TT7. These calls, according to affiant, discussed a problem with a specific amount of drugs whose quality was bad. [ER2–38-45] The October 11, 2010, call discussed a meeting between the two men at an apartment where Cruz would take "shit" or "it". The affiant believed "it" to be narcotics. [ER2–44-45]

### d. <u>TT4–September 29, 2010</u>

Cruz, Castro-Perez, Mariano and Genaro were again targets when on September 29, 2010, District Judge Martone authorized wire interception of TT4, a telephone used by Castro-Perez. Castro-Perez was intercepted pursuant to this authorization. [ER2–23,112]

TT4 interceptions were terminated early on October 13, 2010, "due to the lack of discussions regarding drug trafficking activities." [ER2–23,49]

On October 19, 2010, investigators seized $118,000 hidden in a vehicle driven by Osiel Guadalupe Mendoza after it left Castro-Perez's Poinsettia stash house. Mendoza claimed no knowledge of the money and was released. The affiant believed that "Mendoza was associated with the Castro-Perez DTO, but he is not associated with or connected to the Cruz DTO." [ER2–31,98]

-16-

After this, Castro-Perez disappeared.  [ER2-20]

### e.  TT5–October 5, 2010 and TT6–October 28, 2010

Castro-Perez was "a listed target" on the remaining authorized wiretaps for TT5 and TT6, telephones utilized by Aviles-Contreras.   "[N]one of the target subjects were intercepted . . ."  These authorizations were approved by District Judge Teilborg on October 5, 2010 (TT5) and October 28, 2010 (TT6).   [ER2–23-24]

### f.  TT7 Tracking Warrant–November 3, 2010

A TT7 tracking warrant was authorized on November 3, 2010.  On unspecified dates TT7 was located at the Orange Blossom, 82nd Lane and Hazelwood addresses.  [ER2–32]

On November 4, 2010, the Monte Carlo, believed to be driven by Cruz, parked in the driveway at the Orange Blossom address.  A Ford F150 entered the garage and the door closed.  A Hispanic male exited the house, placed a white cooler into the Monte Carlo's trunk and drove away and returned twenty minutes later.  Shortly thereafter, two Hispanic males left the house.  One man placed a black plastic bag into the Monte Carlo.  The men drove away.  The Ford F150 exited the garage and followed the Monte Carlo.   Both vehicles parked next to each other at a Fry's parking lot.  The F150's driver exited the truck and accepted a

-17-

black bag from someone inside the Monte Carlo.  The Monte Carlo left, obtained
gas from a Shell gas station and returned to the same parking lot in a different row.
A man exited the F150 and walked toward the Monte Carlo.  Surveillance could
not determine if he entered the Monte Carlo.  A different Hispanic male came from
an area close to the Monte Carlo and entered the F150.  Both vehicles exited the
parking lot.  [ER2–63-67]

On January 3, 2011, surveillance followed a silver Ford van from the 82nd
Lane address to another address.  Investigators had previously seen this van at the
Orange Blossom address.  [ER2–67]

### g.  TT7 Tracking Warrant–January 4, 2011

On January 4, 2011, surveillance observed an unknown male with a yellow
bag enter the Monte Carlo while parked in the Hazelwood driveway.  Later, the
Monte Carlo left Hazelwood and entered the Orange Blossom garage.  A subject
left the Orange Blossom house, placed something into the backseat of a Honda
Civic parked in front of the house, and then drove to an area near 88th Avenue and
Cherry Lynn.  Later in the day, the Monte Carlo again parked in the garage at
Orange Blossom.  A Hispanic male driving a light green Volkswagen with a
temporary license plate parked in the Orange Blossom driveway and walked to the
front door.  Later, he left the house with an envelope, drove to the 82nd Lane

-18-

residence and placed a license on the rear of the Volkswagen. He then went to the Phoenix College parking garage and after ten minutes left and went to Walgreen's. [ER2–67-69]

A second TT7 tracking warrant was authorized on January 4, 2011. TT7 was located at the Orange Blossom and Hazelwood residences on January 5, 2011. [ER2–32]

On January 7, 2011, the Monte Carlo and an Altima left the Orange Blossom residence, drove in tandem to a restaurant parking lot where a Ford F150 truck parked in between them. An unknown male spoke with a man, believed to be Cruz, and the driver of the Altima. The truck and Nissan left the lot together. [ER2–69-70]

### h. **TT7 Toll Records**

On January 10, 2011, agents subpoenaed the toll records for TT7. It was activated on October 3, 2010. From its activation through January 9, 2011, 2,804 calls to 173 different phones, 40 of which were Mexican based numbers, were made. The subscriber's name, Boost Boost, appeared fictitious. Drug traffickers used fictitious names and addresses when subscribing to obtain cell phones to hide their identities, although legitimate users sometimes do this. [ER2–45,48-49]

TT7 was in contact eleven times with a telephone utilized by Wilfredo

Flores-Lopez who was stopped on January 17, 2011, with one pound of methamphetamine inside his vehicle and "refused to provide information about the narcotics." [ER2–48,86]

### 3. TT9 Affidavit

#### a. Prior Authorizations

TT1 through TT6 prior authorizations were reported along with the subsequent TT7 and TT8 authorizations. [ER2–111-113]

The TT9 affidavit incorrectly informed that Artemio, Cruz, Chiquillo, Chuy and Guero were the targets of the TT7 wiretap authorized on January 24, 2011. [ER2–14,113]

Artemio, Cruz, Chiquillo, Chuy and Guero were the listed targets of TT8, another phone utilized by Cruz, but only Cruz and El Senor were intercepted over TT8 which was authorized on February 22, 2011. [ER2–113]

#### b. TT9 Listed Targets

Artemio was utilizing TT9 and agents anticipated that Artemio, Cruz, Chuy, El Senor, David, Chiquillo, Guero and Kenny would be intercepted over TT9. [ER2–109-111]

#### c. Castro-Perez and Cruz Investigations

A short summary, not a detailed version, of the Castro-Perez investigation

was provided.   Investigations of Castro-Perez and Aviles-Contreras between June 2010, and November, 2010, resulted in traffic stops and search warrants that garnered approximately $2,622,454, two handguns and 22 kilograms of cocaine. [ER2–114]

Based on TT3 wire intercepts, investigators believed that Cruz operated a drug cell in the Phoenix area and distributed narcotics to customers. "Investigators have learned of possible customers to whom the Cruz DTO is delivering narcotics as well as possible Sources of Supply (SOS) for the DTO. Investigators are attempting to identify several more customers and members of the DTO as well as the full scope and operation of the DTO."  [ER2–117-118] Based on intercepted calls, authorities believed Artemio lived at Cruz's new San Miguel residence and was a "facilitator for the DTO and works at the direction of Cruz."  [ER2–110]

Affiant reported the following incidents that were reported in the TT7 affidavit:

1.  August 31/September 1, 2010, conversations where Chapo and Castro-Perez, and Cruz and Castro-Perez, discussed the delivery and return of what was believed to be bad quality drugs along with the surveillance.  [ER2–114-115]

2.  September 15, 2010, surveillance where Castro-Perez was seen in the

-21-

McDowell apartment garage talking briefly to two males connected to a Ford Expedition that was stopped in California with five kilograms of cocaine. [ER2–115-116]

Authorities connected Cruz to the Orange Blossom residence but not to the owner of record, David Chacon.  [ER2–114-115]   Surveillance indicated that Cruz lived at a new house on San Miguel.  They also believed that the 82nd Lane, Hazelwood and possibly 65th Drive addresses were used by the Cruz DTO. However, they were unable to connect Cruz or Artemio to the respective owners of these residences.  [ER2–110,116-117]

### d.  TT7 Interceptions and Surveillance

On February 1, 2011, a male drove a Monte Carlo from nearby the Cruz residence to the Hazelwood residence.  A male exited the home and entered the car.  The men drove to and entered a storage facility.  Shortly thereafter, they left and drove to an area near the San Miguel address.  Surveillance terminated. [ER2–132-133]

Later, a red Volkswagen exited Cruz's gated community.  It went to a strip mall and a carniceria where a male entered the vehicle and left.  Surveillance terminated.  [ER2–133]

On February 3, 2011, a red Volkswagen, believed to be used by Cruz, left

his garage and returned a half hour later. [ER2–133-134]

The same Honda Civic seen during January 4, 2011, surveillance left the Hazelwood address that afternoon. [ER2–134]

A Ford van, previously observed during surveillance on January 3, 2011, arrived at the 82nd Lane address. A female and person thought to be Guero exited the residence. She drove away in the van. Guero walked down the street, returned and entered the home. [ER2–133-134] A Mitsubishi Endeavor parked in the driveway. Guero and a male talked inside the garage. The Mitsubishi left and was followed to a business location where surveillance terminated. [ER2–134] Later, Guero left 82nd Lane in a green Volkswagen, parked in Cruz's driveway and walked to the front door. [ER2–135]

A silver/maroon taxi parked in Cruz's garage, the door closed. After thirty minutes, it left. The taxi went to a Laveen address. [ER2–135]

On February 7, 2011, based on intercepted calls, agents watched a Denny's restaurant expecting Cruz to meet with an unknown male. No Cruz vehicles were observed and surveillance was terminated. [ER2–135]

Based on intercepted calls, authorities believed Cruz was planning a narcotics transaction at 67th Avenue and Thomas Road that same day and would loan a vehicle to one of the participants. At 2:50 p.m., a grey Honda Civic pulled

into Cruz's driveway and quickly left. A black Ford 150 truck parked on the corner of 67th Avenue and Thomas Road. [ER2–135] The red Volkswagen parked next to the truck. The truck's passenger and the Volkswagen's driver exited and spoke briefly. The Honda Civic pulled next to the Volkswagen. The Volkswagen driver entered the passenger seat of the Honda Civic. The Ford truck passenger drove off in the Volkswagen as the two other vehicles left. The Volkswagen followed the Ford truck, drove into a residential neighborhood and later returned to 67th Avenue and Thomas Road. Both vehicles left taking the same route. The Ford truck was seen at a residence on 68th Avenue. [ER2–136]

Authorities, based on an intercepted call, believed Cruz told someone to bring money to the house. Tracking data indicated TT7 was at 64th Drive and Indian School. The red Volkswagen and Honda Civic were observed "driving in tandem in the area." Surveillance ended because agents believed they had been spotted. [ER2–136]

On February 10, 2011, a man called Cruz, who answered on TT7, asking Cruz for directions to a specific location where they could meet. Cruz asked Artemio, who was in the background, to give directions to the location, which he did both in the background and later directly answering on the phone. [ER2–118-120]

-24-

Affiant concluded the male was asking for directions from Cruz and Artemio so that the male could deliver "a suspected load of illegal narcotics to Cruz." [ER2–120]

On February 10, 2011, based on intercepted calls, investigators believed Cruz was going to deliver narcotics to Gil. The Monte Carlo left the Cruz residence and went to a home on Marshall street. TT8 and TT9 were tracked to this residence. The Monte Carlo left the residence during the afternoon. A Toyota cruiser then left the Marshall home, went to Home Depot and three males bought cellophane and tape and returned to the Marshall address. One male placed three bags and a suitcase into a Cadillac parked at the residence. This male then worked on the front passenger door panel. Another male appeared to look up and down the street while the man worked on the door panel. The Cadillac eventually left the residence and was stopped near Kingman, Arizona. Although a dog alerted to the doors, no drugs or money were found inside. [ER2–136-137]

On February 11, 2011, Cruz using TT7 called TT9. Cruz asked what happened? Artemio stated, "Hey, I put the papers–those, those of Dori [Phonetic]–I put them there, where the stove is. Haven't you, haven't you turned it on?" Cruz told him he had not. Artemio indicated, "Oh, because I put the papers there and, and–I just forgot to tell you guys yesterday. So, so they won't

-25-

get burned." Cruz commented that he would check it for him right now. Artemio stated, "They are there–put inside through the bottom, man." [ER2–120]

Drug traffickers speak in code and affiant opined that "papers" referred to drug proceeds. [ER2–120]

On February 13, 2011, Artemio using TT9 called Cruz using TT7. Artemio told Cruz he left it there and did not think Cruz was there because the car was not there. Cruz indicated Martin was there and "Chiquillo went to take the groceries to Tommy." Artemio offered to pick up Cruz but Cruz wanted to wait and see if Chiquillo returned. [ER2–120-121]

The affiant opined that "groceries" was code for narcotics and that Chiquillo had delivered drugs. [ER2–120-121]

That same day, Artemio using TT9 called Cruz using TT7. Cruz indicated that Guero was at the house and asked Artemio if he was going to take "[unintelligible]" to Martin. Artemio agreed but stated, "Why don't you lend him the black one?" Cruz said that's fine but stated that he was going to need two because two were used and Cruz was being asked for some tomorrow. Cruz stated, "I'm going to leave you five." Artemio indicated that "[w]e're only going to need four. I only need four." Cruz and Artemio then discussed the numbers and that Cruz would send Guero over there in the black car. [ER2–121,123]

-26-

The affiant's interpretation was that "Cruz called Artemio asking for a certain amount of narcotics. When Artemio indicated he only needed four, they were "discussing quantity of narcotics." [ER2–123]

On February 17, 2011, the Monte Carlo left the Cruz residence traveling to a business location. Cruz was believed in the car because TT7 and TT8 were pinpointed at that location. Agents temporarily lost sight of the Monte Carlo but located it at Wal-Mart. Two men exited the store and entered the Monte Carlo already occupied by another man. Surveillance followed them to a Home Depot where they bought grilling supplies. The car was observed going to another store and surveillance was ended. [ER2–138]

On February 22, 2011, the Honda Civic left the Cruz residence and went to a bank where it parked next to a Lexus registered to a female who had a bank account that authorities, based on intercepts, suspected was used by the Cruz DTO for its proceeds. A female exited the Honda and entered the Lexus. Both vehicles left the bank. The Honda Civic went to the Hazelwood address. Later, the Honda Civic and a white Honda left Hazelwood and parked next to a Ford Explorer in a Walgreen's parking lot. Several Hispanic males met in front of the Hondas. Authorities could not tell what these men were doing. Surveillance terminated after agents were unable to follow the vehicles. [ER2–138-139]

-27-

On February 23, 2011, Artemio using TT9 called Cruz using TT7. Artemio apparently called El Senor and El Senor wanted Cruz to call him. Artemio relayed the phone number to Cruz who stated he already had the number and would call. [ER2–122]

The affiant believed that Artemio provided Cruz with El Senor's number. [ER2–122]

On February 24, 2011, based on intercepts agents believed that Chiquillo would pick up narcotic proceeds and poor quality narcotics from Gil. The Monte Carlo left the Cruz residence traveling to the Marshall address. Shortly thereafter, it left and went to the Hazelwood address where surveillance was terminated. [ER2–139-140]

On March 1, 2011, a Toyota Solara arrived and left the Cruz residence. After a traffic stop, authorities found $123,034 inside a hidden compartment. Its occupants, Pedro and Delores Hernandez invoked their rights upon arrest. [ER2–140,149]

### e. TT9 Tracking Warrant–February 17, 2011

A TT9 tracking warrant authorized on February 17, 2011, located TT9 on February 17, 21, 24 and 26, 2011, at the San Miguel home. [ER2–118] "Surveillance has been established numerous times in the area of the Cruz

-28-

residence, but investigators have not been able to establish a pattern of when

Artemio leaves the residence."  [ER2–132]

### f. TT9 Toll Information and Analysis

Authorities subpoenaed the toll records for TT9 subscribed to by Boost

Boost.  The subscriber address was a default address used by Sprint/Nextel.  Drug

traffickers used fictitious names and addresses to hide their identities although

legitimate users may also do this, as well.  [ER2–126-127]

From TT9's activation on December 21, 2010, through February 25, 2011,

4,303 calls to 208 different phones, 72 of which were Mexican based, were made.

[ER2–126]  One call occurred between TT9 and El Senor's number.

During this period, TT9 contacted a number utilized by David eighty-eight

times.  David's number had  been intercepted over TT7.  [ER2–124]   Agents

believed David was involved in the management of the Cruz DTO's narcotics

proceeds. [ER2–124-125]

### 4. Necessity

### a. Investigation to Date Demonstrated the Need for Further Interceptions

Interception of TT7 and TT9 communications was necessary "because

normal investigative techniques have failed or appear reasonably unlikely to

succeed if tried, or are too dangerous to be tried, as more fully explained below."
[ER2–17,49,109,127]

Both affidavits contained the following information to justify a necessity finding, unless otherwise noted.

The previous interceptions had produced evidence of the structure of the Castro-Perez and Aviles-Contreras DTOs.  [ER2–49,51-52,127]

Although interception over TT3  had shown that Cruz was Castro-Perez's customer, none of these wiretaps had provided enough information to prosecute the Cruz DTO to the fullest extent and achieve the goals of the investigation. Interception of TT7 and TT9 was necessary to find all the stash houses, locations, vehicles, distribution networks, transportation routes, times of distributions, transportation methods, customers, affiliates, associates, co-conspirators, members and sources of supply of the Cruz DTO.  Merely targeting the subjects for arrest and prosecution would not dismantle the organization.  [ER2–49-52,127-128,130]

Without TT7 interception, "it will be nearly impossible to identify . . ." all DTO participants and dismantle the entire organization.  [ER2–53,130]

The affiant in TT9 further acknowledged that TT7 and TT8 interceptions had produced evidence of the Cruz DTO's structure, the identities of its members, the residences used and the Mexican sources of supply.  [ER2–127] These

-30-

interceptions had not produced evidence sufficient to prosecute the entire organization and interception of TT9 was necessary to achieve the Government's goal. [ER2–127] Not all of the "stash houses, distribution networks, customers or affiliates in Arizona. . . ." had been identified. [ER2–128]

Artemio worked at Cruz's direction and "is a facilitator for the DTO." Authorities believed that Artemio lived with and discussed the DTO's activities with Cruz. They opined that Cruz was discussing DTO business over TT9 that was not being discussed over TT7 or TT8. Artemio, affiant believed, was contacting members, customers, possible sources of supply of the DTO over TT9 that were not contacting Cruz via TT7 or TT8. [ER2–128]

### b. <u>Normal Investigative Techniques Previously Employed</u>

Both affidavits listed investigative methods that had been unsuccessfully employed or why, if not employed, it would be useless to try.

### i. <u>Confidential Sources</u>

No one had agreed to cooperate and provide information regarding the Cruz DTO. Although authorities would attempt to recruit confidential sources by debriefing those who were arrested or who had abandoned the organization, the chances of this occurring was remote. Thus, the necessity for interception of TT7 and TT9 was "all the more imperative." [ER2–54,130]

-31-

### ii. **Undercover Agents**

Most high-level narcotics traffickers, like Cruz (and Artemio was added to the TT9 affidavit), were "extremely exclusive" in whom they would deal with. They remained close-knit and secretive. They did not trust outsiders. It would be extremely difficult and dangerous for an undercover agent or outside informant to penetrate the Cruz DTO. [ER2–56-57,131]

Before dealing with an outsider, the undercover agent must have an established reputation as a drug dealer. This would take an extended period of time. Attempts to penetrate the Cruz DTO would likely fail, make the targets suspicious and circumspect and might jeopardize the agent's safety. [ER2–56-57,131]

### iii. **Consensual Recordings**

For the same reasons, consensual phone calls between an undercover agent and a target "has almost no possibility of success and would possibly compromise the investigation." The targets would become suspicious if an unfamiliar person obtained their phone numbers causing them to discard the telephones. The risk/reward of future undercover calls would have to be carefully evaluated to prevent compromising the investigation. [ER2–57-58,131-132]

### iv. **Physical Surveillance**

The TT7 affidavit reported that agents conducted physical surveillance of the Castro-Perez DTO on July 20, September 1, 6 and 15, November 4, 2010; and January 3, 4 and 7, 2011. [ER2–58-69]

Physical surveillance of the Cruz DTO reported in the TT9 affidavit occurred on January 3, February 1, 3, 7, 10, 17, 22, and 24 and March 1, 2011. Artemio was not identified as being any of those individuals surveilled. [ER2–132-140]

Despite the success of electronic surveillance (pole cameras) and physical surveillance conducted in the case, authorities had been unable "to uncover the entire organizational structure or provide sufficient evidence to prosecute all members of the DTO." [ER2–70,140]

Only wire interceptions could achieve this goal. Only the content of the phone calls could alert authorities to the time, location and purpose of the DTO's activities. This would permit pinpoint surveillance. Without wire interception, the authorities would have to engage in blanket surveillance which might alert the targets of the pending investigation. [ER2–70-71,140,143]

### v.  Pen Registers, Trap and Trace Devices, Toll Analysis and Telephone Subscriber Information

Pen registers, trap and trace devices (which were not used), and toll records (which were obtained) identify the numbers called and received by the telephone. They do not identify the caller, his location or the content of the conversation. [ER2–71,143]

Toll records were analyzed.  However, drug traffickers frequently gave false subscriber information.  None of the toll record/subscriber information was helpful in identifying any of the individuals.  [ER2–72,143-144]   Although these devices and methods "are all valuable investigative tools . . . " they would not alone achieve the goals of the investigation.  [ER2–71,143]

### vi.  Tracking Devices

Telephone tracking devices were authorized for TT7 and TT9.  This device revealed the approximate location of the target telephone but did not reveal the content of the conversation.  By itself it would not achieve the goals of the investigation.  [ER2–72,143-144]

Mobile tracking devices used GPS to determine a vehicle's location.  To enable live tracking, the vehicle's power source must be used.  This required more time and effort to install.  Since Cruz parked his Monte Carlo in his garage or on

-34-

his driveway, authorities did not want to risk being discovered. "Therefore, the live tracking option is not available in this investigation." [ER2–72-73,144-145]

A battery powered system required less exposure but did not provide live tracking. Although less difficult to install, it must be frequently serviced resulting in a greater risk of discovery. Authorities determined both were too risky to use against the Cruz DTO. Although a GPS system was extremely useful at times, it neither identified nor deciphered a person's role in the DTO. [ER2–72-74,144-145]

The TT7 affidavit, but not the TT9 affidavit, reported that in July, 2010, Castro-Perez investigators placed a battery powered GPS tracker on a gold F250. The device did not provide the current location because of sporadic reception and signal strength. [ER2–74]

Both affidavits reported that Genaro DTO investigators on September 6, 2010, placed a tracking device on a Ford Ranger. On October, 21, 2010, it located the Ranger at the 82nd Lane address. The device was removed in November, 2010, because it "will not provide any additional information in to the activities of the Cruz DTO." [ER2–74-75,145-146]

### vii. Mobile Number Recorders (MNR)

A MNR collected non-content signaling information from wireless

-35-

telephones.  Used with physical surveillance it could identify the telephone likely associated with the target.   Although an MNR would assist in identifying other Cruz DTO members and their locations, it did not provide content of the call information, therefore an MNR "alone will not be able to achieve the goals of the Government's investigation."  [ER2–76,146-147]

On December 7, 2010, and February, 2011, the court authorized the use of a MNR for the Cruz DTO.  [ER2–75-76,146]

Agents would consider its further use once more Cruz DTO members were identified.  [ER2–76,147]

### viii.  <u>Search Warrants</u>

#### (a)  <u>TT7 Affidavit</u>

High level DTO members were unlikely to store narcotics at their homes to reduce the risk of being caught with contraband.  [ER2–79-80]

On July 28, 2010, a search warrant was executed at a Castro-Perez stash house.  Investigators seized $118,156, documents and "miscellaneous" items. [ER2–78]

On November 11, 2010, police served a search warrant at the Aviles-Contreras stash house.  Authorities seized $1,881,190, cocaine, and miscellaneous documents and items.  [ER2–78-79]

The following four were found at the residence.

Aviles-Contreras admitted receiving the narcotics but not how the organization worked in Mexico. [ER2–98] There was "no connection between Cruz and Aviles-Contreras except for both dealt with Castro-Perez." [ER2–98-99]

Nevares-Meneses admitted transporting drugs for Aviles-Contreras. He refused to cooperate with the Government. [ER2–99]

Sanchez-Torres had no knowledge of criminal activity. [ER2–99-100]

Ortiz provided information regarding how the parties were related. [ER2–100-101]

None were associated with or connected to the Cruz DTO. [ER2–99-101]

On December 16, 2010, Aviles-Contreras's residence was searched. Drug paraphernalia and documents were found. [ER2–79]

### (b) TT9 Affidavit

The search warrants that had been served on the Castro-Perez and Aviles-Contreras houses were not mentioned.

San Miguel, 82nd Lane and Hazelwood addresses were believed to be used in some unknown way by the Cruz DTO. [ER2–147]

### (c) Both Affidavits

DTOs kept narcotics and proceeds at the stash houses for brief periods of

time. As of January, 2011 (TT7) and March 15, 2011 (TT9), authorities were

unsure about which of the Cruz stash houses to search. [ER2–80,147-148]

Authorities would continue to try to identify Cruz DTO stash houses which was

difficult because DTO's used multiple locations and uses. Serving a search

warrant at this time would be premature, unlikely to garner more than a fraction of

the drugs involved and jeopardize the investigation. Alerting members to the

investigation caused relocation or alteration of operating methods. [ER2–78,147]

Although search warrants might be a useful tool later towards completion

of the investigation, any warrants executed presently "would jeopardize the future

viability of this investigation."

### ix. Interviews, Grand Jury Subpoenas and Immunity

#### (a) TT7 Affidavit

Those listed in the affidavit who were detained or arrested in the Castro-

Perez and Aviles-Contreras investigations were not associated or connected with

the Cruz DTO and provided no information regarding it. [ER2–78-79,96,98-101]

#### (b) TT9 Affidavit

Pedro and Delores Hernandez arrested on March 1, 2011, after leaving the

Cruz residence refused to speak with the police and were still in custody. Affiant

concluded they would not be willing to provide any information about the Cruz

DTO.  [ER2–142,149]

### (c)  **Both Affidavits**

Wilfredo Flores-Lopez arrested on January 17, 2011, refused to answer questions and "would not provide any information to investigators regarding the structure and organization of the Cruz DTO."  [ER2–101]

Witness interviews would not produce enough evidence to prosecute the entire DTO.  DTO members would be reluctant to incriminate themselves or risk their personal safety, even if immunity was offered, "because of the very real danger of violent retaliation by the organization."  [ER2–80-81,148]

No one, including customers, was currently available to provide information about the Cruz DTO.  None would be offered immunity "since law enforcement would not know the extent of the person's involvement in the DTOs . . . ."  It was unlikely that customers or associates could provide enough information to dismantle the organization.  Any notice to them of the investigation would jeopardize the investigation.  For these reasons, no Grand Jury subpoenas would issue.  [ER2–86-87,140,149]

### x.  **Trash Searches**

### (a)  **Both Affidavits**

Trash searches would likely be unproductive.  Criminals do not put

incriminating evidence in trash, dispose of it away from the residence and place trash out shortly before pickup. Trash searches alone would be insufficient to prosecute the target subjects and advance investigative objectives. [ER2–87-88,149-150]

Cruz lived at the Orange Blossom residence until about January 10, 2011. On December 13 and 27, 2010, and January 3 and 9, 2011, agents saw a trash can at curbside. No attempt was made to search the can on three separate dates because it was daylight or on the fourth occasion because, although the can was near the home, it might belong to another residence. [ER2–87-88,149-150]

Investigators would continue to attempt a trash search at all of the Cruz DTO residences.

### (b) **TT7 Affidavit**

Authorities made only one attempt to collect trash from the 82nd Lane and Hazelwood addresses on one date, January 7, 2011. No trash can was observed. [ER2–88-89]

### (c) **TT9 Affidavit**

No trash can had been observed on the curb near the 82nd Lane residence. [ER2–150-151]

On January 14 and 28, 2010, and February 11, 2011, surveillance observed

the trash can at the Hazelwood house on the curb in direct sight line of the front door. No trash search occurred due to the can's location and since it was not routinely placed at the curb. [ER2–151]

No trash cans had been observed at the San Miguel and newly identified Laveen residences. [ER2–151]

### xi. Pole Cameras

#### (a) TT7 Affidavit

Pole cameras were placed overlooking the Orange Blossom, 82nd Lane and Hazelwood addresses on October 26, December 21 and 30, 2010, respectively. Vehicles associated with the Cruz DTO were seen at these addresses. [ER–89-90]

#### (b) TT9 Affidavit

The TT9 affidavit reported the same information as the TT7 affidavit and added the following.

The Orange Blossom pole camera installed in October, 2010, was terminated because Cruz had moved to the San Miguel address. On February 3, 2011, a pole camera was installed overlooking this San Miguel house. Vehicles were observed arriving and leaving the residences. [ER2–151-152]

On February 11, 2011, authorities installed a pole camera at a Laveen, Arizona, address because during a February 3, 2011, surveillance a silver and

-41-

maroon taxi and grey Honda Civic were observed there.  [ER2–152]

### xii.  Financial Investigations

#### (a)  TT7 Affidavit

No financial investigation was conducted of the Cruz DTO.  Until they were "fully" identified, authorities would not "utilize a wide variety of investigative techniques, including a review of public records concerning property ownership, the issuance of Grand Jury subpoenas for bank and credit card account information, and a review of financial records and checks through the Financial Crimes Enforcement Network (FINCEN) to determine the nature of suspicious financial transactions."  [ER2–90]

#### (b)  TT9 Affidavit

Based upon wire intercepts, authorities had identified two bank accounts "associated" with the Cruz DTO they believed were used for narcotics proceeds. Further information needed to be gathered before investigators would use a wide variety of investigative techniques to determine the nature of suspicious transactions.  [ER2–152-153]

### 5.  Conclusion

Based upon the information contained in the affidavits and the affiant's experience, authorities sought authorization to intercept the communications over

TT7 on January 24, 2011, and TT9 on March 15, 2011. Affiant believed that the targets have committed, are committing and will commit Title 18 offenses and that probable cause existed to believe that TT7 and TT9 were "being used to conduct and orchestrate federal drug trafficking offenses" as set forth in the respective affidavits. [ER2–93,155]

The affiant claimed that interception of TT7 and TT9 communications was necessary "because normal investigative techniques have failed or appear reasonably unlikely to succeed if tried, or are too dangerous to be tried."

<u>**SUMMARY OF ARGUMENTS**</u>

**I.  <u>Issues One and Two</u>**

Did the judge issuing the TT7 or TT9 wiretap authorizations have a substantial basis to find there was probable cause to believe, as required by 18 U.S.C. § 2518(3), that:  (1) Cruz was committing, had committed, or was about to commit drug trafficking offenses; (2) that communications relevant to these offenses would be intercepted through the wiretapping of TT7 or TT9; and (3) that Cruz would use TT7 or TT9 to discuss matters relevant to these offenses?

Did the district court abuse its discretion, in reviewing the issuing court's decision, and in violation of the Fourth Amendment, deny appellant's motion to suppress evidence of the wiretapped conversations that were admitted at trial?

**A.  <u>Summary of Argument One</u>**

Much of the information contained in the TT7 affidavit pertained to the Castro-Perez, and not the Cruz, DTO.

Although authorities observed on September 1, 2010, what they believed was a delivery of drugs that coincided with intercepted conversations on August 31 and September 1, 2010, no actual exchange was observed and the vehicles involved were never stopped and searched to verify that drugs were present.

The hand-to-hand exchange that occurred on September 6, 2010, in a

-44-

parking lot between someone in Castro-Perez's Sport Track and someone in Cruz's Monte Carlo was vaguely described. Again, neither vehicle was stopped nor searched after the exchange to verify the officer's conclusion.

According to the affiant, the September 15, 2010, seizure had nothing to do with the Cruz DTO.

The October, 2010, phone conversations between Castro-Perez and Cruz, even if drug related, occurred before Castro-Perez disappeared.

Insufficient information was presented in the affidavit that Cruz was still in the drug business or would be obtaining drugs from another source. Even if there was probable cause to believe that Cruz had committed a drug offense in September, 2010, there was no substantial basis to believe that after Castro-Perez disappeared, Cruz would be using a telephone, let alone TT7, to discuss past, ongoing or future specified crimes.

Artemio raised an objection to the validity of the TT7 wiretap authorization and the admission of numerous wiretapped conversations at his trial. These conversations served as the basis for his convictions on all counts and did not constitute harmless error. His convictions should be reversed, his sentences vacated and his case be dismissed with prejudice. In the alternative, appellant requests a remand to the district court to determine which, if any, of the counts

-45-

remain.

**B. <u>Summary of Argument Two</u>**

Agents alleged that Artemio was a facilitator for the Cruz DTO, that he discussed Cruz's DTO business with Cruz because they lived together and that Artemio was conducting business over TT9 that Cruz was not conducting over TT7. These claims are unsupported by the evidence set forth in the TT9 affidavit.

Artemio's name was not mentioned in the TT7 affidavit. The first identification of Artemio as being a participant in the Cruz DTO occurred on February 10, 2011, during the "give me directions" phone call. None of the minimal surveillance conducted during the months of February and March identified him as, or even suggested that he might be, one of the people seen leaving the San Miguel address, or traveling to and from Cruz's various residences, or being followed during surveillance throughout the Phoenix area.

The five phone calls were the best evidence cited in the TT9 affidavit in support of a probable cause finding. But the reliability and accuracy of affiant's interpretation of these phone calls was subject to question. First, there was no evidence that affiant was familiar with Spanish colloquialisms. It was not a case where a drug dealer was substituting code words for certain nouns. At least one of the conversations, "I put the papers in the stove," appeared to be confused and

-46-

nonsensical.  Whether as a result of inaccurate translation, regional speech issues

or for some other reason, the translation, according to Artemio's argument in the

district court, was unreliable.  The affidavit itself calls into question the reliability

of the Spanish-speaking phone call translations.  "The Spanish conversations were

summarized in, and in some instances translated to, English by Spanish-speaking

translators under the supervision of DEA agents.  For the purpose of this Affidavit,

quotation marks have been placed around statements taken directly from these

English-language translations and line sheet summaries." [ER2–13-14,106]  It is

unclear from the affidavit whether these conversations, including those statements

that were contained in quotation marks, were the actual translated words of the

speaker or a mere translation of the agent's summary of the call.

Finally, ordinary everyday conduct, like giving directions, telling another

person that someone wants to speak with them, meeting people in public places,

taking groceries to another, should be considered as innocent, not criminal,

conduct unless a foundation or bases is established as to why it is in fact criminal.

The affidavit did not explain why it was criminal conduct for Artemio to

call Cruz to inform him that El Senor wished to speak with him.  Although the

affiant interpreted the "take groceries to Tommy" conversation to reference

contraband, there was no surveillance or stop to coincide with this seemingly

innocent conversation, nor did affiant explain that this word had been previously used in other Cruz DTO conversations to mean some sort of contraband.

Artemio raised an objection to the validity of the TT9 wiretap authorization and the admission of numerous wiretapped conversations at his trial. These conversations served as the basis for his convictions on all counts and did not constitute harmless error. His convictions should be reversed, his sentences vacated and his case be dismissed with prejudice. In the alternative, Artemio requests a remand to the district court to determine which, if any, of the counts remain.

## II. **Issues Three and Four**

Did the issuing court err in finding that the TT7 and TT9 wiretap authorizations were supported by a full and complete statement of facts in compliance with 18 U.S.C. § 2518(1)(c) and in finding there was necessity for the wiretap authorizations pursuant to 18 U.S.C. § 2518(3)?

Did the district court, in reviewing the district court's decision, abuse its discretion, and deny appellant's motion to suppress evidence of the wiretapped conversations that were admitted at trial, in violation of the Fourth Amendment?

### A. **Summary of Arguments Three and Four**

Agents failed to comply with the necessity requirements set forth in 18

-48-

U.S.C. §§ 2518(1)(c) and 2518(3)(c). The Government did not prove, based on the four corners of each wiretap affidavit, that the investigative methods that it used were employed for a reasonable period of time. It also failed to prove, based upon the information contained in its affidavits, that the normal investigative techniques that were not used in the investigation would not likely succeed. For these reasons, the district court abused its discretion in denying the motion to suppress.

Appellant raised an objection to the validity of the wiretap authorizations and the admission of numerous wiretapped conversations at his trial. These conversations served as the basis for appellant's conviction on all counts and did not constitute harmless error. His convictions should be reversed, his sentences vacated and his case dismissed with prejudice. In the event the Court is unable to determine the effect of suppression on the various counts of conviction, then the case should be remanded to the district court for this determination.

## III. <u>Issue Five</u>

Since Pena-Torrecillas's sentence is not final until completion of direct review and an intervening amendment has made him eligible for a two-level reduction in base offense level pursuant to U.S.S.G § 2D1.1, effective date November 1, 2014, is he entitled to a remand to the district court for consideration

of a sentence reduction?

## A. **Summary of Argument Five**

A sentence is not final until the completion of direct review. While pending on appeal, an amendment to U.S.S.G. § 2D1.1 made Pena-Torrecillas eligible for a two-level reduction in offense level due to a lowering of offense levels based upon the quantity of drugs involved in the offense. If viewed as a clarifying change, rather than a substantive one, this Court will apply the change retroactively. However, in United States v. Wales, 977 F.2d 1323, 1327-1328 n.3 (9th Cir.1992) the Court determined that although a substantive change to the Guidelines favorable to Wales had occurred while the case was on appeal, it would remand the case to allow the district court to determine if his sentence should be lowered in light of a Guidelines amendment now applicable to him to avoid forcing the appellant to take an additional step and seek a modification of his sentence pursuant to U.S.S.G. §1B1.10.

## ARGUMENTS ONE AND TWO

### I.  Issues One and Two

Did the judge issuing the TT7 or TT9 wiretap authorizations have a substantial basis to find there was probable cause to believe, as required by 18 U.S.C. § 2518(3), that:  (1) Cruz was committing, had committed, or was about to commit drug trafficking offenses; (2) that communications relevant to these offenses would be intercepted through the wiretapping of TT7 or TT9; and (3) that Cruz would use TT7 or TT9 to discuss matters relevant to these offenses?

Did the district court abuse its discretion, in reviewing the issuing court's decision, and in violation of the Fourth Amendment, deny appellant's motion to suppress evidence of the wiretapped conversations that were admitted at trial?

### II.  Standard of Review for Issues One and Two

The denial of a motion to suppress wiretap evidence is reviewed *de novo*. United States v. Lynch, 367 F.3d 1148, 1159 (9th Cir.2004).

An authorization for a wiretap is reviewed for an abuse of discretion. United States v. Canales Gomez, 358 F.3d 1221, 1225 (9th Cir.2004).

An appellate court will uphold a district court's finding of probable cause if considering a totality of the circumstances the four corners of the affidavit provide a "substantial basis" for its finding.  United States v. Meling, 47 F.3d 1546, 1552

-51-

(9th Cir.1995); United States v. Stanert, 762 F.2d 775, 778-779, *amended* 769 F.2d 1410 (9th Cir.1985); United States v. Brown, 761 F.2d 1272, 1275 (9th Cir. 1985). The substantial basis must not be predicated upon conclusory statements but the application must set forth particular facts and circumstances to allow the court to make an independent evaluation of the case. Illinois v. Gates, 462 U.S. 213, 236, 239; 103 S.Ct. 2317, 2331 (1983); United States v. Cervantes, 703 F.3d 1135, 1139-1140 (9th Cir.2012).

Whether the requisite full and complete statement of facts was submitted in compliance with 18 U.S.C. § 2518(1) is reviewed *de novo.* United States v. Canales Gomez, 358 F.3d 1221, 1224 (9th Cir.2004). The district court's underlying factual determinations are reviewed for clear error. United States v. Shryock, 342 F.3d 948, 975 (9th Cir.2003).

## III. Points and Authorities

### A. Standing to Challenge the Wiretap Authorizations

Artemio has standing to challenge the legality of the January 14, 2011, and March 15, 2011, wiretaps pursuant to 18 U.S.C. §2518(10)(a) as an aggrieved person. An "aggrieved person" is one "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. §2510(11). Artemio was a party to intercepted conversations

with Cruz, the target of TT7, and was the target of TT9. This is the basis for his

standing to challenge both wiretap authorizations. United States v. Abascal, 564

F.2d 821, 825 (9th Cir.1977); United States v. King, 478 F.2d 494, 506 (9th

Cir.1973).

### B. Probable Cause for Wiretap Authorizations

In order to issue a wiretap order, a district court must find probable cause to

believe that: (1) an individual is committing, has committed, or is about to

commit specified offenses; (2) communications relevant to that offense will be

intercepted through the wiretap; and (3) the individual who is the focus of the

wiretap investigation will use the tapped phone. 18 U.S.C. § 2518(3); United

States v. Fernandez, 388 F.3d 1199, 1235 (9th Cir.2004), opinion modified on

other grounds by 425 F.3d 1248 (9th Cir.2005); United States v. Meling, 47 F.3d

1546, 1552 (9th Cir.1995).

The probable cause showing in 2518 wiretap authorization cases is the same

as that required by the Fourth Amendment for search warrant cases. United States

v. Tham, 960 F.2d 1391, 1395 (9th Cir.1992); United States v. Macklin, 902 F.2d

1320, 1324 (8th Cir.1990).

The judicial officer must:

make a practical, common-sense decision whether, given all the

circumstances set forth in the affidavit before him, including the
'veracity' and 'basis of knowledge' of persons supplying hearsay
information, there is a fair probability that contraband or evidence of
a crime will be found in a particular place.

Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).

Although the probable cause standard is the same, the Supreme Court in

Berger v. New York emphasized that in wiretap cases:

The need for particularity and evidence of reliability in the showing
required when judicial authorization of a search is sought is
especially great in the case of eavesdropping. By its very nature
eavesdropping involves an intrusion on privacy that is broad in scope.

Berger v. New York, 388 U.S. 41, 56, 87 S.Ct. 1873, 1882 (1967). This imposed a

"heavier responsibility" on courts "in supervising the fairness of procedures."

Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429 (1966).

In the instant case, based upon a review of the information contained within

the four corners of each affidavit, appellant maintains that there was no substantial

basis for the district court's finding of probable cause.

## C. **Facts Used to Establish Probable Cause in the TT7 Affidavit**

The stated purpose of obtaining wiretap authorization for TT7 was to gather

evidence against the Cruz DTO, not the Castro-Perez DTO. The following

observations and conversations were relied upon by the affiant to fulfill the

requirements of 18 U.S.C. § 2518(3) and establish that probable cause existed that

-54-

Cruz and the members of his DTO were committing, had committed or were about to commit drug trafficking offenses.

### 1. Castro-Perez DTO

The affidavit provided much information about the Castro-Perez DTO and reported that a number of individuals were found with large amounts of cash and/or drugs. According to affiant, Castro-Perez was a major drug distributor in the Phoenix area. A series of wiretaps were authorized by District of Arizona judges for phones utilized by Castro-Perez. As a result of the Castro-Perez investigation, large amounts of cash and drugs were seized. On June 28, 2010, $194,000 was seized from Ariel-Arreola after he left Castro-Perez's former stash house. On July 21, 2010, Gibbons and Sayamontry were found with $5,594 and fifteen kilograms of cocaine after meeting with Castro-Perez. Martin-Quijada and Encinas had $305,014 in the vehicle when stopped on July 27, 2010, after leaving Castro-Perez's former stash house. The next day, investigators located $118,156 during a search of Castro-Perez's prior stash house. On September 15, 2010, a Ford Expedition was stopped after two men met with Castro-Perez at a McDowell apartment complex. Barraza, the driver of the Expedition, was stopped in California later that day with five kilograms of cocaine in the vehicle. Lopez-Felix was found in possession of two kilograms of cocaine in Las Vegas after he

met with Castro-Perez on September 18, 2010.  On October 19, 2010, agents seized $118,000 secreted in a vehicle driven by Mendoza after he left Castro-Perez's Poinsettia stash house.

In all of the above seizures, affiant reported that although these people were believed to be associated with the Castro-Perez DTO, they were "not associated with or connected to the Cruz DTO."

## 2.  **The McDowell Apartment Complex Connection**

Cruz was first observed during the surveillance of Castro-Perez in late August, 2010, continuing into September, 2010.  Contemporaneously, on August 30, 2010, a wiretap authorized for TT3 named Cruz as one of those expected to be intercepted on a phone used by Castro-Perez.

Affiant declared in the TT7 affidavit that Genaro was believed to be a customer of the Castro-Perez DTO and tried to link Cruz to Castro-Perez through Genaro or his associates by their connection to an apartment on McDowell Road. Castro-Perez was believed to have delivered drugs to Genaro at the McDowell apartment on July 20, 2010, and September 15, 2010.  Agents saw Castro-Perez again at the McDowell apartment on September 1, 2010, prior to an alleged delivery of drugs to Cruz's courier in a Fry's parking lot.

The September 1, 2010, Castro-Perez sighting coincided with an

-56-

interception of conversations over TT3 beginning on August 31, 2010.

Authorities believed that Chapo directed Castro-Perez to deliver narcotics to Cruz.

Authorities interpreted September 1, 2010, conversations between Cruz and

Castro-Perez to be a discussion of the delivery details. Surveillance followed

Castro-Perez to the McDowell apartment where he met with someone in a green

van. However, no transfer was observed between the two vehicles. Castro-Perez

eventually went to a Fry's parking lot where a person, believed to be sent by Cruz,

arrived and retrieved the drugs. Later, authorities interpreted Castro-Perez, in a

wiretapped conversation, telling Chapo that he had delivered it to Cruz. Even later

that day, according to agents, Cruz and Castro-Perez discussed that they did not

coagulate and were "runny."

Although agents observed this alleged delivery of drugs, none stopped the

vehicle as had been done on several occasions during the Castro-Perez

investigation.

After Castro-Perez appeared at the McDowell apartment complex on

September 15, 2010, affiant reported that Cruz's black Monte Carlo was observed

at the McDowell apartment complex stopped next to a Ford Expedition.

Occupants from each vehicle spoke with one another. However, no transfer was

observed. As reported above, the Expedition was stopped in California and found

to contain five kilograms of cocaine.

Despite a possible implication that Cruz was involved in this transaction, the affiant made clear that the Expedition's driver "is not associated with or connected to the Cruz DTO."

### 3. **Surveillance and Phone Conversations**

On September 6, 2010, surveillance observed Castro-Perez and another in a Sport Track meet with someone in Cruz's black Monte Carlo at a Phoenix condominium. An agent observed a hand to hand transaction in the parking lot between two unknown occupants of the vehicles.

No further description of this "transaction" was provided. The implication was that contraband was being exchanged. The vagueness of this description, appellant maintains, does not suffice as a substantial basis for probable cause. Again, no one was stopped. Nothing was seized.

In two phone conversations on October 8 and one on the 11th, 2010, Castro-Perez and Cruz discussed the bad quality of what affiant interpreted to be drugs along with a meeting where Cruz would take the "shit" or "it."

### 4. **Tracking Warrants**

These warrants revealed that Cruz's phone had been at the Orange Blossom, 82nd Lane and Hazelwood street addresses. Surveillance conducted with the aid

of the tracking warrants established various cars traveling to and from each of these addresses.

On November 4, 2010, agents surveilled the Orange Blossom residence and saw an unknown male place a white cooler in the Monte Carlo's trunk and drive away. Later, a weighted black bag was placed into the Monte Carlo and driven to a Fry's parking lot. A Ford F150 left the Orange Blossom garage and parked next to the Monte Carlo where the truck's driver exited and retrieved a black bag from the car. Both vehicles then left the parking lot. Again, the truck was never stopped, as many vehicles had been in the Castro-Perez wiretap investigation.

### 5. **Toll Records**

Although the subscriber to TT7 had used a fictitious name during registration, affiant admitted that legitimate users might also do this. Although 2,804 calls had been made to 173 different phones, these occurred over a three-month period. That forty of these phones were based in Mexico during this time frame would not be incriminating since Cruz and several others native to Mexico lived in his home.

Although Cruz attempted to make one phone call during the three months to Mariano, this did not support a theory that those two were engaging in some sort of drug business. Mariano was listed in the wiretap application as a person whose

conversations might be intercepted over TT7 and a "possible associate of Castro-Perez and narcotics distributor for the DTO." Other than this one brief reference, no other information, surveillance, or conversation suggesting his participation in either the Castro-Perez or Cruz DTO was mentioned in the TT7 affidavit. Likewise, phone calls made during a three-month period to Flores-Lopez, who on January 17, 2011, was arrested with one pound of methamphetamine, with no further information provided as to the location of the arrest, did not provide a substantial basis for a finding of probable cause.

### D. Lack of Probable Cause to Support the TT7 Wiretap Authorization

The stated purpose of obtaining wiretap authorization for TT7 was to gather evidence against the Cruz DTO, not the Castro-Perez DTO.

The TT7 affidavit contained lots of information about the Castro-Perez DTO. As stated above, much of this information, including the numerous seizures and searches, had nothing to do with the Cruz DTO. To the extent that the Castro-Perez background information established that Castro-Perez had a drug trafficking organization, that he had contacts with Cruz and was a source of drugs for Cruz, this background information was relevant.

However, after October 19, 2010, the date that $118,000 was seized from a car after it left Castro-Perez's Poinsettia stash house, Castro-Perez vanished from

-60-

the scene. His absence from the Phoenix area is substantiated by the remaining

target telephone results. The TT7 affidavit informs that TT3 interception ended on

October 22, 2010. The TT4 wiretap, authorized on September 29, 2010, which

targeted both Castro-Perez and Cruz, was terminated early on October 13, 2010,

"due to the lack of discussions regarding drug trafficking activity." [ER2–49]

Although Castro-Perez was one of the listed targets of the TT5 (approved on

October 5, 2010) and TT6 (approved on October 28, 2010) authorizations, none of

the targets, including Castro-Perez, were intercepted. [ER2–23-24] It is

reasonable to assume that Castro-Perez had abandoned the drug trade, at least in

the Phoenix area, and did not want to be arrested.

    The test for judging the timeliness of a search warrant is whether there is a

sufficient basis to believe, based on a continuing pattern or other good reasons,

that the items to be seized are still on the premises. United States v. Gann, 732

F.2d 714, 722 (9th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 505 (1984); United

States v. Collins, 559 F.2d 561, 564 (9th Cir.), *cert. denied*, 434 U.S. 907, 98 S.Ct.

309 (1977).

    Appellant recognizes that in drug trafficking cases where there is "ongoing

narcotics businesses, lapses of several months–and up to two years in certain

circumstances–are not sufficient to render the information in an affidavit too stale

to support probable cause." United States v. Fernandez, 388 F.3d 1199, 1254 (9th Cir.2004); United States v. Pitts, 6 F.3d 1366, 1370 (9th Cir.1993); United States v. Landis, 726 F.2d 540, 542 (9th Cir.1984).

In the instant wiretap case, the issue becomes: Based on a continuing pattern or on other good reasons, was there a sufficient basis to believe that Cruz would still be engaging in criminal conduct and communicating about that criminal conduct over TT7 after the source of his drugs vanished in October, 2010?

The case specific facts to determine the question must be found within the four corners of the TT7 affidavit.

The investigation of the Cruz DTO began on August 30, 2010. The bulk of the information, surveillance and wire interception, provided in the affidavit to support probable cause occurred in September and early October, 2010, before Castro-Perez disappeared. The phone calls intercepted over TT3 describing what agents believed were a drug delivery from Castro-Perez to Cruz, along with the surveillance of this proposed delivery, occurred on September 1, 2010. The hand-to-hand transaction, described no further, between an unknown person in Cruz's black Monte Carlo and an unknown occupant of the Sport Track occurred on September 6, 2010. The September 15, 2010, Castro-Perez delivery of drugs

which resulted in Barraza's arrest, despite Cruz's brief appearance at the
McDowell apartment complex, had nothing to do with the Cruz DTO according to
the affiant's avowal. The two intercepted discussions between Cruz and Castro-
Perez about what agents termed "bad drugs" and their imminent return occurred in
early October, 2010, before Castro-Perez disappeared.

After Castro-Perez's disappearance, pole cameras were placed near Cruz's
house and what agents believed were the Cruz DTO stash houses. Surveillance
conducted with the aid of the tracking warrants established various cars traveling
to and from each of these addresses.

Affiant relied upon the placement of a white cooler into the Monte Carlo's
trunk and the transfer of a bag between Cruz's and another's vehicles occurring on
November 4, 2010, as evidence of drug dealing. However, the vehicles were never
stopped and without further evidence of these events being criminal in nature, it
remained merely innocent conduct, as described in United States v. Cervantes, 703
F.3d 1135, 1139-1140 (2012) (An officer's conclusion that a white box carried
from a suspected stash house contained contraband and that a suspect's detour
through a neighborhood constituted counter-surveillance, without providing a
reasonable basis for these conclusions, were insufficient to establish probable
cause; United States v. Angulo-Lopez, 791 F.2d 1394, 1397-1398 (9th Cir.1986)

(The relevant inquiry is not whether the conduct appears innocent or guilty but the degree of suspicion that attaches to noncriminal acts.)

The phone call to Mariano on November 4, 2010, who was only mentioned in an early section of the affidavit as a possible associate of the Castro-Perez DTO and never mentioned in any other substantive way, should not be considered in establishing the existence of probable cause.

### E. Conclusion

Insufficient information was presented in the affidavit that after Castro-Perez's disappearance, Cruz was, or would be, obtaining drugs from another source or that he himself was in the business of dealing drugs or would continue to use TT7, or any other telephone, to discuss past, present or future crimes.

Although it could be argued there was probable cause to believe that Cruz had committed a drug offense in September, 2010, there was no substantial basis to believe that after Castro-Perez disappeared, Cruz would be using a telephone, let alone TT7, to discuss past, ongoing or future specified crimes.

For these reasons, Artemio submits there was no substantial basis for the issuing court's finding of probable cause. All three of the mandated requirements of 18 U.S.C. § 2518(3) were not met. The district court abused its discretion in determining that the issuing court had a substantial basis to support its findings.

-64-

Artemio raised an objection to the validity of the TT7 wiretap authorization and the admission of numerous wiretapped conversations at his trial. These conversations served as the basis for his conviction on all counts and their admission did not constitute harmless error.

Artemio respectfully requests that his convictions be reversed, his sentences vacated and his case be dismissed with prejudice. 18 U.S.C. § 2515; United States v. Carneiro, 861 F.2d 1171, 1183 (9th Cir.1988); United States v. Spagnuolo, 549 F.2d 705, 711-712 (9th Cir.1977).

If this Court is unable to determine the effect of suppression on the various counts of conviction, then the case should be remanded to the district court to make this determination.

## F. Facts Used to Establish Probable Cause in the TT9 Affidavit

TT9 had been utilized by Artemio. Agents believed, based upon intercepted phone calls during TT7 interception, that Artemio was a "facilitator" for the Cruz DTO and worked at Cruz's direction. Cruz, who now lived at the San Miguel address, was still described as a "customer" of the Castro-Perez DTO. Agents believed that Artemio lived in the Cruz house. On four dates in February, 2011, TT9 was located at Cruz's house and once at the 82nd Lane property.

### 1. **Surveillance**

Surveillance in February, 2011, observed Hispanic males and vehicles come and go from the Cruz residence.  Some went to the Hazelwood residence.  Men drove to a storage facility.  Cars seen in past surveillance were observed anew. The silver Ford van, seen during January 3, 2011, surveillance, was observed at the 82nd Lane address and a Honda Civic, seen during the January 4, 2011, surveillance, was observed at the 82nd Lane address.   These locations were suspected stash houses.  Vehicles left the Cruz residence and drove to a bank, restaurant, street corner, residences, businesses, stores and parking lots. Sometimes people from these vehicles would meet and talk, sometimes not.

### 2. **Surveillance and Intercepted Conversations**

Surveillance and intercepted conversations led authorities to believe that Cruz had sent someone to meet with Castro-Perez on a few occasions to receive and return narcotics.

Sometimes agents interpreted calls to mean something that failed to bear fruit.  They expected meetings to occur and they did not.  A call led them to believe that a meeting would occur, no one showed, surveillance was terminated.

At other times, agents felt a narcotics deal would take place.  They were able to see people meeting together, but observed no exchanges between the

-66-

parties.

On February 10, 2011, based on intercepted calls, investigators believed Cruz was going to deliver narcotics to Gil. Surveillance observed the black Monte Carlo leave the Cruz residence and go to a home where tracking located TT8 and TT9. After the Monte Carlo left the home, three men exited the home and went to Home Depot where they bought cellophane and tape and returned to the home. One of the men, placed bags and a suitcase into a Cadillac parked at the residence. This Hispanic male then worked on the front passenger door panel. The Cadillac left the residence and was stopped by agents. Although a dog alerted on the car, no drugs or money was found inside the Cadillac.

In late February, 2010, an intercepted call indicated that poor quality drugs would be picked up from Gil. The black Monte Carlo left the Cruz residence and went to the same home as before, then left and went to the Hazelwood address.

### 3. **Telephone Calls**

The application presented five phone calls on TT9 claiming they demonstrated Artemio's criminal use of TT9.

#### a. **Giving Directions for Meeting**

On February 10, 2011, an unidentified male called Cruz, who answered on TT7, asking Cruz for directions to a specific location where they could meet. Cruz

asked Artemio, who was in the background, to give directions to the location, which he did both in the background and later directly answering on the phone and agreeing to meet at a specific location. [ER2–118-120]

### b. <u>Put Papers Where the Stove Is</u>

On February 11, 2011, Cruz using TT7 called TT9. Cruz asked what happened? "Artemio stated, 'Hey, I put the papers–those, those of Dori [Phonetic]–I put them there, where the stove is. Haven't you, haven't you turned it on?'" Cruz told him he had not. Artemio indicated, "Oh, because I put the papers there and, and–I just forgot to tell you guys yesterday. So, so they won't get burned." Cruz commented that he would check it for him right now. Artemio stated, "They are there–put inside through the bottom, man." [ER2–120]

### c. <u>Chiquillo Took the Groceries to Tommy</u>

On February 13, 2011, Cruz using TT7 called Artemio using TT9. Artemio told Cruz he left it there and did not think Cruz was there because the car was not there. Cruz indicated Martin was there and "Chiquillo went to take the groceries to Tommy." Artemio offered to pick up Cruz but Cruz wanted to wait and see if Chiquillo returned. [ER2–120-121]

### d. <u>Lend Him the Black One–But I Only Need Four</u>

That same day, Artemio using TT9 called Cruz using TT7. Cruz indicated

-68-

that Guero was at the house and asked Artemio if he was going to take "[unintelligible]" to Martin. Artemio agreed but stated, "Why don't you lend him the black one?" Cruz said that's fine but stated that he was going to need two because two were used and Cruz was being asked for some tomorrow. Cruz stated, "I'm going to leave you five." Artemio indicated that "[w]e're only going to need four. I only need four." Cruz and Artemio then discussed the numbers and that Cruz will send Guero over there in the black car. [ER2–121,123]

### e. **Call El Senor**

On February 23, 2011, Artemio using TT9 called Cruz using TT7. Artemio apparently called El Senor and El Senor wanted Cruz to call him. Artemio did not know what was up. Artemio relayed the phone number to Cruz who stated he already had the number and would call El Senor. [ER2–123]

### 4. **Money Seizure**

An intercepted call led authorities to observe a Toyota Solara leave the Cruz residence on March 1, 2011. After stopping the car, agents discovered $123,034 in a hidden compartment.

### 5. **Toll Calls**

Although the subscriber to TT9 had used a fictitious name during registration, something that drug traffickers do, affiant admitted that legitimate

users might also do this.  Although over 4,000 phone calls had been made to over 200 different phone numbers, these occurred over a 66-day period.  Approximately 72 of these numbers were Mexican-based.  [ER2–126]  Artemio was a native Mexican and phone calls to Mexico would not be unusual.

Eighty-eight phone calls were placed to David from TT9.  Affiant cited an intercepted phone call on TT7.  Cruz told David to tell Mayra to withdraw narcotics proceeds from the bank.  It is doubtful that Cruz referred to the money as "narcotics proceeds."

### G.  <u>Lack of Probable Cause to Support the TT9 Wiretap Authorization</u>

The affiant claimed that Artemio was a facilitator of the Cruz DTO and worked at Cruz's direction.  It was believed that he lived with Cruz.  Agents alleged that "Cruz is discussing some of the DTO's activities with Artemio in person."  Affiant also believed that Artemio was "contacting members, customers, and/or other possible sources of supply  of the DTO who are not in contact with Cruz over Target Telephone 7 or Target Telephone 8." [ER2–128]

Despite these assertions, there was insufficient evidence set forth in the TT9 affidavit to support affiant's claim that business was being discussed over TT9 that was not being discussed over TT7 or TT8.  Nor was there a substantial basis provided in the affidavit to conclude that Artemio was contacting members,

customers and possible sources of supply using TT9 that were not contacting Cruz over TT7 or TT8. [ER2–128]

Artemio's name, or even his existence as someone involved with Cruz and Cruz's DTO, was never mentioned in the TT7 affidavit which was signed on January 24, 2011. The belief that he lived with Cruz was not alleged in the TT7 affidavit. The belief that he lived with Cruz, and was involved with his drug business, was of recent vintage. The main evidence contained in the TT9 affidavit that suggested Artemio's involvement with the DTO were the five phone calls. There was no identification of Artemio's person during any of the surveillance.

The five phone calls, recited above, were affiant's best evidence that Artemio was involved with the Cruz DTO. The content of the calls were set out in detail in the TT9 affidavit.

Artemio questioned the reliability of their interpretation and meaning in the district court below. In considering the phone calls, Artemio submitted that the affiant's opinion evidence was not entitled to any weight because there was no basis for any determination that affiant was familiar with Spanish colloquialisms. He argued that this was not just a case where a drug dealer was substituting nouns or other words in place of "drugs", "money", locations or names. Some of these conversations, even if one assumed they contained coded drug terms, were

-71-

nonsensical. The papers in the stove conversation in particular, he argued, made

no sense. Even the "drug quantity" conversation fell into this category. No pole

camera footage was referenced, no surveillance occurred and no tracking devices

were used to support the affiant's conclusory interpretations. Artemio argued that

the translation was unreliable whether as a result of inaccurate translation, regional

speech differences or some other issue. The court should not have relied upon

these translations as a substantial basis for finding probable cause.

This position is supported by the affiant's own words of how the content of

the five conversations were interpreted. Affiant indicated that the statements

contained in the affidavit were based on call summaries. The intercepted phone

calls were conducted almost exclusively in the Spanish language. "The Spanish

conversations were summarized in, and in some instances translated to, English by

Spanish-speaking translators under the supervision of DEA agents. For the

purpose of this Affidavit, quotation marks have been placed around statements

taken directly from these English-language translations and line sheet summaries."

The affiant, based on his training and experience and knowledge of the

investigation, interpreted the drug-related content of the calls set forth. [ER2–106]

It is unclear from the affidavit whether these conversations, including those

statements that were contained in quotation marks, were the actual translated

words of the speaker or a mere translation of the agent's summary of the call.

Finally, the <u>Cervantes</u> case emphasized that ordinary everyday conduct and occurrences cannot be considered criminal conduct without providing a background or foundation as to why seemingly innocent conduct is in fact of a criminal nature. <u>United States v. Cervantes</u>, 703 F.3d 1135 (9th Cir.2012). Artemio argued in the district court that his giving directions in the background, and later on the phone, to someone trying to meet was innocent conduct on his part. Other than the conversation, the meeting was never observed and no one was stopped with contraband. The affidavit does not explain why it was criminal conduct for Artemio to call Cruz to inform him that El Senor wished to speak with him. Although the affiant interpreted the "take groceries to Tommy" conversation to reference contraband, there was no surveillance or stop to coincide with this seemingly innocent conversation, nor did affiant explain that this word had been previously used in other Cruz DTO conversations to mean some sort of contraband.

## H.  <u>Conclusion</u>

Appellant submits there was no substantial basis for the issuing court's finding of probable cause as to all three of the requirements mandated by 18 U.S.C. § 2518(3). The district court abused its discretion in determining that the

-73-

issuing court had a substantial basis for it findings of probable cause.

Artemio objected to the validity of the TT9 wiretap authorization and the admission of numerous wiretapped conversations at his trial. [CR 404,ER1–1; CR492,ER1–3-4,41-42;CR499,ER1–44-45;CR496,ER1–46-61]  These conversations were instrumental to his conviction on all counts and did not constitute harmless error.

Even if this Court determines that the TT9 wiretap authorization was valid, if the Court were to find the TT7 wiretap authorization invalid, Artemio would still be entitled to the same relief since the TT9 authorization was based mainly on those conversations seized pursuant to the TT7 wiretap authorization.  As fruit of the poisonous tree, all conversations admitted at trial pursuant to both authorizations would be suppressed.  18 U.S.C. § 2515; United States v. Carneiro, 861 F.2d 1171, 1183 (9th Cir.1988); United States v. Spagnuolo, 549 F.2d 705, 711-712 (9th Cir.1977).

Artemio respectfully requests that his convictions be reversed, his sentences vacated and his case be dismissed with prejudice.

If this Court is unable to determine the effect of suppression on the counts of conviction, then the case should be remanded to the district court to make this determination.

## ARGUMENTS THREE AND FOUR

## I. Issues Three and Four

Did the issuing court err in finding that the TT7 and TT9 wiretap authorizations were supported by a full and complete statement of facts in compliance with 18 U.S.C. § 2518(1)(c) and in finding there was necessity for the wiretap authorizations pursuant to 18 U.S.C. § 2518(3)?

Did the district court, in reviewing the district court's decision, abuse its discretion, and deny appellant's motion to suppress evidence of the wiretapped conversations that were admitted at trial, in violation of the Fourth Amendment?

## II. Standard of Review for Issues Three and Four

Whether a wiretap application incorporates a full and complete statement of facts supporting its compliance with 18 U.S.C. §2518(1)(c) is reviewed *de novo*. United States v. Rivera, 527 F.3d 891, 898 (9th Cir.2008); United States v. Canales Gomez, 358 F.3d 1221, 1224 (9th Cir.2004).

Whether other investigative procedures have been exhausted or why they reasonably appear not likely to succeed is reviewed *de novo*.  United States v. Lynch, 367 F.3d 1148, 1159 (9th Cir.2004).

If a wiretap is adequately supported, then this Court reviews the district court's necessity finding for abuse of discretion.  United States v. Lynch, 437 F.3d

902, 912 (9th Cir.2006)." United States v. Forrester, 616 F.3d 929, 934 (9th Cir.2010).

The district court's underlying factual determinations are reviewed for clear error. United States v. Shryock, 342 F.3d 948, 975 (9th Cir.2003).

## III. Points and Authorities

### A. Background and Objective of the Investigations

The TT7 affidavit consisted of 80 pages. The TT9 affidavit contained 49 pages. Both of these affidavits were very similar as is set forth in the Statement of Facts. They contained much of the same historical and current investigation information although the TT9 affidavit eliminated some of the historical Castro-Perez information. The necessity sections are likewise almost identical with a section-by-section comparison made in the Statement of Facts. The TT9 affidavit added the content of additional telephone calls that were captured pursuant to the TT7 wiretap along with an update of pole camera and physical surveillance.

Both affidavits state a broad objective to use the wiretap to gather evidence to lead to the identification, indictment and conviction of all members of the Cruz DTO. The agents sought to learn the various methods, items, locations and transportation routes being used to facilitate and further the Cruz DTO's drug distribution as well as the locations and methods it used to conceal its proceeds

-76-

and assets. A wiretap interception of TT7 and TT9, according to affiant, would be the only way of accomplishing the government's goal of dismantling the entire organization and producing a prosecutable case against the entire Cruz DTO for all of its criminal activities. [ER2–16-17,51,108-109,129]

The Castro-Perez investigation lasted several months. During this time, authorities were able to produce a substantial amount of evidence that he was trafficking in drugs in the Phoenix area. Wiretaps on Castro-Perez's phones allowed agents to learn about his sources, associates, customers and methods.

## B. Necessity

### 1. Statutory Requirements to Prove Necessity

"Congress was well aware of the grave threat to the privacy of every American that is posed by modern techniques of electronic surveillance. . . ." United States v. King, 478 F.2d 494, 503 (9th Cir.1973). Wiretaps should not be resorted to by law enforcement as the first meaningful step in an investigation. United States v. Giordano, 416 U.S. 505, 515, 94 S.Ct. 1820 (1974); United States v. Gonzalez, Inc., 412 F.3d 1102, 1113 (9th Cir.2005). Therefore, in addition to establishing probable cause, the Government must prove that a wiretap is "necessary" in order to overcome the statutory presumption against this intrusive investigative method. United States v. Blackmon, 273 F.3d 1204, 1207 (9th

Cir.2001). Necessity is a congressionally mandated requirement found in 18

U.S.C. §§2518(1)(c) and 2518(3)(c). A wiretap authorization must include:

> a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. §2518(1)(c). The district court must determine whether:

> normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. §2518(3)(c).

## 2. Necessity for Each Target Telephone and Targeted Conspirator

The TT7 affidavit, and the TT9 affidavit to a lesser extent, included pages

of information about the Castro-Perez investigation. Many people were stopped,

search warrants were served, Castro-Perez and his DTO were surveilled and large

quantities of drugs and cash were seized. The affiant used the success of the

Castro-Perez wiretap interceptions over TT1 through TT3 and the Aviles-

Contreras interceptions over TT5 and TT6 to help justify the need for wiretap

authorizations for TT7 and TT9. [ER–50-52;ER2–129-130]

An issuing court may not examine various wiretap affidavits together when

deciding whether a new application meets the statutory necessity requirements.

United States v. Gonzalez, Inc., 412 F.3d 1102, 1115 (9th Cir.2005); United States

v. Carneiro, 861 F.2d 1171, 1181 (9th Cir.1988). This Court has held that the

sufficiency of each wiretap application should be based on its own merits. This is

so even in conspiracy cases. The Ninth Circuit has held that even if the

Government is investigating a conspiracy each conspirator must be individually

investigated before seeking to wiretap that conspirator's telephone. The

Government must prove necessity for each target telephone and each targeted

conspirator. United States v. Carneiro, 861 F.2d 1171, 1181-1183 (9th Cir.1988).

The necessity for a previous wiretap cannot be transferred or used to justify the

necessity for a subsequent one. United States v. Carneiro, 861 F.2d 1171, 1181-

1183 (9th Cir.1988).

Although agents had conducted a substantial investigation into the activities

of Castro-Perez, the investigative techniques used in his investigation could not be

used to establish the necessity requirement mandated for both TT7 and TT9

authorizations. Likewise, the investigative techniques used to establish the

requisite necessity for TT7 could not be used to satisfy the necessity required for

the TT9 wiretap. In United States v. Gonzalez, Inc., 412 F.3d 1102, 1115 (9th

Cir.2005), the Court reached the same conclusion. A substantial investigation

using failed traditional investigative methods into illegal activity occurring at

Phoenix and Tucson bus terminals, could not be used to justify the need for a

wiretap of Los Angeles co-conspirators' phones after a very brief and limited investigation into their involvement took place.

Based on this rationale, the necessity required for the wiretap of Cruz's or Artemio's phones could not be established by the Castro-Perez investigation. Nor could the necessity requirement for the TT9 wiretap be furnished by the necessity established for TT7.

### 3. **Investigative Procedures Must Be Tried for a Reasonable Period**

In order to find there is a necessity for the issuance of a wiretap order the court must determine whether law enforcement, while using a normal amount of resources, failed to make the case within a reasonable period of time. United States v. Bennett, 219 F.3d 1117,1122 (9th Cir.2000). However, officials need not exhaust every conceivable investigative technique before obtaining a wiretap. United States v. Carneiro, 861 F.2d 1171, 1178 (9th Cir.1988); United States v. Commito, 918 F.2d 95, 98-99 (9th Cir.1990).

Artemio maintains that authorities did not adequately exhaust investigative measures and that those techniques it did employ were not used for a reasonable amount of time to give the investigation a chance to succeed before tapping into his phone. The issuing court erred in finding necessity and the district court abused it discretion in denying the motion to suppress.

-80-

### a. **Cruz Investigation**

During a wiretap on TT3, Chapo told Castro-Perez to deliver drugs to Cruz. This conversation occurred on August 31, 2010, and is approximately when Cruz first came to the attention of agents. The subsequent investigations of both Castro-Perez and Cruz led to the eventual request to place a wiretap on TT7 which was authorized on January 24, 2011.

The Cruz investigation, according to the affiant in TT7, commenced in late August or early September, 2010, and lasted over a five-month period.

Only five conversations between Cruz, using TT7, and Castro-Perez, using TT3, were reported in the affidavit. These occurred on September 1, 2010, and October 8 and 11, 2010, and were captured over the Castro-Perez TT3 wiretap.

Pole cameras were not installed at Cruz's Orange Blossom residence until October 26, 2010, and even later, on December 21, 2010, at 82nd Lane, and December 30, 2010, at the Hazelwood house.

The only physical surveillance of the DTO members occurred on seven days over a five-month long investigation. An analysis reveals that the first three days' worth of surveillance occurred on September 1, 6 and 15, 2010, as authorities were tracking Castro-Perez's movements and Cruz intersected with those movements. The November, 3, 2010, and January 3, 4 and 7 surveillance actually

concentrated on Cruz and the activities surrounding him. Telephone tracking warrants were obtained for TT7 on November 3, 2010, and again on January 4, 2011. A mobile number recorder authorization was obtained on December 7, 2010. The toll records and subscriber information for TT7 were finally obtained through an administrative subpoena on January 10, 2011, a mere two weeks before the wiretap authorization was approved. The subscriber information revealed that TT7 was not activated until October 3, 2010.

Although the Government need not exhaust all possible investigative techniques before seeking a wiretap authorization, the methods it does employ must be used for a reasonable period of time. United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir.2000).

Although the Government suggested that the investigation of the Cruz DTO started at the end of August, 2010, most of the investigative techniques relied upon by the Government to justify seeking a wiretap of TT7, occurred much closer to the January 24, 2011, authorization date. According to the TT7 affiant, these techniques were successful in producing evidence of criminal activity but not in the Government's lofty goal of dismantling the entire organization and successfully prosecuting all participants involved. The delay in implementation created a much shorter period of time, than appeared at first glance, in which these

methods were used to determine if they would achieve a realistic goal. Had these methods continued for a reasonable period of time, a wiretap on TT7 likely would have been unnecessary.

### b. Artemio Investigation

Artemio's name was never mentioned in the TT7 affidavit.

The first awareness agents had of Artemio, according to the TT9 affidavit, is when on February 10, 2011, a man called Cruz on his wiretapped TT7 phone line needing directions about where they could meet. Artemio gave directions to this person before the meeting. Within the next three days, Artemio was a party to three wiretapped TT7 conversations with Cruz, the "put papers where the stove is" call (February 11, 2011), "Chiquillo took the groceries to Tommy" call (February 13, 2011); and the "lend him the black one–but I only need four" call (February 13, 2011). Shortly thereafter, on February 17, 2011, agents obtained a telephone tracking warrant for TT9, a phone Artemio had used to make the above-referenced telephone calls. This phone, according to affiant, was located on four occasions in February at Cruz's residence and once near the 82nd Lane address. Finally, on February 23, 2011, agents intercepted Artemio's "call El Senor" call. This is the total amount of information, specifically referencing Artemio's activity, contained in the TT9 affidavit. On March 15, 2011, the authorization to wiretap TT9 was

ordered.  It is unknown to appellant how long before this date the Government

sought approval from the Department of Justice to seek this authorization.

The entire investigation of Artemio's activities took place over twenty days

in February, 2011.  Surveillance did occur during this time period; however, not

all of it was focused on determining Artemio's identity or role in the conspiracy.

The February 1, 3 and 7, 2011, surveillance occurred before the first February 10,

2011, "give me directions" phone call.  The remaining surveillance occurred on

February 10, 17, 22, 24, 2011, and March 1, 2011.  Artemio was never identified

during this surveillance.  On February 17, 2011, authorities obtained a tracking

warrant for TT9.  The telephone tracking device eventually reported that on

February 17, 21, 24 and 26, TT9 was located at Cruz's San Miguel residence and

that on February 25, TT9 was found in the area of the 82nd Lane house.  A mobile

number recorder was obtained in February, as well.  Agents obtained the

subscriber information and toll records of Artemio's phone sometime in February.

These records were analyzed as of February 25, 2011.

The investigation of Artemio, per the TT9 affidavit occurred within a one-

month period.  As with the Cruz affidavit, Artemio maintains that those limited

methods used to investigate him were not employed for a reasonable amount of

time before authorities went to the court on March 15, 2011, seeking a wiretap

authorization of TT9.

### 4. <u>Effective Traditional Investigative Techniques not Employed</u>

Both affidavits, as set forth in the Statement of Facts, gave similar justifications for the non-use of various normal investigative techniques.

In order to demonstrate that normal investigative techniques, that were not used in an investigation, would not likely have succeeded, the Government must "allege specific circumstances that render normal investigative techniques particularly ineffective." <u>United States v. Ippolito</u>, 774 F.2d 1482, 1486 (9th Cir.1985). These circumstances must include facts specific to each individual application and targeted individual, to establish the extraordinary need to eavesdrop on private citizens' conversations. Boilerplate assertions and conclusory allegations will not suffice. <u>U.S. v. Blackmon</u>, 271 F.3d 1204, 1207 (9th Cir.2001). Also, an affidavit's broad objectives cannot be used to validate what would otherwise be an unnecessary wiretap. <u>United States v. Blackmon</u>, 273 F.3d 1204, 1210 (9th Cir.2001).

No confidential sources were developed, no attempt to use undercover officers to penetrate the organization and no attempt to obtain consensual recordings had been tried in the Cruz or Artemio investigations. The affiant, in both affidavits, justified the non-use of these normal investigative methods as

follows.  Since "high-level" traffickers like Cruz and Artemio were extremely

exclusive, close knit and secretive, it would take an extended period of time for an

undercover officer or informant, to establish a reputation that might allow him to

penetrate the organization.  More aggressive attempts to penetrate the group with

undercover operatives or obtain consensual recordings might arouse suspicion and

compromise the investigation.  It would be dangerous for an undercover agent to

try an infiltrate such an organization.  [ER2–56-57,131]

This description of the Cruz DTO as being closeknit and secretive fits the

description of the typical DTO and is an inherent characteristic of most drug

conspiracy organizations.   The possibility that an attempted infiltration might

disclose the investigation was a risk common to all.  Without additional facts, as to

the relationship between the DTO participants, instances of conduct during

surveillance or comments during interception, establishing why this DTO would

be more difficult to penetrate than any other, the affiant failed to show that his

conclusory allegations, that these traditional investigative techniques would be any

less effective against this organization than any other, had merit.

The omnipresent risk to an undercover operative is a possibility in any DTO

related investigation.  Both affidavits indicated that certain investigative

procedures were too dangerous to try. [ER2–57,131]  This claim does not allow

the rejection of normal investigative techniques in every DTO case. To prove

danger, the affidavit should explain why this particular DTO is more dangerous

than others. Is the affiant aware of killings of informants or suspected snitches?

Have threats been made? Have guns or weapons been observed during

surveillance? Have the monitored phone calls mentioned any type of threats or

violence? Was there a violent gang involved? None of this type of information

appeared in either TT7 or TT9 affidavit.

The justification presented, for not using undercover agents or informants

without providing specifics as to why this particular group would be harder to

penetrate or was more dangerous than other DTOs, was conclusory and

insufficient to justify why these traditional investigative techniques were not

employed.

Agents did not attempt to use pen registers or trap and trace devices before

applying for wiretap authorizations for either line. Affiant acknowledged, in both

affidavits, that these were valuable investigative tools. However, these devices,

according to affiant, were of limited use in the instant investigations because they

did not identify the caller, pinpoint his location or disclose the content of the

conversation. [ER2–71,143]

These devices do provide real-time information which would allow an

-87-

investigator to coordinate surveillance activities at crucial moments.  However, this invaluable tool was not used since toll records, according to affiant, provided the same information.  But the agents did not request the toll records until after January 9, 2011, (over five months after the Cruz investigation supposedly started) per the TT7 affidavit, and until February 25, 2011, (at the end of the Artemio investigation) per the TT9 affidavit.   Had pen register/trap and trace devices been used, agents would have access to this important information in real time–an important step an investigator should take in building a case to avoid resorting to the intrusive invasion of one's privacy.

No search warrants had been served during the TT7 and TT9 investigations. The affiant in both affidavits indicated that narcotics were kept at stash houses for brief periods of time and only a fraction of the drugs would likely be found during a search warrant.  It was premature to serve them in the instant case and would jeopardize the investigation.

At the same time, affiant in the same section of the TT7 affidavit, reported about the July 28, 2011, search warrant served on  the Castro-Perez prior stash house that discovered $118,156, and the November 11, 2010, search of the Aviles-Contreras stash house that found $1,881,190.  High-level drug dealers do keep significant amounts of contraband in their residences.

Although Castro-Perez was alerted to the investigation by numerous searches taking place at his residence and of his customers/couriers, as early as June, 2010, he did not disappear, until late October, 2010, after a vehicle was stopped after leaving his Poinsetta stash house. Again, the affiant's reluctance to use this investigative tool, based on the four corners of the affidavits, is contradicted by the information that was provided in the same affidavit. Search warrants can be and were an effective investigative tool.

Affiant in the TT7 and TT9 affidavits admitted that no trash searches had been conducted at any of the residences because criminals place trash out shortly before pickup and dispose of incriminating evidence away from the residence. This is a broad generalization. Trash cans do contain items other than contraband. Searches can reveal paperwork that identify people, places they may work at, or frequent. Names of people they know or associate with may be thrown away. Bills or even junk mail can lead to an identification. Although officers observed trash cans outside several of the residences during surveillance, no attempt to search the cans occurred. On three of the days, at the Orange Blossom address, they refused to search because it was daylight and on the fourth occasion, they thought the can might belong to a neighbor. At another residence they did not search because the trash can could be seen from the door. This lack of effort seems unreasonable. No

security cameras were mentioned. Except for the one residence, no windows or doors were described as overlooking the garbage can. Agents could have taken the trash can at night or sought the city's help with removing the trash can or replacing it with a like trash can. The failure to pursue the trash seems unreasonable particularly when identifying individuals was of paramount importance.

Although affiant mentions checking property records and telephone records, at no time does the affiant indicate an attempt to obtain utility, electric, gas, cable television or internet records for the suspected residences. Surveillance observed individuals going to banks, stores, restaurants and gas stations. There is no indication that any attempt was made to discover if the suspected subjects were using some form of identification to use or purchase any items.

Authorities did not use traffic stops in the Cruz investigation stating that this normal investigative technique would alert the DTO to its investigation. The only information put forth in the affidavits in this regard proved quite the opposite. Thousands of dollars and kilos of drugs were seized in the Castro-Perez investigation before Castro- Perez disappeared. Traffic stops can also be used to identify subjects, something the affiant claimed authorities were reluctant to do in the Cruz DTO investigation in fear of alerting the targets. Again, the only facts

contained in the affidavit, regarding a traffic stop to identify someone, proved quite the contrary. Castro-Perez was identified during a traffic stop.

After months of investigating Cruz, affiant informed that no financial investigation had occurred. Admitting the availability of a wide variety of investigative techniques, including a review of public records concerning property ownership, the issuance of subpoenas for bank and credit card information and a review of financial records and checks through the Financial Crimes Enforcement Network to determine the nature of suspicious financial transactions, affiant preferred to wait until Cruz DTO members were more fully identified. While admitting that wire intercepts had identified two bank accounts associated with the Cruz DTO believed to contain drug proceeds, no investigation would occur. This position regarding a readily available and common investigative technique seems unreasonable.

## IV. <u>Conclusion</u>

These justifications for not-using these normal investigative techniques would be true of most drug conspiracy investigations. Merely describing the inherent limitations of these techniques is not a sufficient reason to justify the failure to employ the method in the first place. <u>United States v. Blackmon</u>, 273 F.3d 1204, 1210 (9th Cir.201).

Affidavits supporting wiretap applications should provide truthful specifics and not rely on vague generalities to justify why normal investigative techniques were not employed. Rather than describing why these techniques are not optimal–because only a wiretap provides content to allow the government to reach its goal of prosecuting all members of the DTO–the affidavit must show why they would not work in the case at hand.

For the reasons stated, Artemio submits that the Government failed to comply with the necessity requirements set forth in 18 U.S.C. §§ 2518(1)(c) and 2518(3)(c). The Government did not prove, based on the four corners of each wiretap affidavit, that the investigative methods that it used were employed for a reasonable period of time. It also failed to prove, based upon the information contained in its affidavits, that the normal investigative techniques that were not used in the investigation would not likely succeed. For these reasons, the district court abused its discretion in denying the motion to suppress.

Appellant raised an objection to the validity of the wiretap authorizations and the admission of numerous wiretapped conversations at his trial. These conversations served as the basis for appellant's conviction on all counts and did not constitute harmless error. 18 U.S.C. § 2515; United States v. Carneiro, 861 F.2d 1171, 1183 (9th Cir.1988); United States v. Spagnuolo, 549 F.2d 705, 711-

712 (9th Cir.1977).

As a result, Artemio Pena-Torrecillas respectfully requests that his convictions be reversed, his sentences vacated and his case be dismissed with prejudice. In the event the Court is unable to determine the effect of suppression on the various counts of conviction, the case should be remanded to the district court for this determination.

## ARGUMENT FIVE

### I.  Issue Five

Since Pena-Torrecillas's sentence is not final until completion of direct review and an intervening amendment has made him eligible for a two-level reduction in base offense level pursuant to U.S.S.G § 2D1.1, effective date November 1, 2014, is he entitled to a remand to the district court for consideration of a sentence reduction?

### II.  Standard of Review

Issues not raised before the district court are reviewed for plain error.  Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 730-36, 113 S.Ct. 1770, 1775-1779 (1993); United States v. Pelisamen, 641 F.3d 399, 404 (9th Cir.2011).

### III.  Points and Authorities

A sentence is not final until completion of direct review. Williams v. United States, 651 F.2d 648, 650 (9th Cir.1981).  Under the Guidelines applied to Pena-Torrecillas's case at the time of sentencing, his base offense level was at 38 because his offenses involved a marihuana equivalency of 44,359.  U.S.S.G. § 2D1.1(c)(1)(2010).

The Sentencing Commission voted unanimously to lower the base offense levels for most federal drug trafficking offenses in April, 2014.  In July, 2014, it

voted to make Amendment 782 retroactive. Amendment 782 of the United States Sentencing Guidelines became effective on November 1, 2014, during the pendency of this appeal.

The procedure that allows a sentenced person to seek a lower sentence when, as here, the Guidelines have been amended post sentencing in a defendant's favor is set forth in 18 U.S.C. §3582(c)(2). First, the court must determine if the person is eligible for the reduction. Second, the court needs to consider the sentencing factors set forth in 18 U.S.C. §3553(a) and determine that a reduction would be consistent with the Sentencing Commission's policy statements. Finally, the court has full discretion to determine if a lowering of sentence is warranted after considering the additional factors of danger to the community and the defendant's post sentencing conduct.

Pena-Torrecillas is eligible for a retroactive sentencing reduction. Since the marijuana equivalency of 44,359 under this new sentencing provision would result in a base offense level of 36, instead of 38, Pena's total offense level becomes 40, instead of 42.[5] §2D1.1(c)(2)(2014). Under the current scheme, his Guidelines range would be reduced from 360 months to life to a range of 292 to 360 months.

---

[5] A four-level upward adjustment is added since the district court determined that Pena-Torrecillas was a leader/organizer.

U.S.S.G. Ch.5, Pt.A. (2010) and (2014).

The Ninth Circuit has consistently held that a clarifying amendment, but not a substantive one, should be applied retroactively.  U.S.S.G. §1B1.11(b)(2); United States v. Sanders, 67 F.3d 855, 856 (9th Cir.1995).  "Substantive amendments to the Guidelines that occur between the date of sentencing and the resolution of an appeal have no retroactive effect, [citations omitted]."  United States v. Aldana-Ortiz, 6 F.3d 601, 602 (9th Cir.1993).

However, a year earlier in another Ninth Circuit case, United States v. Wales, 977 F.2d 1323, 1327-1328 n.3 (9th Cir.1992), the Court determined that although a substantive change to the Guidelines favorable to Wales had occurred while the case was on appeal, it would remand the case to allow the district court to determine if his sentence should be lowered in light of a Guidelines amendment now applicable to him.  While acknowledging that ordinarily a person sentenced must petition the court to seek a modification of his sentence pursuant to U.S.S.G. §1B1.10, "we see no need to force him to take this additional step."  *See* United States v. Connell, 960 F.2d 191, 197 n.10 (1st Cir.1992).

## IV.  Conclusion

Appellant requests that his case be remanded to the district court to allow it to determine whether he is entitled to a two-level reduction in base offense level as

a result of the intervening amendment to the Guidelines.

**Form 6.    CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE, REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1.    This brief does not comply with type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because:

☒    this brief contains 19,058 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because:

☒    this brief has been prepared in a proportionately spaced typeface using WordPerfect X6, with font size 14, Times New Roman.

*s/Nancy Hinchcliffe*
Attorney for Defendant-Appellant
July 13, 2015

-98-

## <u>STATEMENT OF RELATED CASES</u>

Five individuals were indicted in this case. Only two of the defendants appealed their case to this Court. In addition to Appellant Pena-Torrecillas, Francisco Torrecillas-Torres, No. 13-10316, appealed. On June 27, 2014, this Court filed its Memorandum Opinion and the appeal was dismissed.

As of this date, there are no related cases on appeal arising out of the same district court case number.

Dated July 13, 2015

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 13, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, to Artemio Pena-Torrecillas, Register No. 36541-308, USP Atwater, U.S. Penitentiary, P.O. Box 019001, Atwater, California, 95301, a non–CM/ECF participant.

Dated this 13th day of July, 2015.

s/ *Nancy Hinchcliffe*
Nancy Hinchcliffe
5025 North Central Avenue, # 616
Phoenix, Arizona 85012-1505
Attorney for Defendant-Appellant