U.S.C.A. No. 13-10444
U.S.D.C. No. 2:11-cr-00731-SRB-2

_____

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ARTEMIO PENA-TORRECILLAS,

Defendant-Appellant.
_____

Appeal from a Judgment of the United States District Court

District of Arizona
_____

**BRIEF OF APPELLANT**
_____

Nancy Hinchcliffe
Attorney-at-Law
State Bar No. 004052
5025 North Central Avenue, # 616
Phoenix, Arizona 85012-1505
(602) 252-3200
Attorney for Defendant-Appellant

# **TABLE OF CONTENTS**

**Title**                                                                 **Page**

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

**Table of Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

**Statement of Jurisdiction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

I.     District Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
II.    Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
III.   Timeliness of Appeal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
IV.    Bail Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

**Statement of Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

I.     Issues One and Two  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
II.    Issues Three and Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
III.   Issue Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

**Statement of the Case**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

I.     Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
II.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
       A.  Issues One and Two  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
                 1. Probable Cause for the Wiretap Applications . . . . . . . . . . . . . . .  6
                 2. TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
                       a. Prior Wiretap Authorizations  . . . . . . . . . . . . . . . . . . . . . .  7
                       b. Tracking Warrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
                       c. Toll Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
                 3. TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
                       a. Listed Targets  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
                       b. Prior Authorizations  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
                       c. Castro-Perez and Cruz Investigations  . . . . . . . . . . . . . . .  15
                       d. Interceptions and Surveillance  . . . . . . . . . . . . . . . . . . . .  16
                       e. Tracking Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

f. TT9 Toll Information and Analysis . . . . . . . . . . . . . . . . . . 21

B. Issues Three and Four

1. Necessity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

a. Investigative Need for Further Interceptions . . . . . . . . . . 22

b. Normal Investigative Techniques Previously Employed . 24

i. Confidential Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ii. Undercover Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

iii. Consensual Recordings . . . . . . . . . . . . . . . . . . . . . . . . 25

iv. Physical Surveillance . . . . . . . . . . . . . . . . . . . . . . . . . 25

v. Pen Registers, Trap and Trace Devices, Toll
Analysis and Telephone Subscriber Information . . . . 26

vi. Tracking Devices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

vii. Mobile Number Recorders (MNR) . . . . . . . . . . . . . . 27

viii. Search Warrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

a. TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 28

b. TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 29

c. Both Affidavits . . . . . . . . . . . . . . . . . . . . . . 29

ix. Interviews, Grand Jury Subpoenas and Immunity . . . 29

a. TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 29

b. TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 30

c. Both Affidavits . . . . . . . . . . . . . . . . . . . . . . 30

x. Trash Searches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

a. Both Affidavits . . . . . . . . . . . . . . . . . . . . . . 31

b. TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 31

c. TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 31

xi. Pole Cameras . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

a. TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 32

b. TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 32

xii. Financial Investigation . . . . . . . . . . . . . . . . . . . . . . . 33

a. TT7 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 33

b. TT9 Affidavit . . . . . . . . . . . . . . . . . . . . . . . 33

2. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Summary of Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

I. Argument One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

II.     Argument Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
II.     Arguments Three and Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
III.    Argument Five . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Arguments One and Two** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

I.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
II.     Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
        A.  Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
        B.  Probable Cause for Wiretap Authorizations . . . . . . . . . . . . . . . . . . . . 42
        C.  Summary of Facts Supporting Probable Cause in TT7 Affidavit . . . . . 43
                1.  Castro-Perez DTO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
                2.  McDowell Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
                3.  Surveillance and Phone Conversations . . . . . . . . . . . . . . . . . . 46
                4.  Tracking Warrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
                5.  Toll Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
        D.  Lack of Probable Cause to Support the TT7 Authorization . . . . . . . . . 48
        E.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
        F.  Summary of Facts Supporting Probable Cause in TT9 Affidavit . . . . . 52
                1.  Surveillance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
                2.  Surveillance and Intercepted Conversations . . . . . . . . . . . . . . 53
                3.  Telephone Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
                        a.  Giving Directions for Meeting . . . . . . . . . . . . . . . . . . . 54
                        b.  Put Papers Where the Stove Is . . . . . . . . . . . . . . . . . . 55
                        c.  Chiquillo Took the Groceries to Tommy . . . . . . . . . . . . 55
                        d.  Lend Him the Black One–But I Only Need Four . . . . . . 55
                        e.  Call El Senor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
                4.  Money Seizure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
                5.  Toll Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        G.  Lack of Probable Cause to Support the TT9 Wiretap Authorization . . 56
        H.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**Arguments Three and Four** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

I.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
II.     Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        A.  Background and Objective of the Investigation . . . . . . . . . . . . . . . . . . 61

B.  Necessity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
    1.  Statutory Requirements to Prove Necessity  . . . . . . . . . . . . . . 62
    2.  Necessity for Each Target Telephone and Targeted
        Conspirator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    3.  Investigative Procedures Must Be Tried for a Reasonable
        Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
        a.  Cruz Investigation  . . . . . . . . . . . . . . . . . . . . . . . . . . 66
        b.  Artemio Investigation  . . . . . . . . . . . . . . . . . . . . . . . . 67
    4.  Effective Traditional Investigative Techniques not Employed . . 69
III.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

**Argument Five** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

I.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
II.    Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
III.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

**Certificate of Compliance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

**Statement of Related Cases** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

**Certificate of Service** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

# TABLE OF AUTHORITIES

**Authority**                                                        **Page(s)**

## Constitution

Amendment 4  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 42

## Cases

<u>Berger v. New York</u>, 388 U.S. 41, 87 S.Ct. 1873 (1967) . . . . . . . . . . . . . 43

<u>Illinois v. Gates</u>, 462 U.S. 213, 103 S.Ct. 2317 (1983)  . . . . . . . . . . . 41, 43

<u>Osborn v. United States</u>, 385 U.S. 323, 87 S.Ct. 429 (1966) . . . . . . . . . . 43

<u>United States v. Angulo-Lopez</u>, 791 F.2d 1394 (9th Cir.1986) . . . . . . . . 51

<u>United States v. Bennett</u>, 219 F.3d 1117 (9th Cir.2000)  . . . . . . . . . . 65, 67

<u>United States v. Blackmon</u>, 271 F.3d 1204 (9th Cir.2001)  . . . . . . 63, 70, 76

<u>United States v. Canales Gomez</u>, 358 F.3d 1221(9th Cir.2004)  . . . . . . . . 41

<u>United States v. Carneiro</u>, 861 F.2d 1171

      (9th Cir.1988)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 60, 64, 65, 77

<u>United States v. Cervantes</u>, 703 F.3d 1135 (9th Cir.2012)  . . . . . . 41, 50, 59

<u>United States v. Collins</u>, 559 F.2d 561(9th Cir.),

      *cert. denied*, 434 U.S. 907, 98 S.Ct. 309 (1977)  . . . . . . . . . . . . . . 49

<u>United States v. Commito</u>, 918 F.2d 95 (9th Cir.1990)  . . . . . . . . . . . . . . 65

<u>United States v. Connell</u>, 960 F.2d 191 (1st Cir.1992)  . . . . . . . . . . . . . . 79

<u>United States v. Fernandez</u>, 388 F.3d 1199 (9th Cir.2004)  . . . . . . . . . . . 49

<u>United States v. Gann</u>, 732 F.2d 714 (9th Cir.), *cert. denied*,

      469 U.S. 1034, 105 S.Ct. 505 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 49

<u>United States v. Giordano</u>, 416 U.S. 505, 94 S.Ct. 1820 (1974)  . . . . . . . . 62

<u>United States v. Gonzalez, Inc.</u>, 412 F.3d 1102 (9th Cir.2005) . . . . . . 62, 64

<u>United States v. Ippolito</u>, 774 F.2d 1482 (9th Cir.1985)  . . . . . . . . . . . . . 70

<u>United States v. King</u>, 478 F.2d 494 (9th Cir.1973) . . . . . . . . . . . . . . . . . 62

<u>United States v. Landis</u>, 726 F.2d 540 (9th Cir.1984)  . . . . . . . . . . . . . . . 49

<u>United States v. Lynch</u>, 367 F.3d 1148 (9th Cir.2004)  . . . . . . . . . . . 41, 61

<u>United States v. Lynch</u>, 437 F.3d 902 (9th Cir.2006)  . . . . . . . . . . . . . . . 61

<u>United States v. Meling</u>, 47 F.3d 1546 (9th Cir.1995) . . . . . . . . . . . . . 41, 42

<u>United States v. Olano</u>, 507 U.S. 725, 113 S.Ct. 1770 (1993) . . . . . . . . . . 78

<u>United States v. Pelisamen</u>, 641 F.3d 399 (9th Cir.2011)  . . . . . . . . . . . . 78

<u>United States v. Pitts</u>, 6 F.3d 1366 (9th Cir.1993) . . . . . . . . . . . . . . . . . . 49

United States v. Rivera, 527 F.3d 891 (9th Cir.2008) . . . . . . . . . . . . . . . . 61
United States v. Shryock, 342 F.3d 948 (9th Cir.2003) . . . . . . . . . . . . 41, 61
United States v. Spagnuolo, 549 F.2d 705 (9th Cir.1977) . . . . . . . 52, 60, 77
United States v. Tham, 960 F.2d 1391 (9th Cir.1992) . . . . . . . . . . . . . . . . 42
United States v. Wales, 977 F.2d 1323 (9th Cir.1992) . . . . . . . . . 39, 40, 79
Williams v. United States, 651 F.2d 648, 650 (9th Cir.1981) . . . . . . . . . . 78

## United States Code

18 U.S.C. § 2510(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
18 U.S.C. § 2515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 60
18 U.S.C. § 2518(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
18 U.S.C. § 2518(1)(c) . . . . . . . . . . . . . . . . . . . . . . . 2, 38, 39, 61, 63, 76
18 U.S.C. § 2518(3) . . . . . . . . . . . . . . . . . . . . . . 2, 39, 42, 43, 52, 53
18 U.S.C. § 2518(3)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 76
18 U.S.C. § 2518(10)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
18 U.S.C. § 3582(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## United States Sentencing Guidelines

1B1.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 79
2D1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 39
2D1.1(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
2D1.1(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

## Federal Rules of Appellate Procedure

4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
32(a)(7)(B)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

## Federal Rules of Criminal Procedure

52(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

# STATEMENT OF JURISDICTION

## I.  District Court

Artemio Pena-Torrecillas appeals his conviction and sentence for five federal felony offenses.  [CR466,ER2–3[1]]  The district court had jurisdiction pursuant to 18 U.S.C. §3231.

## II.  Court of Appeals

The appellate court has jurisdiction from a final judgment and sentence pursuant to 18 U.S.C. §3742(a) and 28 U.S.C. §1291.

## III.  Timeliness of Appeal

A timely notice of appeal was entered on August 23, 2013.  Fed.R.App.P. 4(b)(1).  [CR467,ER2–1]

## IV.  Bail Status

Pena-Torrecillas was sentenced on August 12, 2013, to 480 months in the Bureau of Prisons and is serving his sentence in a federal prison in Atwater, California.  His projected release date is February 14, 2046.

---

[1] "ER1" refers to Excerpts of Record, Volume One, and "ER2" refers to Excerpts of Record, Volumes Two through Four, followed by page number.

## STATEMENT OF ISSUES

### I.  Issues One and Two

Was there probable cause for the issuance of the TT7 (Issue One) and TT9 (Issue Two) wiretap authorizations as required by 18 U.S.C. §2518(3)?

Did the district court abuse its discretion in upholding these probable cause findings, and in violation of the Fourth Amendment, deny appellant's motion to suppress evidence of the wiretapped conversations that were admitted at trial?

### II.  Issues Three and Four

Were the TT7 (Issue Three) and TT9 (Issue Four) wiretap authorizations supported by a full and complete statement of facts in compliance with 18 U.S.C. §2518(1)(c) and was there a necessity for these wiretap authorizations as required by 18 U.S.C. §2518(3)?

Did the district court abuse its discretion in upholding these findings and deny appellant's motion to suppress evidence of the wiretapped conversations that were admitted at trial in violation of the Fourth Amendment?

### III.  Issue Five

Should this case be remanded to the district court for sentencing reduction consideration since an amendment, taking effect on November 1, 2014, during the pendency of this appeal, has made Pena-Torrecillas eligible for a two-level

-2-

reduction in base offense level pursuant to U.S.S.G §2D1.1?

## STATEMENT OF THE CASE

### I. Procedural History

Pena-Torrecillas (Artemio) was indicted on April 19, 2011, along with Cruz Ortega-Ruano (Cruz), and others, for drug and money laundering offenses occurring in Arizona between January through April 14, 2011.

Pena-Torrecillas filed a Motion to Suppress on January 11, 2013, challenging the validity of the authorizations allowing the interception of Pena-Torrecillas's telephone conversations. The response and reply were filed on February 4 and 9, 2013, respectively.

The first count of a second superceding indictment[2] filed on March 12, 2013, accused Pena-Torrecillas, between January through April 14, 2011, of conspiring with Ortega-Ruano and others to possess with intent to distribute 500 grams or more of methamphetamine. The second count charged Pena-Torrecillas, Ortega-Ruano and another with conspiring, during these same dates, to commit money laundering. Count 3 charged that on April 12, 2011, Pena-Torrecillas, an alien, possessed firearms[3]. Counts 7 and 9, charged Pena-Torrecillas with

_____

[2] All four co-defendants had entered plea agreements.

[3] The Government dismissed Counts 3, 4, 5 and 6 as they were added "in error" to the indictment. [PSR,p.4,¶4]

-4-

possessing methamphetamine, with the intent to distribute it, between April 9 through April 11, 2011 (Count 7), and on April 11 through April 13, 2011 (Count 9). Counts 8 and 10 accused Pena-Torrecillas of possessing firearms on April 9 through April 12, 2011 (Count 8), and on April 11 through April 13, 2011 (Count 10), in furtherance of a drug trafficking offense. Finally, forfeiture allegations were included. [CR396,ER2–156]

On March 25, 2013, the district court denied Pena-Torrecillas's suppression motion and his request for a *Franks* hearing. [CR404,ER1–1;CR492,ER1–42]

During trial, the Government introduced numerous unsuppressed TT7 and TT9 phone calls as evidence. [CR499,ER1–44-45;CR496,ER1–46-61]

Pena-Torrecillas was convicted on all counts on May 30, 2013, and was sentenced on August 12, 2013, to 480 months in prison, five years of supervised release, and a $500 penalty assessment. [CR435;CR452;CR466,ER2–3]

A timely Notice of Appeal was entered on August 23, 2013. [CR467,ER2–1]

## II. Statement of Facts

### A. Issues One and Two

Pena-Torrecillas sought to suppress all wiretapped conversations seized pursuant to wiretap authorizations issued on January 24, 2011, on Target

Telephone 7 (TT7), used by Ortega-Ruano (Cruz), and issued on March 15, 2011, on Target Telephone 9 (TT9), used by Pena-Torrecillas (Artemio).[4]  [ER2–14-15,106-108]  The supporting affidavits failed to set forth sufficient reliable facts to support findings of probable cause or of the necessity for resorting to the interception.

### 1.  <u>Probable Cause for the Wiretap Applications</u>

The affidavits used the following facts to support the probable cause and necessity requirements.  The sections below delineate those facts used in both affidavits and those that were unique to each.

The government's broad goal in seeking the wiretap authorizations was to identity the participants in the Cruz Drug Trafficking Organization (DTO), and its methods, locations, and transportation routes, in order to dismantle the entire organization and prosecute its members.  [ER2–16-17,108-109]

The investigation into Cruz began as an offshoot of the investigation into Manuel Castro-Perez, one of the persons expected to be intercepted over TT7.  In both affidavits, affiant provided pages of information regarding the Castro-Perez DTO investigation.  In turn, the investigation of Cruz led to the investigation of

_____

[4] Ortega-Ruano will be referred to as "Cruz" and Pena-Torrecillas as "Artemio" since the affidavits refer to them only by their first names.

Artemio.

## 2. TT7 Affidavit

The Government relied upon the following to establish probable cause for issuance of a wiretap authorization for TT7.

### a. Prior Wiretap Authorizations

Castro-Perez was intercepted on January 24, 2010, pursuant to a wiretap authorized by a Denver judge. Authorities believed that Castro-Perez was involved in drug trafficking in the Phoenix area and notified local agents who began their own investigation. [ER2–19-20,22,111,114]

Castro-Perez, identified during a traffic stop, lived and had stash houses in the Phoenix area. [ER2–19-20]

On June 4, 2010, Judge Snow authorized a wiretap for TT1, a phone used by Cholo. [ER2–22] Castro-Perez and Mariano, a possible narcotics distributor for the DTO, were intercepted over TT1. [ER2–20-21,22] TT1 interceptions revealed that Castro-Perez had several customers and answered to Chapo and Chuy. [ER2–25-26]

On June 28, 2010, agents seized $194,500 from a load vehicle that left from Castro-Perez's "former" stash house. The driver, Victor Ariel-Arreola, denied knowledge of the currency and invoked his right to counsel. Although Ariel-

Arreola was part of the Castro-Perez DTO, "he is not associated with or connected to the Cruz DTO." [ER2–26,96]

Castro-Perez and Mariano became targets when Judge Teilborg authorized interception for TT2 on July 13, 2010. [ER2–22-23,25,112]

Mariano was not intercepted over TT2. Genaro, a likely customer of the Castro-Perez DTO was first intercepted over TT2. Authorities believed that Castro-Perez delivered narcotics to Genaro at a McDowell apartment on July 20, 2010, when Castro-Perez's vehicle backed out of an apartment garage, a male appeared to communicate with Castro-Perez, then closed the garage door and walked away carrying a backpack. [ER2–20-21,58-59]

On July 21, 2010, Castro-Perez's white Ford Explorer met with a Ford F250 in Phoenix that was stopped and found to contain $5,594 and 15 kilograms of cocaine. [ER2–26-27] The occupants, John Gibbons and Lisa Sayamontry, were arrested but neither identified their source. Both were associated with the Castro-Perez DTO, but "they are not associated with or connected to the Cruz DTO." [ER2–96-97]

On July 27, 2010, Jose Martin-Quijada and Trinidad Encinas were stopped after leaving Castro-Perez's "prior" stash house. Their vehicle contained $305,014. Neither answered questions about the money. Both were associated

with the Castro-Perez DTO, but "they are not associated with or connected to the Cruz DTO." [ER2–28,97]

The next day, investigators found $118,156 during a search of this "prior" stash house. [ER2–28]

Surveillance of the Cruz DTO began in late August, 2010. Cruz drove a black Monte Carlo and utilized residences on Orange Blossom, 82nd Lane and Hazelwood streets located within the Phoenix area. [ER2–18-19,28-29,31-32]

On August 30, 2010, Castro-Perez, Cruz, Mariano and Genaro became targets when Judge Teilborg authorized interception of TT3, used by Castro-Perez. All had their phone conversations intercepted. This wiretap was re-authorized on September 28, 2010. [ER2–23,112]

Affiant interpreted the following translated TT3 intercepted telephone conversations. [ER2–13-14]

Chapo directed Castro-Perez on August 31, 2010, to deliver narcotics to Cruz. [ER2–18,23,32,34]

On September 1, 2010, Cruz and Castro-Perez traded phone calls discussing delivery details. Surveillance followed Castro-Perez to the same McDowell apartment complex mentioned above. A minivan pulled up next to Castro-Perez's truck. Authorities believed Castro-Perez obtained narcotics from someone inside.

-9-

Based upon wire interceptions and surveillance, authorities believed Cruz sent a courier driving a white Honda to meet with Castro-Perez and receive the drugs in a Fry's parking lot. [ER2–34-36,59-60] Afterwards, Castro-Perez called Chapo informing Chapo that Cruz had taken them. That afternoon, Cruz called Castro-Perez stating that they were runny and he would later hand them to Castro-Perez. [ER2–36-37]

On September 6, 2010, Castro-Perez and another in Castro-Perez's Sport Track met with someone in Cruz's Monte Carlo at a Phoenix condominium. An agent observed a hand-to-hand transaction in the parking lot between the two unknowns. [ER2–61]

Castro-Perez delivered narcotics to Genaro at the McDowell apartment again on September 15, 2010. Surveillance observed Castro-Perez in a garage, utilized by Genaro's DTO, talking to two individuals who later drove a Ford Expedition into the same garage after hauling some storage containers back and forth. Later, the Monte Carlo parked along side the Expedition but left after a man exited and spoke to someone in the Monte Carlo. Authorities stopped the Expedition later that day in California and discovered five kilograms of cocaine. Its driver, David Barraza, was arrested but invoked his rights. Barraza was believed associated with the Castro-Perez DTO, but "he is not associated with or

-10-

connected to the Cruz DTO." [ER2–29-30,61-63,97]

Castro-Perez met with Javier Lopez-Felix in Phoenix on September 18, 2010. Lopez-Felix, who was stopped later in Las Vegas and found to be carrying approximately two kilograms of cocaine, refused to make any statements. He is believed to be associated with the Castro-Perez DTO, but "he is not associated with or connected to the Cruz DTO." [ER2–30-31,97-98]

On October 8, 2010, the agents recorded two calls, and on October 11, 2010, one call, between Castro-Perez and Cruz. These calls, according to affiant, discussed a problem with a specific amount of drugs whose quality was bad. [ER2–38-45] The October 11, 2010, call discussed a meeting between the two men at an apartment where Cruz would take "shit" or "it". The affiant believed "it" to be narcotics. [ER2–44-45]

Cruz, Castro-Perez, Mariano and Genaro were targets when on September 29, 2010, Judge Martone authorized wire interception of TT4, a telephone used by Castro-Perez. Although Castro-Perez was intercepted, the wiretap was terminated early on October 13, 2010, "due to the lack of discussions regarding drug trafficking activities." [ER2–23,49,112]

On October 19, 2010, investigators seized $118,000 from a vehicle driven by Osiel Mendoza after it left Castro-Perez's Poinsettia stash house.

-11-

Mendoza claimed no knowledge of the money. "Mendoza was associated with the Castro-Perez DTO, but he is not associated with or connected to the Cruz DTO." [ER2–31,98]

After this, Castro-Perez disappeared. [ER2-20]

Castro-Perez was targeted on TT5 and TT6, phones utilized by Aviles-Contreras. These authorizations were approved on October 5, 2010 (TT5) and October 28, 2010 (TT6). "[N]one of the target subjects were intercepted . . ." [ER2–23-24]

### b. Tracking Warrants

A tracking warrant, authorized on November 3, 2010, located TT7 at Orange Blossom, 82nd Lane and Hazelwood on unspecified dates. [ER2–32]

On November 4, 2010, the Monte Carlo parked at Orange Blossom. A Ford 150 entered the garage, the garage door closed, a Hispanic male exited the house, placed a white cooler into the Monte Carlo's trunk, drove away and later returned. Two Hispanic males left the house, placed a black bag into the Monte Carlo and drove away. The Ford F150 exited the garage, followed the Monte Carlo and parked next to it at a Fry's parking lot. The F150's driver exited the truck and accepted a black bag from someone inside the Monte Carlo. [ER2–63-67]

-12-

On January 3, 2011, a silver Ford van, previously seen at Orange Blossom, left 82nd Lane.  [ER2–67]

 On January 4, 2011, a male at Hazelwood carrying a yellow bag entered the Monte Carlo.  Later, the Monte Carlo left and entered the Orange Blossom garage.  Someone left the Orange Blossom house, placed something into a parked Honda Civic and drove away.  Later, the Monte Carlo again parked in the Orange Blossom garage.  A light green Volkswagen with a temporary license plate parked at Orange Blossom, a man entered the home, left with an envelope, drove to 82nd Lane, placed a license on the rear of the Volkswagen, drove to Phoenix College's parking garage and after ten minutes drove to Walgreen's.  [ER2–67-69]

A second TT7 tracking warrant, authorized on January 4, 2011, located TT7 at Orange Blossom and Hazelwood on January 5, 2011.  [ER2–32]

On January 7, 2011, the Monte Carlo and an Altima left the Orange Blossom residence, drove in tandem to a restaurant parking lot where a Ford F150 truck parked in between them.  An unknown male spoke with a man, believed to be Cruz, and the driver of the Altima.  The truck and Nissan left the lot together.  [ER2–69-70]

### c.  **Toll Records**

On January 10, 2011, agents subpoenaed TT7 toll records.  TT7 was

activated on October 3, 2010.  From activation through January 9, 2011, 2,804

calls to 173 different phones, 40 of which were Mexican based numbers, were

made.  The subscriber's name was Boost Boost.  Drug traffickers used fictitious

names and addresses to hide their identities, although affiant admitted legitimate

users sometimes do this.  [ER2–45,48-49]

TT7 contacted a telephone utilized by Wilfredo Flores-Lopez who was

stopped on January 17, 2011, with one pound of methamphetamine inside his

vehicle.  Flores-Lopez "refused to provide information about the narcotics."

[ER2–48,86]

### 3.  TT9 Affidavit

#### a.  Listed Targets

Artemio was utilizing TT9 and agents anticipated that Artemio and Cruz,

and six others, would be intercepted.  [ER2–109-111]

#### b.  Prior Authorizations

TT7 through TT8 authorizations were reported in addition to TT1 through

TT6.  [ER2–111-113]

Cruz, Castro-Perez, Mariano and Genaro were the targets of the TT7

wiretap authorized on January 24, 2011.  [ER2–14,113]  The TT9 affidavit

incorrectly stated that Artemio, Cruz, Chiquillo, Chuy and Guero, the targets of

TT8, another telephone utilized by Cruz, were also the targets of TT7. Only Cruz and El Senor were intercepted over TT8 which was authorized on February 22, 2011. [ER2–113]

### c. **Castro-Perez and Cruz Investigations**

The Castro-Perez investigation was summarized. Investigations of Castro-Perez and Aviles-Contreras between June and November, 2010, resulted in traffic stops and search warrants that garnered approximately $2,622,454, two handguns and 22 kilograms of cocaine. [ER2–114]

Based on TT3 intercepts, investigators believed that Cruz operated a drug cell in the Phoenix area. Investigators had learned of its possible customers and supply sources but needed to identify "the full scope and operation of the DTO." [ER2–117-118] Based on calls, authorities believed Artemio lived at Cruz's new San Miguel residence and was a "facilitator for the DTO and works at the direction of Cruz." [ER2–110]

Affiant reported the following events that were reported in the TT7 affidavit:

1. August 31/September 1, 2010, conversations where Chapo, Castro-Perez, and Cruz discussed the delivery and return of what was believed to be bad quality drugs. Surveillance of the suspected delivery. [ER2–114-115]

-15-

2.  September 15, 2010, surveillance where Castro-Perez was seen in the McDowell apartment garage talking briefly to two males connected to a Ford Expedition that was stopped in California with five kilograms of cocaine. [ER2–115-116]

Authorities connected Cruz to the Orange Blossom house but not to its owner, David Chacon.  [ER2–114-115]   Surveillance indicated Cruz now lived on San Miguel.  Hazelwood, 82nd Lane and possibly 65th Drive addresses were used by the Cruz DTO but agents were unable to connect Cruz or Artemio to the residential owners.  [ER2–110,116-117]

### d.  <u>Interceptions and Surveillance</u>

On February 1, 2011, the Monte Carlo from nearby the Cruz residence went to Hazelwood.  A male exited the home, entered the car, drove to and entered a storage facility.  The car returned to the San Miguel neighborhood.  Surveillance terminated.  [ER2–132-133]

A red Volkswagen exited Cruz's gated community, went to a strip mall carniceria where a male entered the vehicle.  Surveillance terminated.  [ER2–133]

On February 3, 2011, a red Volkswagen left Cruz's garage and returned. [ER2–133-134]

The Honda Civic, seen during January 4 surveillance, left Hazelwood.

-16-

[ER2–134]

A Ford van, observed during January 3 surveillance, arrived at 82nd Lane. A female, possibly Guero and a man in a Mitsubishi Endeavor were seen at the residence. She drove away in the van. [ER2–133-134] [ER2–134] Later, Guero left 82nd Lane in a green Volkswagen, parked in Cruz's driveway and walked to the front door. [ER2–135]

A silver/maroon taxi parked in Cruz's garage, the door closed. Thirty minutes later it went to a Laveen address. [ER2–135]

On February 7, 2011, based on calls, agents expected Cruz to meet someone at Denny's. No one showed and surveillance terminated. [ER2–135]

Based on calls, authorities believed Cruz was planning a narcotics transaction at 67th Avenue and Thomas Road that same day, would loan a vehicle to a participant, and someone would bring money to his house. That afternoon authorities observed a Honda Civic leave Cruz's driveway and park next to a black Ford 150 and red Volkswagen on the corner of 67th Avenue and Thomas Road. The Volkswagen driver entered the passenger seat of the Honda Civic. The Ford truck passenger drove off in the Volkswagen as the two other vehicles left. The Volkswagen followed the Ford truck, drove into a residential neighborhood and later returned to 67th Avenue and Thomas Road. Both vehicles left taking the

-17-

same route.  Surveillance ended because agents believed they had been spotted.
[ER2–135-136]

On February 10, 2011, Cruz answered a call on TT7, giving directions to a
meeting location.  Cruz asked Artemio, present in the background, to assist giving
directions, which he did from the background and on the phone, agreeing to meet
at a specific location.  [ER2–118-120]

Affiant concluded the male was delivering "a suspected load of illegal
narcotics to Cruz."  [ER2–120]

On February 10, 2011, based on calls, investigators believed Cruz was
going to deliver narcotics to Gil.  The Monte Carlo left Cruz's residence and went
to a Marshall street home and left.  TT8 and TT9 were tracked to this residence.
Three men left the Marshall home, went to Home Depot, bought cellophane and
tape and returned to the Marshall address.  One male placed three bags and a
suitcase into a Cadillac parked at the residence, worked on the front passenger
door panel while another man appeared to look up and down the street.  The
Cadillac eventually left the residence and was stopped near Kingman, Arizona.
Although a dog alerted to the doors, no drugs or money was found.  [ER2–136-
137]

On February 11, 2011, Cruz using TT7 called TT9.  Cruz asked what

-18-

happened?  Artemio stated, "Hey, I put the papers–those, those of Dori [Phonetic]–I put them there, where the stove is.  Haven't you, haven't you turned it on?"  Cruz told him he had not.  Artemio indicated, "Oh, because I put the papers there and, and–I just forgot to tell you guys yesterday.  So, so they won't get burned."  Cruz commented that he would check it for him right now.  Artemio stated, "They are there–put inside through the bottom, man."  [ER2–120]

Drug traffickers speak in code and affiant opined that "papers" referred to drug proceeds.  [ER2–120]

On February 13, 2011, Artemio using TT9 called Cruz using TT7.  Artemio told Cruz he left it there and did not think Cruz was there because the car was not there.  Cruz indicated Martin was there and "Chiquillo went to take the groceries to Tommy."  Artemio offered to pick up Cruz but Cruz wanted to wait and see if Chiquillo returned.  [ER2–120-121]

The affiant opined that "groceries" were code for narcotics and that Chiquillo had delivered drugs.  [ER2–120-121]

That same day, Artemio using TT9 called Cruz using TT7.  Cruz indicated that Guero was at the house and asked Artemio if he was going to take "[unintelligible]" to Martin.  Artemio agreed but stated, "Why don't you lend him the black one?"  Cruz said that's fine but stated that he was going to need two

-19-

because two were used and Cruz was being asked for some tomorrow. Cruz stated, "I'm going to leave you five." Artemio indicated that "[w]e're only going to need four. I only need four." Cruz and Artemio then discussed the numbers and that Cruz would send Guero over there in the black car. [ER2–121,123]

The affiant opined that Cruz called Artemio asking for narcotics. When Artemio indicated he only needed four, they were "discussing quantity of narcotics." [ER2–123]

On February 17, 2011, the Monte Carlo left Cruz's residence traveling to a business. TT7 and TT8 were pinpointed at that location. The Monte Carlo went to Wal-Mart and then to Home Depot where its occupants bought grilling supplies. [ER2–138]

On February 22, 2011, a Honda Civic left Cruz's home, went to a bank and parked next to a Lexus registered to a female. Authorities suspected her account was used by the Cruz DTO. A female exited the Honda and entered the Lexus. The Honda Civic went to Hazelwood. Later, it and a white Honda left Hazelwood and parked next to a Ford Explorer in a Walgreen's parking lot. Several Hispanic males met. Surveillance terminated. [ER2–138-139]

On February 23, 2011, Artemio using TT9 called Cruz using TT7. Artemio apparently called El Senor and El Senor wanted Cruz to call him. Artemio relayed

-20-

the number to Cruz who stated he had the number and would call.  [ER2–122]

The affiant believed that Artemio provided Cruz with El Senor's phone number.  [ER2–122]

On February 24, 2011, based on intercepts, agents believed that Chiquillo would pick up narcotic proceeds and poor quality narcotics from Gil.  The Monte Carlo left Cruz's residence, went to the Marshall address, returning shortly thereafter.  [ER2–139-140]

On March 1, 2011, a Toyota Solara left the Cruz residence, was stopped by authorities and $123,034 was found inside a hidden compartment. The Toyota's occupants, Pedro and Delores Hernandez, invoked their rights.  [ER2–140,149]

### e.  **Tracking Warrant**

A tracking warrant authorized on February 17, 2011, located TT9 on February 17, 21, 24 and 26, 2011, at Cruz's San Miguel home.  [ER2–118] "Surveillance has been established numerous times in the area of the Cruz residence, but investigators have not been able to establish a pattern of when Artemio leaves the residence."  [ER2–132]

### f.  **Toll Information and Analysis**

Authorities subpoenaed TT9, subscribed to by Boost Boost, toll records. The subscriber address was a default address used by Sprint/Nextel.  Drug

traffickers used false information to hide their identities although legitimate users sometimes do this.  [ER2–126-127]

From TT9's activation on December 21, 2010, through February 25, 2011, 4,303 calls to 208 different phones, 72 of which were Mexican based, were made. [ER2–126]  One call occurred between TT9 and El Senor's number.

During this period, TT9 contacted a number utilized by David eighty-eight times.  Agents believed David was involved in the management of the Cruz DTO's proceeds. [ER2–124-125]

## B. **Issues Three and Four**

### 1. **Necessity**

#### a. **Investigative Need for Further Interceptions**

TT7 and TT9 interceptions were necessary "because normal investigative techniques have failed or appear reasonably unlikely to succeed if tried, or are too dangerous to be tried, as more fully explained below."  [ER2–17,49,109,127]

Both affidavits contained the following information to justify a necessity finding, unless otherwise noted.

Previous interceptions produced evidence of Castro-Perez and Aviles-Contreras DTOs' structure.  [ER2–49,51-52,127]

Although TT3 interceptions showed Cruz was Castro-Perez's customer,

none provided enough information to prosecute the Cruz DTO to the fullest extent and achieve the investigation's goals of dismantling the entire organization. TT7 and TT9 interceptions were needed to find all the stash houses, locations, vehicles, distribution networks, transportation routes, times of distributions, transportation methods, customers, affiliates, associates, co-conspirators, members and sources of supply of the Cruz DTO. [ER2–49-52,127-128,130]

Without TT7 interception, "it will be nearly impossible to identify . . ." all DTO participants and dismantle the entire organization. [ER2–53,130]

The affiant in TT9 acknowledged that TT7 and TT8 interceptions produced evidence of the Cruz DTO's structure, members' identities, residences used and the Mexican supply sources. [ER2–127] However, not all of the "stash houses, distribution networks, customers or affiliates in Arizona. . . ." had been identified. [ER2–128] Interceptions had failed to produce sufficient evidence to prosecute the entire organization and TT9 interception was necessary to achieve the Government's goal. [ER2–127]

Artemio worked at Cruz's direction and "is a facilitator for the DTO." Authorities believed Artemio lived with Cruz, discussed the DTO's activities, contacted members, customers, possible sources of supply of the DTO over TT9 that were not contacting Cruz via TT7 or TT8 and that Cruz discussed DTO

-23-

business over TT9 not being discussed over TT7 or TT8.  [ER2–128]

### b.  Normal Investigative Techniques Previously Employed

Both affidavits listed investigative methods unsuccessfully employed or why, if not employed, it was useless to try.

### i.  Confidential Sources

No one cooperated and provided information regarding the Cruz DTO. Authorities would continue to recruit confidential sources by debriefing arrested individuals and those who had abandoned the organization.  Chances of recruitment were remote.  Necessity for interception of TT7 and TT9 was "all the more imperative."  [ER2–54,130]

### ii.  Undercover Agents

High-level narcotics traffickers, like Cruz (Artemio was added to the TT9 affidavit), were close-knit, secretive, distrustful of outsiders and "extremely exclusive" in whom they would deal with.  It was extremely difficult and dangerous for an undercover agent or informant to penetrate the Cruz DTO. [ER2–56-57,131]

Before penetrating the DTO, the undercover agent must establish his reputation as a drug dealer over a long period.  Penetration of the Cruz DTO would likely fail, arouse suspicions and jeopardize the agent's safety.  [ER2–56-

-24-

57,131]

### iii. __Consensual Recordings__

For the same reasons, consensual recorded calls between an undercover agent and a target "has almost no possibility of success and would possibly compromise the investigation." [ER2–57-58,131-132]

### iv. __Physical Surveillance__

The TT7 affidavit reported physical surveillance of the Castro-Perez DTO occurred on July 20, September 1, 6 and 15, November 4, 2010; and January 3, 4 and 7, 2011. [ER2–58-69]

Physical surveillance of the Cruz DTO per the TT9 affidavit occurred on January 3, February 1, 3, 7, 10, 17, 22, and 24; and March 1, 2011. Artemio was not identified as being any of those individuals surveilled. [ER2–132-140]

Touting the success of electronic (pole cameras) and physical surveillance, authorities were unable "to uncover the entire organizational structure or provide sufficient evidence to prosecute all members of the DTO." [ER2–70,140]

Wire interceptions would achieve this goal. Intercepted calls allowed surveillance to pinpoint the time, location and purpose of DTO activities. Without interception, authorities used blanket surveillance risking the investigation's disclosure. [ER2–70-71,140,143]

### v. **Pen Registers, Trap and Trace Devices, Toll Analysis and Telephone Subscriber Information**

Pen registers, trap and trace devices (not used), and toll records (obtained) identify the numbers called and received by a telephone but do not identify the caller, his location or the content of the conversation.  [ER2–71,143]

Toll records were analyzed.  False subscriber information was given and none of the toll record/subscriber information was helpful in identifying individuals.  [ER2–72,143-144]  Although "valuable investigative tools . . . " these devices and records were not helpful and could not alone achieve the goals of the investigation.  [ER2–71,143]

### vi. **Tracking Devices**

Telephone tracking devices were authorized for TT7 and TT9.  This device revealed the approximate location of the target telephone but not the conversation's content.  By itself it would not achieve the goals of the investigation.  [ER2–72,143-144]

A mobile tracking device used GPS to determine a vehicle's location. Although useful at times, it did not identify a person's role in the DTO.  Live tracking used the vehicle's power source which was more difficult to install.  The Monte Carlo parked in the driveway or garage and agents did not want to risk

-26-

discovery. "Therefore, the live tracking option is not available in this investigation." Although a battery powered system was less risky and difficult to install, its frequent servicing increased discovery and it did not provide live tracking. Authorities determined both were too risky to use against the Cruz DTO. [ER2–72-74,144-145]

Only the TT7 affidavit reported Castro-Perez investigators placed a battery powered GPS tracker on a gold F250 in July, 2010. The device provided sporadic reception and signal strength. [ER2–74]

Both affidavits reported that Genaro DTO investigators on September 6, 2010, placed a tracking device on a Ford Ranger. On October, 21, 2010, it located the Ranger at the 82nd Lane address. The device was removed in November, 2010, because it "will not provide any additional information in to the activities of the Cruz DTO." [ER2–74-75,145-146]

### vii. Mobile Number Recorders (MNR)

A MNR collected non-content signaling information from wireless telephones. Used with physical surveillance it identified the telephone likely associated with the target. On December 7, 2010, and February, 2011, the court authorized use of a MNR for the Cruz DTO. Although an MNR assisted in identifying other Cruz DTO members and their locations, it did not provide call

content. A MNR "alone will not be able to achieve the goals of the Government's investigation." Agents would consider its further use once more Cruz DTO members were identified. [ER2–75-76,146-147]

### viii. Search Warrants

#### (a) TT7 Affidavit

High level DTO members were unlikely to store narcotics at homes to reduce the risk of being caught with contraband. [ER2–79-80]

On July 28, 2010, police searched Castro-Perez's stash house seizing $118,156, documents and "miscellaneous" items. [ER2–78]

On November 11, 2010, investigators searched Aviles-Contreras's stash house. Authorities seized $1,881,190, cocaine and miscellaneous documents and items. [ER2–78-79]

The following individuals were found at the residence.

Aviles-Contreras admitted receiving the narcotics but not how the Mexican organization worked. [ER2–98] There was "no connection between Cruz and Aviles-Contreras except for both dealt with Castro-Perez." [ER2–98-99]

On December 16, 2010, Aviles-Contreras's residence was searched. Drug paraphernalia and documents were found. [ER2–79]

-28-

### (b)  TT9 Affidavit

The search warrants that had been served on the Castro-Perez and Aviles-Contreras houses were not mentioned.

San Miguel, 82nd Lane and Hazelwood addresses were believed to be used in some unknown way by the Cruz DTO.  [ER2–147]

### (c)  Both Affidavits

DTOs kept narcotics and proceeds at the stash houses for brief periods.  As of January, 2011 (TT7), and March 15, 2011 (TT9), authorities were unsure about which Cruz stash houses to search.  Authorities would continue trying to identify Cruz stash houses.  This was difficult because DTO's used multiple locations and uses.   Although search warrants might be a useful tool towards completion of the investigation, serving them now would be premature, jeopardize the investigation, cause relocation or alteration of operating methods and would garner only a fraction of the contraband.  [ER2–78-80,147-148]

### ix.  Interviews, Grand Jury Subpoenas and Immunity

### (a)  TT7 Affidavit

Those listed in the affidavit who were detained or arrested in the Castro-Perez and Aviles-Contreras investigations were not associated or connected with the Cruz DTO and provided no information regarding it.  [ER2–78-79,96,98-101]

### (b) **TT9 Affidavit**

Pedro and Delores Hernandez arrested on March 1, 2011, after leaving the Cruz residence refused to speak with the police and were still in custody. Affiant concluded they would not be willing to provide any information about the Cruz DTO. [ER2–142,149]

### (c) **Both Affidavits**

Wilfredo Flores-Lopez arrested on January 17, 2011, refused to answer questions. [ER2–101]

Witness interviews would not produce enough evidence to prosecute the entire DTO. DTO members were reluctant to self-incriminate or risk their personal safety, even if immunity was offered, "because of the very real danger of violent retaliation by the organization." [ER2–80-81,148]

No one, including customers, was currently available to provide information about the Cruz DTO. None would be offered immunity "since law enforcement would not know the extent of the person's involvement in the DTOs . . . ." It was unlikely that customers or associates could provide enough information to dismantle the organization. Contacting participants would jeopardize the investigation. For these reasons, no Grand Jury subpoenas would issue. [ER2–86-87,140,149]

-30-

### x. __Trash Searches__

#### (a) __Both Affidavits__

Trash searches would likely be unproductive. Criminals do not put incriminating evidence in trash, dispose of it off site and place trash out shortly before pickup. Trash searches alone would not advance investigative objectives. [ER2–87-88,149-150]

Cruz lived at Orange Blossom until about January 10, 2011. On December 13 and 27, 2010, and January 3 and 9, 2011, agents saw a trash can at curbside. No attempt was made to search the can on three separate dates because it was daylight or on the fourth occasion because, although the can was near the home, it might belong to another residence. [ER2–87-88,149-150]

Investigators would continue to attempt a trash search at all of the Cruz residences.

#### (b) __TT7 Affidavit__

Authorities made one attempt to collect trash from 82nd Lane and Hazelwood on one date, January 7, 2011. No trash cans were observed. [ER2–88-89]

#### (c) __TT9 Affidavit__

No trash can was observed on the curb near 82nd Lane. [ER2–150-151]

On January 14 and 28, 2010, and February 11, 2011, surveillance observed, but did not search, the trash can at Hazelwood because it was on the curb in view of the front door and it was not routinely placed at the curb.  [ER2–151]

No trash cans were observed at San Miguel and Laveen residences. [ER2–151]

### xi.  **Pole Cameras**

#### (a)  **TT7 Affidavit**

Pole cameras were placed overlooking Orange Blossom, 82nd Lane and Hazelwood on October 26, December 21 and 30, 2010, respectively, allowing observation of the Cruz DTO.  [ER–89-90]

#### (b)  **TT9 Affidavit**

The TT9 affidavit reported the same information as the TT7 affidavit and added the following.

Cruz moved to San Miguel.  On February 3, 2011, a pole camera was installed overlooking San Miguel.  On February 11, 2011, authorities installed a pole camera at Laveen because vehicles familiar to surveillance, a silver and maroon taxi and grey Honda Civic, were observed there.  [ER2–152]

### xii. __Financial Investigations__

#### (a) __TT7 Affidavit__

No financial investigation was conducted of the Cruz DTO.  Until they were "fully" identified, authorities would not "utilize a wide variety of investigative techniques, including a review of public records concerning property ownership, the issuance of Grand Jury subpoenas for bank and credit card account information, and a review of financial records and checks through the Financial Crimes Enforcement Network (FINCEN) to determine the nature of suspicious financial transactions."  [ER2–90]

#### (b) __TT9 Affidavit__

Based upon intercepts, authorities identified two bank accounts they believed the Cruz DTO used for narcotics proceeds.  Authorities needed to gather "further information" using a variety of investigative techniques to determine the nature of suspicious transactions.  [ER2–152-153]

### 2. __Conclusion__

Agents used this information, as set forth in the respective affidavits, to establish that targets have committed, are committing and will commit Title 18 offenses, that probable cause existed to believe that TT7 and TT9 were "being used to conduct and orchestrate federal drug trafficking offenses," and that

-33-

interception of TT7 and TT9 communications was necessary "because normal investigative techniques have failed or appear reasonably unlikely to succeed if tried, or are too dangerous to be tried." [ER2–93,155]

## SUMMARY OF ARGUMENTS

### I.  Argument One

Much of the information contained in the TT7 affidavit pertained to the Castro-Perez, and not the Cruz, DTO.

Although authorities observed on September 1, 2010, what they believed was a delivery of drugs that coincided with intercepted conversations on August 31 and September 1, 2010, no actual exchange was observed and the vehicles involved were never stopped and searched to verify that drugs were present.

The hand-to-hand exchange that occurred on September 6, 2010, in a parking lot between persons in Castro-Perez's Sport Track and Cruz's Monte Carlo was vaguely described.  Neither vehicle was stopped after the exchange to verify criminal conduct.

Affiant admitted the September 15, 2010, seizure had nothing to do with the Cruz DTO.

The October, 2010, Castro-Perez and Cruz conversations, even if drug related, occurred before Castro-Perez disappeared.

Even if there was probable cause to believe that Cruz had committed a drug offense in September, 2010, there was no substantial basis presented in January, 2011, showing that Cruz was still in the drug business, would be obtaining drugs

-35-

from another source, or that Cruz would be using a telephone, let alone TT7, to discuss past, ongoing or future specified crimes.

Artemio raised an objection to the validity of the TT7 wiretap authorization and the admission of numerous wiretapped conversations at trial. These conversations served as the basis for his convictions on all counts and there use did not constitute harmless error. His convictions should be reversed, his sentences vacated and his case dismissed with prejudice. In the alternative, appellant requests a remand to the district court to determine which, if any, of the counts remain.

## II. Argument Two

Agents alleged Artemio lived with Cruz, was a facilitator for Cruz's DTO, discussed Cruz's DTO business with Cruz and conducted business over TT9 that Cruz was not conducting over TT7. These claims are unsupported by the TT9 affidavit.

Artemio's name was never mentioned in the TT7 affidavit. The first identification of Artemio as being a participant in the Cruz DTO occurred on February 10, 2011, during the "give me directions" phone call. None of the minimal surveillance conducted during the months of February and March identified him as, or even suggested that he might be, one of the people seen

-36-

leaving the San Miguel address, traveling between Cruz's residences, or being followed during surveillance.

The five phone calls were the best evidence in support of a probable cause finding. But the reliability and accuracy of affiant's interpretation of these phone calls was subject to question. First, there was no evidence that affiant was familiar with Spanish colloquialisms. It was not a case where a drug dealer was substituting code words for certain nouns. At least one of the conversations, "I put the papers in the stove," appeared to be confused and nonsensical. Whether as a result of inaccurate translation, regional speech differences or for some other reason, the translation, according to Artemio's argument in the district court, was unreliable. The affidavit itself calls into question the reliability of the Spanish-speaking phone call translations. "The Spanish conversations were summarized in, and in some instances translated to, English by Spanish-speaking translators under the supervision of DEA agents. For the purpose of this Affidavit, quotation marks have been placed around statements taken directly from these English-language translations and line sheet summaries." [ER2–13-14,106] It is unclear from the affidavit whether these conversations, including those statements that were contained in quotation marks, were the actual translated words of the speaker or a mere translation of the agent's summary of the call.

-37-

Finally, ordinary everyday conduct, like giving directions, telling another person that someone wants to speak with them, meeting people in public places, taking groceries to another, should be considered as innocent, not criminal, conduct unless a foundation or basis is established as to its criminality.

The affidavit did not explain why it was criminal conduct for Artemio to call Cruz to inform him that El Senor wished to speak with him. Although the affiant interpreted the "take groceries to Tommy" conversation to reference contraband, there was no surveillance or stop to coincide with this seemingly innocent conversation, nor did affiant explain that this word had been previously used in other Cruz DTO conversations to mean some sort of contraband.

Artemio raised an objection to the validity of the TT9 wiretap authorization and the admission of numerous wiretapped conversations at trial. These conversations served as the basis for his convictions on all counts and there use did not constitute harmless error. His convictions should be reversed, his sentences vacated and his case dismissed with prejudice. In the alternative, Artemio requests a remand to the district court to determine which, if any, of the counts remain.

## III.  Arguments Three and Four

Agents failed to comply with the necessity requirements set forth in 18

U.S.C. §§ 2518(1)(c) and 2518(3)(c). The Government did not prove, based on the four corners of each wiretap affidavit, that the investigative methods that it used were employed for a reasonable period of time. It also failed to prove, based upon the information contained in its affidavits, that the normal investigative techniques that were not used in the investigation would not likely succeed. For these reasons, the district court abused its discretion in denying the motion to suppress.

Appellant raised an objection to the validity of the wiretap authorizations and the admission of numerous wiretapped conversations at trial. These conversations served as the basis for appellant's conviction on all counts and did not constitute harmless error. His convictions should be reversed, his sentences vacated and his case dismissed with prejudice. In the event the Court is unable to determine the effect of suppression on the various counts of conviction, the case should be remanded to the district court for this determination.

## IV. **Argument Five**

A sentence is not final until the completion of direct review. While pending on appeal, an amendment to U.S.S.G. § 2D1.1 made Pena-Torrecillas eligible for a two-level reduction in offense level due to a lowering of offense levels based upon the quantity of drugs involved in the offense. In United States v. Wales, 977 F.2d

1323, 1327-1328 n.3 (9th Cir.1992), the Court determined that although a substantive change to the Guidelines favorable to Wales had occurred while the case was on appeal, it would remand the case to allow the district court to determine if his sentence should be lowered in light of a Guidelines amendment now applicable to him to avoid forcing the appellant to take an additional step and seek a modification of his sentence pursuant to U.S.S.G. §1B1.10.

## ARGUMENTS ONE AND TWO

## I.  Standard of Review

The denial of a motion to suppress wiretap evidence is reviewed *de novo*.

United States v. Lynch, 367 F.3d 1148, 1159 (9th Cir.2004).

An authorization for a wiretap is reviewed for an abuse of discretion.

United States v. Canales Gomez, 358 F.3d 1221, 1225 (9th Cir.2004).

A finding of probable cause is upheld if considering a totality of the

circumstances the four corners of the affidavit provide a "substantial basis" for its

finding.  United States v. Meling, 47 F.3d 1546, 1552 (9th Cir.1995).  The

substantial basis must not be predicated upon conclusory statements but the

application must set forth particular facts and circumstances to allow the court to

make an independent evaluation of the case.  Illinois v. Gates, 462 U.S. 213, 236,

239; 103 S.Ct. 2317, 2331 (1983); United States v. Cervantes, 703 F.3d 1135,

1139-1140 (9th Cir.2012).

Whether the requisite full and complete statement of facts was submitted in

compliance with 18 U.S.C. § 2518(1) is reviewed *de novo*.  United States v.

Canales Gomez, 358 F.3d 1221, 1224 (9th Cir.2004).  Factual determinations are

reviewed for clear error.  United States v. Shryock, 342 F.3d 948, 975 (9th

Cir.2003).

-41-

## II. Points and Authorities

### A. Standing

Artemio, as a party to intercepted conversations with Cruz, the target of TT7, and as the target of TT9, has standing to challenge the legality of TT7 and TT9 wiretaps as an aggrieved person. 18 U.S.C. §2510(11); 18 U.S.C. §2518(10)(a).

### B. Probable Cause for Wiretap Authorizations

Before issuing a wiretap order, a district court must find probable cause to believe that: (1) an individual is committing, has committed, or is about to commit specified offenses; (2) communications relevant to that offense will be intercepted through the wiretap; and (3) the individual who is the focus of the wiretap investigation will use the tapped phone. 18 U.S.C. § 2518(3); United States v. Meling, 47 F.3d 1546, 1552 (9th Cir.1995).

A probable cause showing in wiretap authorization cases is the same as that required by the Fourth Amendment for search warrant cases. United States v. Tham, 960 F.2d 1391, 1395 (9th Cir.1992).

The judicial officer must:

make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay

-42-

> information, there is a fair probability that contraband or evidence of
> a crime will be found in a particular place.

Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).

Although the probable cause standard is the same, the Supreme Court

emphasized that in wiretap cases the need for particularity and evidence of

reliability is especially great because eavesdropping involves a broad intrusion on

privacy. Berger v. New York, 388 U.S. 41, 56, 87 S.Ct. 1873, 1882 (1967). This

imposes a "heavier responsibility" on courts "in supervising the fairness of

procedures." Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429 (1966).

Artemio maintains no substantial basis existed for the district court's

finding of probable cause based upon information contained within the four

corners of each affidavit.

### C. **Summary of Facts Supporting Probable Cause in TT7 Affidavit**

Agents sought a TT7 wiretap authorization to dismantle the Cruz DTO, not

the Castro-Perez DTO. The following summarizes the observations and

conversations used to establish probable cause that Cruz's DTO was committing,

had committed or was about to commit drug trafficking offenses. 18 U.S.C. §

2518(3)

-43-

### 1. **Castro-Perez DTO**

As a result of the Castro-Perez investigation, large amounts of cash and drugs were seized. On June 28, 2010, $194,000 was seized from Ariel-Arreola after he left Castro-Perez's former stash house. On July 21, 2010, Gibbons and Sayamontry were found with $5,594 and fifteen kilograms of cocaine after meeting with Castro-Perez. Martin-Quijada and Encinas had $305,014 in the vehicle when stopped on July 27, 2010, after leaving Castro-Perez's former stash house. The next day, investigators located $118,156 during a search of Castro-Perez's prior stash house. On September 15, 2010, a Ford Expedition was stopped after two men met with Castro-Perez at a McDowell apartment complex. Barraza, the driver of the Expedition, was stopped in California later that day with five kilograms of cocaine in the vehicle. Lopez-Felix was found in possession of two kilograms of cocaine in Las Vegas after he met with Castro-Perez on September 18, 2010. On October 19, 2010, agents seized $118,000 secreted in a vehicle driven by Mendoza after he left Castro-Perez's Poinsettia stash house.

All of these seizures involved people associated with the Castro-Perez DTO. They were "not associated with or connected to the Cruz DTO."

### 2. **McDowell Connection**

Cruz was first observed during the surveillance of Castro-Perez in late

August, 2010, continuing into September, 2010.

Genaro was a customer of the Castro-Perez DTO and affiant tried to link Cruz to Castro-Perez through Genaro. Castro-Perez delivered drugs to Genaro at the McDowell apartment on July 20, 2010, and September 15, 2010. Castro-Perez appeared again at the McDowell apartment on September 1, 2010, prior to an alleged delivery of drugs to Cruz's courier in a Fry's parking lot.

The September 1, 2010, Castro-Perez sighting coincided with an interception of conversations over TT3 beginning on August 31, 2010. Authorities believed that Chapo directed Castro-Perez to deliver narcotics to Cruz. Although Castro-Perez pulled next to a minivan at the McDowell apartment, no transfer was observed between the two vehicles. Castro-Perez eventually went to a Fry's parking lot where a person, believed sent by Cruz, arrived and retrieved a package. Authorities interpreted Castro-Perez's later conversation with Chapo to mean he had delivered it to Cruz. Cruz and Castro-Perez later discussed that they did not coagulate and were "runny."

Although agents observed this alleged delivery of drugs, none stopped the vehicle as had been done on several occasions during the Castro-Perez investigation.

After Castro-Perez appeared at the McDowell apartment complex on

-45-

September 15, 2010, Cruz's Monte Carlo was observed there next to a Ford Expedition. Occupants spoke with one another. No transfer was observed. The Expedition was stopped later with five kilograms of cocaine.

Despite an implication that Cruz was involved, the affiant agreed the Expedition's driver "is not associated with or connected to the Cruz DTO."

### 3. <u>Surveillance and Phone Conversations</u>

September 6, 2010, surveillance observed Castro-Perez and another in a Sport Track meet with someone in Cruz's Monte Carlo at a Phoenix condominium. An agent observed a hand to hand transaction in the parking lot between two unknown occupants of the vehicles.

No further description of this "transaction" was provided. The vagueness of this description, appellant maintains, does not suffice as a substantial basis for probable cause. Again, no one was stopped. Nothing was seized.

In two phone conversations on October 8 and one on the 11th, 2010, Castro-Perez and Cruz discussed the bad quality of what affiant interpreted to be drugs along with a meeting where Cruz would take the "shit" or "it."

### 4. <u>Tracking Warrants</u>

Cruz's phone was tracked to Orange Blossom, 82nd Lane and Hazelwood. Surveillance established various cars traveling to and from each of these

addresses.

On November 4, 2010, agents surveilled the Orange Blossom residence and saw an unknown male place a white cooler in the Monte Carlo's trunk and drive away. Later, a weighted black bag was placed into the Monte Carlo and driven to a Fry's parking lot. A Ford F150 left the Orange Blossom garage and parked next to the Monte Carlo where the truck's driver exited and retrieved a black bag from the car. Both vehicles then left the parking lot. Again, the truck was never stopped, as many vehicles had been in the Castro-Perez investigation.

### 5. **Toll Records**

Although the subscriber to TT7 had used a fictitious name during registration, affiant admitted that legitimate users might also do this. Although 2,804 calls had been made to 173 different phones, these occurred over a three-month period. That forty of these phones were based in Mexico during this time frame would not be incriminating since Cruz and several others native to Mexico lived in his home.

Although Cruz attempted to make one phone call during the three months to Mariano, this did not support a theory that those two were engaging in some sort of drug business. Mariano was listed in the wiretap application as a person whose conversations might be intercepted over TT7 and a "possible associate of Castro-

-47-

Perez and narcotics distributor for the DTO." Other than this one brief reference,

no other information, surveillance, or conversation suggesting his participation in

either the Castro-Perez or Cruz DTO was mentioned in the TT7 affidavit.

Likewise,  phone calls made during a three-month period to Flores-Lopez, who on

January 17, 2011, was arrested with one pound of methamphetamine, with no

further information provided as to the location of the arrest, did not provide a

substantial basis for a finding of probable cause.

### D. Lack of Probable Cause to Support the TT7 Authorization

Agents sought a TT7 wiretap authorization to dismantle the Cruz DTO, not

the Castro-Perez DTO.

The TT7 affidavit contained lots of information about the Castro-Perez

DTO.  Much of this information, including the numerous seizures and searches,

had nothing to do with the Cruz DTO.

After October 19, 2010, the date $118,000 was seized from a car after

leaving Castro-Perez's stash house, Castro-Perez vanished.  The remaining target

telephone results reflect his absence.  TT3 interception ended on October 22,

2010.  The TT4 wiretap targeting Castro-Perez and Cruz, authorized on September

29, 2010, terminated early on October 13, 2010, "due to the lack of discussions

regarding drug trafficking activity."  [ER2–49]  Although Castro-Perez was one of

-48-

the listed targets of the TT5 (approved on October 5, 2010) and TT6 (approved on October 28, 2010) authorizations, none of the targets, including Castro-Perez, were intercepted. [ER2–23-24]  Castro-Perez had abandoned the drug trade, at least in the Phoenix area.

A search warrant is timely where there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises.  United States v. Gann, 732 F.2d 714, 722 (9th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 505 (1984); United States v. Collins, 559 F.2d 561, 564 (9th Cir.), *cert. denied*, 434 U.S. 907, 98 S.Ct. 309 (1977).

Pena-Torrecillas recognizes that courts have held in "ongoing narcotics businesses, lapses of several months–and up to two years in certain circumstances–are not sufficient to render the information in an affidavit too stale to support probable cause."  United States v. Fernandez, 388 F.3d 1199, 1254 (9th Cir.2004); United States v. Pitts, 6 F.3d 1366, 1370 (9th Cir.1993); United States v. Landis, 726 F.2d 540, 542 (9th Cir.1984).   However, based upon the four corners of the affidavit there was neither a continuing pattern nor other good reason presented providing a sufficient basis to believe that Cruz would still be engaging in criminal conduct and communicating about that criminal conduct over TT7 after the source of his drugs vanished in October, 2010.

-49-

The Cruz DTO investigation began on August 30, 2010. Most of the information, surveillance and wire interception supporting probable cause occurred in September and early October, 2010, before Castro-Perez disappeared. The supposed drug delivery from Castro-Perez to Cruz occurred on September 1, 2010. The hand-to-hand transaction, described no further, between unknown occupant's of the Monte Carlo and Sport Track occurred on September 6, 2010. The September 15, 2010, Castro-Perez delivery of drugs resulting in Barraza's arrest, according to affiant, had nothing to do with the Cruz DTO. The two intercepted discussions between Cruz and Castro-Perez about "bad drugs" occurred in early October, 2010, before Castro-Perez disappeared.

After Castro-Perez's disappearance, pole cameras were placed near Cruz's house and suspected stash houses. Agents assumed various cars traveling between these residences and the November 4, 2010, placement of a white cooler into the Monte Carlo's trunk and transfer of a bag between Cruz's and another's vehicles, was indicative of drug dealing.

However, these vehicles were never stopped and without further evidence of these events being criminal in nature, it remained merely innocent conduct, as described in United States v. Cervantes, 703 F.3d 1135, 1139-1140 (2012) (An officer's conclusion that a white box carried from a suspected stash house

-50-

contained contraband and that a suspect's detour through a neighborhood constituted counter-surveillance, without providing a reasonable basis for these conclusions, were insufficient to establish probable cause; United States v. Angulo-Lopez, 791 F.2d 1394, 1397-1398 (9th Cir.1986) (The relevant inquiry is not whether the conduct appears innocent or guilty but the degree of suspicion that attaches to noncriminal acts.)

The phone call to Mariano on November 4, 2010, mentioned briefly as a possible associate of the Castro-Perez DTO, but not in any other substantive way, did not establish probable cause.

### E. Conclusion

No probable cause existed establishing that after Castro-Perez's disappearance, Cruz was, or would be, obtaining drugs from another source, that he was in the business of dealing drugs or would continue to use TT7, or another telephone, to discuss past, present or future crimes.

Even if there was probable cause to believe that Cruz had committed a drug offense in September, 2010, no substantial basis existed to believe that after Castro-Perez's disappearance, Cruz would be using TT7 to discuss past, ongoing or future specified crimes.

There was no substantial basis for the issuing court's finding of probable

-51-

cause.  All three of the mandated requirements of 18 U.S.C. § 2518(3) were not

met.  The district court abused its discretion in determining that the issuing court

had a substantial basis to support its findings.

Artemio objected to the validity of the TT7 wiretap authorization and

admission of numerous wiretapped conversations.  These conversations were used

to convict him on all counts and their admission was not  harmless error.

His convictions must be reversed, his sentences vacated and his case

dismissed with prejudice.  18 U.S.C. § 2515; United States v. Carneiro, 861 F.2d

1171, 1183 (9th Cir.1988); United States v. Spagnuolo, 549 F.2d 705, 711-712

(9th Cir.1977).

If this Court cannot determine the suppression's effect on the counts of

conviction, then the case should be remanded to the district court to make this

determination.

### F.  Summary of Facts Supporting Probable Cause in the TT9 Affidavit

TT9 had been utilized by Artemio.  Agents believed, based upon intercepted

phone calls during TT7 interception, that Artemio was a "facilitator" for the Cruz

DTO and worked at Cruz's direction.  Cruz, who now lived at the San Miguel

address, was still described as a "customer" of the Castro-Perez DTO.  Agents

believed that Artemio lived in the Cruz house.  On four dates in February, 2011,

TT9 was located at Cruz's house and once at the 82nd Lane property.

### 1. **Surveillance**

Surveillance in February, 2011, observed Hispanic males and vehicles come and go from the Cruz residence. Some went to the Hazelwood residence. Men drove to a storage facility. Cars seen in past surveillance were observed anew. The silver Ford van, seen during January 3, 2011, surveillance, was observed at the 82nd Lane address and a Honda Civic, seen during the January 4, 2011, surveillance, was observed at the 82nd Lane address. These locations were suspected stash houses. Vehicles left the Cruz residence and drove to a bank, restaurant, street corner, residences, businesses, stores and parking lots. Sometimes people from these vehicles would meet and talk, sometimes not.

### 2. **Surveillance and Intercepted Conversations**

Surveillance and intercepted conversations led authorities to believe that Cruz had sent someone to meet with Castro-Perez on a few occasions to receive and return narcotics.

Sometimes agents interpreted calls to mean something that failed to bear fruit. Meetings expected to occur, did not. No one showed, surveillance was terminated. Sometimes, agents thought a narcotics deal would take place. They saw people meeting together, but no exchanges occurred.

On February 10, 2011, based on calls, investigators believed Cruz would deliver narcotics to Gil. The Monte Carlo left Cruz's home went to a house where tracking located TT8 and TT9. After the Monte Carlo left this house, three men exited the home and went to Home Depot where they bought cellophane and tape and returned to the house. One of the men, placed bags and a suitcase into a Cadillac parked at the residence. This Hispanic male then worked on the front passenger door panel. The Cadillac left the residence and was stopped by agents. Although a dog alerted on the car, no drugs or money was found inside the Cadillac.

In late February, 2010, a call indicated that poor quality drugs would be picked up from Gil. The Monte Carlo left the Cruz residence, went to the same home as before, then left and went to the Hazelwood address.

### 3. **Telephone Calls**

The application presented five phone calls, set forth in the Statement of Facts, claiming they demonstrated Artemio's criminal use of TT9.

#### a. **Giving Directions for Meeting**

On February 10, 2011, an unidentified male called Cruz on TT7, asking for directions to a meeting. Artemio gave directions in the background and on the phone agreeing to meet. [ER2–118-120]

-54-

### b. **Put Papers Where the Stove Is**

On February 11, 2011, Cruz using TT7 called TT9. Artemio mentioned

papers where the stove is, through the bottom and Cruz said he would check for

them. [ER2–120]

### c. **Chiquillo Took the Groceries to Tommy**

On February 13, 2011, Cruz using TT7 called Artemio using TT9. Artemio

told Cruz he left it there. Cruz indicated Martin was there and "Chiquillo went to

take the groceries to Tommy." [ER2–120-121]

### d. **Lend Him the Black One–But I Only Need Four**

That same day, Artemio using TT9 called Cruz using TT7. Artemio stated

he was going to take "[unintelligible]" to Martin. Artemio suggested lending the

black one. Cruz and Artemio discuss the amount needed. Artemio indicated "we"

or "I" only need four. Cruz and Artemio then discussed the numbers and that Cruz

would send Guero over there in the black car. [ER2–121,123]

### e. **Call El Senor**

On February 23, 2011, Artemio using TT9 called Cruz using TT7 telling

Cruz that El Senor wanted Cruz to call him. Artemio did not know what was up.

[ER2–123]

-55-

### 4. **Money Seizure**

An interception led authorities to observe a Toyota Solara leave the Cruz residence on March 1, 2011. After stopping the car, agents discovered $123,034.

### 5. **Toll Calls**

Although the TT9 subscriber used a fictitious name during registration, something that drug traffickers do, affiant admitted that legitimate users might also do this. Although over 4,000 phone calls had been made to over 200 different phone numbers, these occurred over a 66-day period. Approximately 72 of these numbers were Mexican-based. [ER2–126] Artemio was a native Mexican and phone calls to Mexico would not be unusual.

Eighty-eight phone calls were placed to David from TT9. Affiant sited a TT7 call where Cruz told David to tell Mayra to withdraw narcotics proceeds from the bank. It is doubtful that Cruz referred to the money as "narcotics proceeds."

### G. **Lack of Probable Cause to Support the TT9 Authorization**

Affiant claimed that Artemio was a facilitator of the Cruz DTO and worked at Cruz's direction. Agents thought he lived with Cruz. Agents alleged that "Cruz is discussing some of the DTO's activities with Artemio in person." Affiant also believed that Artemio was "contacting members, customers, and/or other possible sources of supply of the DTO who are not in contact with Cruz over Target

Telephone 7 or Target Telephone 8." [ER2–128]

Despite these conclusions, there was insufficient evidence set forth in the TT9 affidavit to support affiant's claim that business was being discussed over TT9 that was not being discussed over TT7 or TT8. Nor was there a substantial basis provided in the affidavit to conclude that Artemio was contacting members, customers and possible sources of supply using TT9 that were not contacting Cruz over TT7 or TT8. [ER2–128]

The TT7 affidavit, dated January 24, 2011, never mentioned Artemio. Nor did it suggest that he lived with Cruz. The belief that he lived with Cruz, and was involved with his drug business, was of recent vintage. Artemio remained unidentified during surveillance. The TT9 affidavit's best evidence of Artemio's involvement with the DTO were the five phone calls.

Artemio challenged the reliability of their interpretation and meaning in the court below. Artemio submitted affiant's opinion evidence of their meaning was not entitled to any weight because there was no evidence that affiant was familiar with Spanish colloquialisms. Some of these conversations, even if one assumed they contained coded drug terms, were nonsensical. It was not simply the typical substitution of coded words in place of "drugs", "money", locations or names. The papers in the stove conversation in particular, he argued, made no sense.

Even the "drug quantity" conversation fell into this category. No pole camera footage or surveillance was referenced and no tracking devices were used to support the affiant's conclusory interpretations. The translation was unreliable because of inaccurate translation, regional speech differences or some other reason. The court should not have relied upon these translations as a substantial basis for finding probable cause.

Artemio's challenge is supported by the affiant's own words of how the content of the five conversations were interpreted. The reported conversations were based on call summaries. Almost all intercepted calls were conducted in Spanish. "The Spanish conversations were summarized in, and in some instances translated to, English by Spanish-speaking translators under the supervision of DEA agents. For the purpose of this Affidavit, quotation marks have been placed around statements taken directly from these English-language translations and line sheet summaries." The affiant, based on his training and experience and knowledge of the investigation, interpreted the drug-related content of the calls set forth. [ER2–106]

It is unclear from the affidavit whether these conversations, including those statements that were contained in quotation marks, were the actual translated words of the speaker or a mere translation of the agent's summary of the call.

-58-

Finally, the <u>Cervantes</u> case emphasized that ordinary everyday conduct and occurrences cannot be considered criminal conduct without providing a background or foundation as to why seemingly innocent conduct is in fact of a criminal nature. <u>United States v. Cervantes</u>, 703 F.3d 1135 (9th Cir.2012). Artemio argued below that his giving directions in the background, and later on the phone, to someone trying to meet was innocent conduct on his part. Other than the conversation, the meeting was never observed and no one was stopped with contraband. The affidavit does not explain why it was criminal conduct for Artemio to call Cruz to inform him that El Senor wished to speak with him. Although the affiant interpreted the "take groceries to Tommy" conversation to reference contraband, there was no surveillance or stop to coincide with this seemingly innocent conversation, nor did affiant explain that this word had been previously used in other Cruz DTO conversations to mean some sort of contraband.

## H. <u>Conclusion</u>

There was no substantial basis for the issuing court's finding of probable cause as to all three requirements mandated by 18 U.S.C. § 2518(3). The district court abused its discretion in determining that the issuing court had a substantial basis for it findings of probable cause.

Artemio objected to the validity of the TT9 wiretap authorization and the admission of wiretapped conversations at trial. [CR 404,ER1–1; CR492,ER1–3-4,41-42;CR499,ER1–44-45;CR496,ER1–46-61]  These conversations were instrumental to his conviction on all counts and was not harmless error.

Even if the TT9 wiretap authorization was valid, if the TT7 wiretap authorization was invalid, Artemio is entitled to the same relief since the TT9 authorization was based mainly on those conversations seized pursuant to the TT7 wiretap authorization.  As fruit of the poisonous tree, all conversations admitted at trial pursuant to both authorizations would be suppressed.  18 U.S.C. § 2515; United States v. Carneiro, 861 F.2d 1171, 1183 (9th Cir.1988); United States v. Spagnuolo, 549 F.2d 705, 711-712 (9th Cir.1977).

Artemio's convictions should be reversed, his sentences vacated and his case dismissed with prejudice.

If this Court cannot determine the suppression's effect on the counts of conviction, then the case should be remanded to the district court for this determination.

## ARGUMENTS THREE AND FOUR

### I. Standard of Review

Whether a wiretap application incorporates a full and complete statement of facts supporting its compliance with 18 U.S.C. §2518(1)(c) is reviewed *de novo.* United States v. Rivera, 527 F.3d 891, 898 (9th Cir.2008).

Exhaustion of investigative procedures or why they reasonably appear not likely to succeed is reviewed *de novo.* United States v. Lynch, 367 F.3d 1148, 1159 (9th Cir.2004).

A necessity finding is reviewed for abuse of discretion. United States v. Lynch, 437 F.3d 902, 912 (9th Cir.2006)."

Underlying factual determinations are reviewed for clear error. United States v. Shryock, 342 F.3d 948, 975 (9th Cir.2003).

### II. Points and Authorities

#### A. Background and Objective of the Investigations

The TT7 affidavit consisted of 80 pages. The TT9 affidavit contained 49 pages. Both of these affidavits were similar as set forth in the Statement of Facts. They contained much of the same historical and current investigation information although the TT9 affidavit eliminated some of the historical Castro-Perez information. The necessity sections are likewise almost identical with a section-

by-section comparison made in the Statement of Facts. The TT9 affidavit added the content of additional telephone calls that were captured pursuant to the TT7 wiretap along with an update of pole camera and physical surveillance.

Both affidavits claimed TT7 and TT9 wiretap interception was the only way of accomplishing the government's goal of dismantling the entire organization and building a prosecutable case. [ER2–16-17,51,108-109,129]

The Castro-Perez investigation produced a substantial amount of evidence that Castro-Perez was trafficking drugs in the Phoenix area. Wiretaps on Castro-Perez's phones allowed agents to learn about his sources, associates, customers and methods.

### B. Necessity

#### 1. Statutory Requirements to Prove Necessity

"Congress was well aware of the grave threat to the privacy of every American that is posed by modern techniques of electronic surveillance. . . ." United States v. King, 478 F.2d 494, 503 (9th Cir.1973). Wiretaps should not be resorted to by law enforcement as the first meaningful step in an investigation. United States v. Giordano, 416 U.S. 505, 515, 94 S.Ct. 1820 (1974); United States v. Gonzalez, Inc., 412 F.3d 1102, 1113 (9th Cir.2005). The Government must prove that a wiretap is "necessary" in order to overcome the statutory presumption

against this intrusive investigative method.  <u>United States v. Blackmon</u>, 273 F.3d 1204, 1207 (9th Cir.2001).  Necessity is a congressionally mandated requirement found in 18 U.S.C. §§2518(1)(c) and 2518(3)(c).  A wiretap authorization must include:

> a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. §2518(1)(c).  The district court must determine whether:

> normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. §2518(3)(c).

## 2. <u>Necessity for Each Target Telephone and Targeted Conspirator</u>

The TT7 affidavit, the TT9 affidavit to a lesser extent, included pages of information about the Castro-Perez investigation.  Many people were stopped, search warrants were served, Castro-Perez and his DTO were surveilled and large quantities of drugs and cash were seized.  The affiant used the success of the Castro-Perez wiretap interceptions over TT1 through TT3 and the Aviles-Contreras interceptions over TT5 and TT6 to help justify the need for wiretap authorizations for TT7 and TT9.  [ER2–50-52;ER2–129-130]

An issuing court may not examine various wiretap affidavits together when

-63-

deciding whether a new application meets the statutory necessity requirements.

United States v. Gonzalez, Inc., 412 F.3d 1102, 1115 (9th Cir.2005); United States v. Carneiro, 861 F.2d 1171, 1181 (9th Cir.1988). The sufficiency of each wiretap application is based on its own merits. This is so even in conspiracy cases. The Ninth Circuit has held that even if the Government is investigating a conspiracy each conspirator must be individually investigated before seeking to wiretap that conspirator's telephone. The Government must prove necessity for each target telephone and each targeted conspirator. United States v. Carneiro, 861 F.2d 1171, 1181-1183 (9th Cir.1988).

The necessity for a previous wiretap cannot be transferred or used to justify the necessity for a subsequent one. United States v. Carneiro, 861 F.2d 1171, 1181-1183 (9th Cir.1988).

Although agents had conducted a substantial investigation into the activities of Castro-Perez, the investigative techniques used in his investigation could not be used to establish the necessity requirement mandated for both TT7 and TT9 authorizations. Likewise, the investigative techniques used to establish the requisite necessity for TT7 could not be used to satisfy the necessity required for the TT9 wiretap. In United States v. Gonzalez, Inc., 412 F.3d 1102, 1115 (9th Cir.2005), the Court reached the same conclusion. A substantial investigation

using failed traditional investigative methods into illegal activity occurring at

Phoenix and Tucson bus terminals, could not be used to justify the need for a

wiretap of Los Angeles co-conspirators' phones after a very brief and limited

investigation into their involvement took place.

Based on this rationale, the necessity required for the wiretap of Cruz's or

Artemio's phones could not be established by the Castro-Perez investigation. Nor

could the necessity requirement for the TT9 wiretap be furnished by the necessity

established for TT7.

### 3. Investigative Procedures Must Be Tried for a Reasonable Period

In order to find there is a necessity for the issuance of a wiretap order the

court must determine whether law enforcement, while using a normal amount of

resources, failed to make the case within a reasonable period of time. United

States v. Bennett, 219 F.3d 1117,1122 (9th Cir.2000). Officials need not exhaust

every conceivable investigative technique before obtaining a wiretap. United

States v. Carneiro, 861 F.2d 1171, 1178 (9th Cir.1988); United States v. Commito,

918 F.2d 95, 98-99 (9th Cir.1990).

Authorities did not adequately exhaust investigative measures and those

techniques it did employ were not used for a reasonable amount of time to give the

investigation a chance to succeed before tapping into his phone. The issuing court

-65-

erred in finding necessity and the district court abused it discretion in denying the motion to suppress.

### a. Cruz Investigation

The Cruz investigation commenced in late August or early September, 2010, and lasted over a five-month period.

Only five conversations between Cruz, using TT7, and Castro-Perez, using TT3, were reported in the affidavit. These occurred on September 1, 2010, and October 8 and 11, 2010, and were captured over the Castro-Perez TT3 wiretap.

Pole cameras were not installed at Cruz's Orange Blossom residence until October 26, 2010, and even later, on December 21, 2010, at 82nd Lane, and December 30, 2010, at the Hazelwood house.

The only physical surveillance of the DTO members occurred on seven days over a five-month long investigation. An analysis reveals that the first three days' worth of surveillance occurred on September 1, 6 and 15, 2010, as authorities were tracking Castro-Perez's movements and Cruz intersected with those movements. The November, 3, 2010, and January 3, 4 and 7, 2011, surveillance actually concentrated on Cruz and the activities surrounding him. Telephone tracking warrants were obtained for TT7 on November 3, 2010, and again on January 4, 2011. A mobile number recorder authorization was obtained on

December 7, 2010.  The toll records and subscriber information for TT7 were finally obtained through an administrative subpoena on January 10, 2011, a mere two weeks before the wiretap authorization was approved. The subscriber information revealed that TT7 was not activated until October 3, 2010.

Although the Government need not exhaust all possible investigative techniques before seeking a wiretap authorization, the methods it does employ must be used for a reasonable period.  United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir.2000).

The Government claimed the investigation of Cruz's DTO started at the end of August, 2010.  Most of the investigative techniques relied upon to justify interception of TT7 occurred much closer to the January 24, 2011, authorization date.  Affiant acknowledged these techniques were successful in producing evidence of criminal activity but not in the Government's lofty goal of dismantling the entire organization and successfully prosecuting all participants.  This delay in implementation created a much shorter period that these methods were used to determine if they would achieve a realistic goal.  Had these methods continued for a reasonable period of time, a wiretap on TT7 likely was unnecessary.

### b. **Artemio Investigation**

Artemio's name was never mentioned in the TT7 affidavit.

The first awareness agents had of Artemio, according to the TT9 affidavit, is the February 10, 2011, phone call to Cruz where Artemio provided directions. Within the next three days, Artemio was a party to three wiretapped TT7 conversations with Cruz, the "put papers where the stove is" call (February 11, 2011), "Chiquillo took the groceries to Tommy" call (February 13, 2011); and the "lend him the black one–but I only need four" call (February 13, 2011). Shortly thereafter, on February 17, 2011, agents obtained a telephone tracking warrant for TT9, a phone Artemio had used to make the above-referenced telephone calls. This phone, according to affiant, was located on four occasions in February at Cruz's residence and once near the 82nd Lane address. Finally, on February 23, 2011, agents intercepted Artemio's "call El Senor" call. This is the information specifically referencing Artemio's activity contained in the TT9 affidavit.

On March 15, 2011, the TT9 authorization was ordered. It is unknown to appellant how long before this date the Government sought approval from the Department of Justice to seek this authorization.

The entire investigation of Artemio's activities took place over twenty days in February, 2011. Surveillance did occur during this time period; however, not all of it was focused on determining Artemio's identity or role. The February 1, 3 and 7, 2011, surveillance occurred before the first February 10, 2011, "give me

directions" phone call. The remaining surveillance occurred on February 10, 17, 22, 24, 2011, and March 1, 2011. Artemio was never identified during this surveillance. On February 17, 2011, authorities obtained a tracking warrant for TT9. The telephone tracking device eventually reported that on February 17, 21, 24 and 26, TT9 was located at Cruz's San Miguel residence and that on February 25, TT9 was found in the area of the 82nd Lane house. A mobile number recorder was obtained in February, as well. Agents obtained the subscriber information and toll records of Artemio's phone sometime in February. These records were analyzed as of February 25, 2011.

The investigation of Artemio, per the TT9 affidavit occurred within a one-month period. As with the Cruz affidavit, Artemio maintains that those limited methods used to investigate him were not employed for a reasonable amount of time before authorities went to the court on March 15, 2011, seeking a TT9 wiretap authorization.

### 4. Effective Traditional Investigative Techniques not Employed

Both affidavits, as set forth in the Statement of Facts, gave similar justifications for the non-use of various normal investigative techniques.

In order to demonstrate that normal investigative techniques, that were not used in an investigation, would not likely have succeeded, the Government must

"allege specific circumstances that render normal investigative techniques particularly ineffective." United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir.1985). These circumstances must include facts specific to each individual application and targeted individual, to establish the extraordinary need to eavesdrop on private citizens' conversations. Boilerplate assertions and conclusory allegations will not suffice. U.S. v. Blackmon, 271 F.3d 1204, 1207 (9th Cir.2001). Also, an affidavit's broad objectives cannot be used to validate what would otherwise be an unnecessary wiretap. United States v. Blackmon, 273 F.3d 1204, 1210 (9th Cir.2001).

No confidential sources were developed, no attempt to use undercover agents to penetrate the organization and no attempt to obtain consensual recordings were tried in the Cruz or Artemio investigations. Affiant justified the non-use of these normal investigative methods as follows. Since "high-level" traffickers like Cruz and Artemio were exclusive, close knit and secretive, it would take an extended period for an undercover agent to establish a reputation allowing penetration. More aggressive attempts to penetrate the group might arouse suspicion, compromise the investigation and endanger the undercover operative's safety. [ER2–56-57,131]

Cruz's DTO's characterization as being closeknit and secretive fits the

description of the typical DTO and is a usual trait of a DTO. The possibility that an attempted infiltration might disclose the investigation was a risk common to all. Without additional facts, such as the relationship between the DTO participants, instances of conduct during surveillance or comments during interception, establishing why this DTO would be more difficult to penetrate than any other, the affiant failed to show that his conclusory allegations, that these traditional investigative techniques would be any less effective against this organization than any other, had merit.

The omnipresent risk to an undercover operative is a possibility in any DTO related investigation. Both affidavits concluded that certain investigative procedures were too dangerous to try. [ER2–57,131] This claim does not allow the rejection of normal investigative techniques in every DTO case. To prove danger, the affiant must explain why this particular DTO is more dangerous than others. Is the affiant aware of killings of informants or suspected snitches? Have threats been made? Have guns or weapons been observed during surveillance? Have the monitored phone calls mentioned any type of threats or violence? Was there a violent gang involved? None of this type of information appeared in either affidavit.

The justification presented, for not using undercover agents without

-71-

providing specifics as to why this particular group would be harder to penetrate or was more dangerous than other DTOs, was conclusory and insufficient to justify why these traditional investigative techniques were not employed.

Agents failed to use pen registers or trap and trace devices before applying for authorizations for either line. Affiant acknowledged, in both affidavits, that these were valuable investigative tools. However, these devices, according to affiant, were of limited use in the instant investigations because they did not identify the caller, pinpoint his location or disclose the content of the conversation. [ER2–71,143]

These devices do provide real-time information which would allow an investigator to coordinate surveillance activities at crucial moments. However, this invaluable tool was not used since toll records, according to affiant, provided the same information. But the agents did not request the toll records until after January 9, 2011, (over five months after the Cruz investigation supposedly started) per the TT7 affidavit, and until February 25, 2011, (at the end of the Artemio investigation) per the TT9 affidavit. Had pen register/trap and trace devices been used, agents would have access to this important information in real time–an important step an investigator should take in building a case to avoid resorting to the intrusive invasion of one's privacy.

No search warrants were served during the TT7 and TT9 investigations. The affiant in both affidavits indicated that narcotics were kept at stash houses for brief periods of time and only a fraction of the drugs would likely be found during a search warrant. It was premature to serve them in the instant case and would jeopardize the investigation.

At the same time, affiant in the same section of the TT7 affidavit, reported about the July 28, 2011, search warrant served on Castro-Perez's prior stash house that discovered $118,156, and the November 11, 2010, search of the Aviles-Contreras stash house that found $1,881,190. High-level drug dealers do keep significant amounts of contraband in their residences.

Although Castro-Perez was alerted to his investigation by numerous searches taking place at his residence and of his customers/couriers, as early as June, 2010, he did not disappear, until late October, 2010, after a vehicle was stopped after leaving his Poinsettia stash house. Again, the affiant's reluctance to use this investigative tool, based on the four corners of the affidavits, is contradicted by the information that was provided in the same affidavit. Search warrants can be and were an effective investigative tool.

Affiant in the TT7 and TT9 affidavits admitted that no trash searches had been conducted at any of the residences because criminals place trash out shortly

before pickup and dispose of incriminating evidence away from the residence. This is a broad generalization. Trash cans do contain items other than contraband. Searches can reveal paperwork that identify people, places they may work at, or frequent. Names of people they know or associate with may be thrown away. Bills or even junk mail can lead to an identification. Although officers observed trash cans outside several of the residences during surveillance, no attempt to search the cans occurred. On three of the days, at the Orange Blossom address, they refused to search because it was daylight and on the fourth occasion, they thought the can might belong to a neighbor. At another residence they did not search because the trash can could be seen from the door. This lack of effort seems unreasonable. No security cameras were mentioned. Except for the one residence, no windows or doors were described as overlooking the garbage can. Agents could have taken the trash can at night or sought the city's help with removing the trash can or replacing it with a like trash can. The failure to pursue the trash seems unreasonable particularly when identifying individuals was of paramount importance.

Although affiant mentioned checking property records and telephone records, at no time did the affiant indicate an attempt to obtain utility, electric, gas, cable television or internet records for the suspected residences. Surveillance

observed individuals going to banks, stores, restaurants and gas stations. There is

no indication that any attempt was made to discover if the suspected subjects were

using some form of identification to use or purchase any items.

Authorities did not use traffic stops in the Cruz investigation stating that

this normal investigative technique would alert the DTO to its investigation. The

only information put forth in the affidavits in this regard proved quite the opposite.

Thousands of dollars and kilos of drugs were seized in the Castro-Perez

investigation before Castro- Perez disappeared. Traffic stops can also be used to

identify subjects, something the affiant claimed authorities were reluctant to do in

the Cruz DTO investigation in fear of alerting the targets. Again, the only facts

contained in the affidavit, regarding a traffic stop to identify someone, proved

quite the contrary. Castro-Perez was identified during a traffic stop.

After months of investigating Cruz, affiant informed that no financial

investigation had occurred. Admitting the availability of a wide variety of

investigative techniques, including a review of public records concerning property

ownership, the issuance of subpoenas for bank and credit card information and a

review of financial records and checks through the Financial Crimes Enforcement

Network to determine the nature of suspicious financial transactions, affiant

preferred to wait until Cruz DTO members were more fully identified before

employing these methods.  While admitting that wire intercepts had identified two

bank accounts associated with the Cruz DTO believed to contain drug proceeds,

no investigation would occur.  This position regarding a readily available and

common investigative technique seems unreasonable.

## IV.  Conclusion

These justifications for not-using these normal investigative techniques

applied to most DTOs.   Describing the inherent limitations of investigative

techniques is insufficient to justify the failure to employ them in the first place.

United States v. Blackmon, 273 F.3d 1204, 1210 (9th Cir.2001).

Wiretap affidavits must provide specifics and not rely on vague generalities

to justify why normal investigative techniques were not employed.  Rather than

describing why these techniques are not optimal–because only a wiretap provides

content to allow the government to reach its goal of prosecuting all members of

the DTO–the affidavit must show why they would not work in this particular case.

Artemio submits that the Government failed to comply with the necessity

requirements set forth in 18 U.S.C. §§ 2518(1)(c) and 2518(3)(c).  The

Government did not prove, based on the four corners of each wiretap affidavit,

that the investigative methods that it used were employed for a reasonable period

of time.   It also failed to prove, based upon the information contained in its

-76-

affidavits, that the normal investigative techniques that were not used in the investigation would not likely succeed.   For these reasons, the district court abused its discretion in denying the motion to suppress.

Appellant raised an objection to the validity of the wiretap authorizations and the admission of numerous wiretapped conversations at trial.  These conversations served as the basis for appellant's conviction on all counts and did not constitute harmless error.  18 U.S.C. § 2515; United States v. Carneiro, 861 F.2d 1171, 1183 (9th Cir.1988); United States v. Spagnuolo, 549 F.2d 705, 711-712 (9th Cir.1977).

Artemio requests that his convictions be reversed, his sentences vacated and his case be dismissed with prejudice.  In the event the Court is unable to determine the effect of suppression on the various counts of conviction, the case should be remanded to the district court for this determination.

## ARGUMENT FIVE

## I.  Standard of Review

Issues not raised before the district court are reviewed for plain error.  Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 730-36, 113 S.Ct. 1770, 1775-1779 (1993); United States v. Pelisamen, 641 F.3d 399, 404 (9th Cir.2011).

## III.  Points and Authorities

A sentence is not final until completion of direct review.  Williams v. United States, 651 F.2d 648, 650 (9th Cir.1981).

Pena-Torrecillas's offenses involved a marihuana equivalency of 44,359. Level 38 was the applicable base offense level.  U.S.S.G. § 2D1.1(c)(1)(2010).

The Sentencing Commission lowered the base offense levels for most federal drug trafficking offenses in April, 2014.  In July, 2014, it made this change retroactive.  Amendment 782 became effective on November 1, 2014, during the pendency of this appeal.

Title 18 U.S.C. §3582(c)(2) mandates the procedure a sentenced person must follow in seeking relief pursuant to the amendment.  First, the court must determine if the person is eligible for the reduction.  Second, the court needs to consider the sentencing factors set forth in 18 U.S.C. §3553(a) and determine if a reduction would be consistent with the Sentencing Commission's policy

-78-

statements.  Finally, the court has full discretion to determine if a lowering of sentence is warranted after considering the additional factors of danger to the community and the defendant's post sentencing conduct.

Pena-Torrecillas is eligible for a retroactive sentencing reduction.  Since the marijuana equivalency of 44,359 under the revision results in a base offense level of 36, instead of 38, Pena's total offense level becomes 40, instead of 42.[5] §2D1.1(c)(2)(2014).  Under the current scheme, his Guidelines range would be reduced  from 360 months to life to a range of 292 to 360 months.  U.S.S.G. Ch.5, Pt.A. (2010) and (2014).

In United States v. Wales, 977 F.2d 1323, 1327-1328 n.3 (9th Cir.1992), the Court determined that although a substantive change to the Guidelines favorable to Wales had occurred while the case was on appeal, it would remand the case to allow the district court to determine if his sentence should be lowered in light of a Guidelines amendment now applicable to him.  While acknowledging that ordinarily a person sentenced must petition the court to seek a modification of his sentence pursuant to U.S.S.G. §1B1.10, "we see no need to force him to take this additional step."  See United States v. Connell, 960 F.2d 191, 197 n.10 (1st

---

[5] A four-level upward adjustment is added since the district court determined that Pena-Torrecillas was a leader/organizer.

Cir.1992).

**IV.  <u>Conclusion</u>**

Appellant requests that his case be remanded to the district court to allow it to determine whether he is entitled to a two-level reduction in base offense level as a result of the intervening amendment to the Guidelines.

**Revised Form 6.   CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1.    This brief does not comply with type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because:

⊠    this brief contains 14,961 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

**2.    This brief complies with the Order filed on August 12, 2015, that allows an opening brief of not greater than 15,000 words to be filed.**

3.    This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because:

⊠    this brief has been prepared in a proportionately spaced typeface using WordPerfect X6, with font size 14, Times New Roman.

*s/Nancy Hinchcliffe*
Attorney for Defendant-Appellant
September 9, 2015

## <u>STATEMENT OF RELATED CASES</u>

Five individuals were indicted in this case. Only two of the defendants appealed their case to this Court. In addition to Appellant Pena-Torrecillas, Francisco Torrecillas-Torres, No. 13-10316, appealed. On June 27, 2014, this Court filed its Memorandum Opinion and the appeal was dismissed.

As of this date, there are no related cases on appeal arising out of the same district court case number.

Dated September 9, 2015.

-82-

## **CERTIFICATE OF SERVICE**

I certify that on September 9, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, to Artemio Pena-Torrecillas, Register No. 36541-308, USP Atwater, U.S. Penitentiary, P.O. Box 019001, Atwater, California, 95301, a non–CM/ECF participant.

Dated this 9th day of September, 2015.

s/ *Nancy Hinchcliffe*
Nancy Hinchcliffe
5025 North Central Avenue, # 616
Phoenix, Arizona 85012-1505
Attorney for Defendant-Appellant

-83-